## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

Sensa Verogna,

     Plaintiff,

     v.

Twitter, Inc.,

     Defendant.

Case No. 1:20-cv-00536-SM

## TWITTER, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION TO DISMISS OR, ALTERNATIVELY, TRANSFER

### I.      INTRODUCTION

After repeated warnings about his conduct, Plaintiff Sensa Verogna ("Plaintiff") was suspended from Defendant Twitter, Inc.'s ("Twitter") online platform because he posted numerous abusive and harassing Tweets from his account @BastaLies (the "Account"). Plaintiff, for example, posted the following message:

> *"[i]f I had special powers I would reach through that video and Bitch slap that commie Bitch who is yelling like a 3-year old!!!"*

Plaintiff now attempts to claim that Twitter suspended his account not because of his numerous violations of Twitter's rules of conduct, but because he is white. Those claims should be dismissed.

As an initial and dispositive matter, Plaintiff's claims are barred by Section 230 of the Communications Decency Act ("CDA") ("Section 230") and by Twitter's own First Amendment rights. Section 230 immunizes companies like Twitter against claims based on their decision to

publish or—as here—decline to publish content created by third parties. And the First Amendment bars Plaintiff's claim because it protects Twitter's right to "exercise [] editorial control and judgment" over the content that flows through its platform. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

While Plaintiff's claims should be dismissed on those bases alone, Plaintiff's claims also suffer from various other fatal deficiencies. With respect to his discrimination claims, Plaintiff alleges no facts that hint at any racially discriminatory conduct.[1] To the contrary, Plaintiff cannot allege that Twitter even knew his race, given that his account operated pseudonymously and Twitter does not require its users to submit any information about their race. Twitter transparently communicated to Plaintiff its suspension decisions, with each suspension (and subsequent appeal) being supported by Twitter's rules and evidence of Plaintiff's violations thereof. More, Plaintiff cannot show that Twitter is a "place of public accommodation," as required to sustain a claim under applicable federal or state law. Finally, Plaintiff's public accommodation claim under New Hampshire law should be dismissed based on his failure to exhaust administrative prerequisites.

With respect to his constitutional claim, Plaintiff cannot overcome the necessity of state action, as Twitter is a private company. Every court to review the issue has come to that same, inexorable conclusion.

---

[1] While Plaintiff also infers, without factual support, that Twitter discriminated against him on the basis of his political affiliations, none of the statutes under which he brings his claims can sustain a claim of political affiliation discrimination. *See Keating v. Carey*, 706 F.2d 377, 383–84 (2d Cir. 1981) ("§ 1981, however generously construed, does not prohibit discrimination on the basis of political affiliation"); 42 U.S.C. § 2000a (listing only "race, color, religion, or national origin" as protected categories); *Lincoln v. Mendler*, No. CV 18-4542, 2018 WL 4205421, at *2 (E.D. La. Sept. 4, 2018) (dismissing § 2000 a claim based on alleged "discrimination against 'openly conservative and traditional' viewpoint"); N.H. RSA 354-A:17 (listing only "age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin" as protected categories). Therefore, any such claim.

Because Plaintiff does not, and cannot, allege a cause of action based on anything other than Twitter's protected decisions regarding content on its platform, his claims can neither survive nor be cured, and should be dismissed with prejudice. Alternatively, if the Complaint is not dismissed entirely with prejudice, this action should be transferred to the Northern District of California pursuant to Twitter's User Agreement, which governs the parties' relationship and the conduct alleged in Plaintiff's Complaint.

## II.      BACKGROUND

### A.      Plaintiff's Complaint and Allegations

#### 1.      Twitter and Its Platform

Twitter is an online platform that allows people all over the world to communicate through short messages called "Tweets" using unique account names called "handles." Twitter is a free, user-directed service, and account holders can find Tweets and other content in a number of ways, including by following the Twitter accounts of other users.

#### 2.      Twitter's User Agreement and Rules

In March 2019, Plaintiff signed up for Twitter using the handle @BastaLies and agreed to Twitter's User Agreement ("UA") during the signup process. Compl. (Doc. No. 1) at ¶ 12.

Twitter's UA contains several provisions regarding the suspension of accounts. For instance, the UA provides that: "We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies . . . ." *See* Compl., Ex. D-1, at § 4.[2] Twitter is also entitled to "create limits on use and storage at our

---

[2] Plaintiff relies upon and attaches as Exhibit D-1 to his Complaint the current version of the Twitter UA, which went into effect on January 1, 2020. Although Plaintiff signed up for the Account in March 2019, Compl. at ¶ 12, there are no relevant differences between the January 1, 2020 version and the May 25, 2018 version that was in place when Plaintiff registered for

sole discretion at any time," and may "remove or refuse to distribute any Content on the

Services, . . . suspend or terminate users, and reclaim usernames without liability to you." *Id.* The

UA also provides that (1) Twitter's service is provided as is, (2) Twitter is neither responsible

nor liable for the availability, security, or reliability of its service, and (3) Twitter does not

guarantee its service will be available on an uninterrupted, secure, or error-free basis.[3] As set out

by the UA, Twitter's suspension decisions are informed by the Twitter Rules, including the

Violent Threats Policy, Hateful Conduct Policy, and Abusive Behavior Policy. *See generally*

Compl., Exs. D-2, D-3, D-4.

Lastly, regarding the venue for any dispute, Twitter's UA provides that: "[a]ll disputes

related to these Terms of the Services will be brought solely in the federal or state courts located

in San Francisco County, California, United States, and you consent to personal jurisdiction and

waive any objection as to inconvenient forum." Compl., Ex. D-1, at § 6.

### 3.        Plaintiff's Conduct on Twitter Led to His Suspension

On November 7, 2019, Twitter "locked" Plaintiff's account based on its Hateful Conduct

Policy because Plaintiff posted this Tweet: "If I had special powers I would reach through that

---

Twitter. That version, which is incorporated by reference through Plaintiff's continual references
to the UA throughout his Complaint, is attached as Exhibit A to the Declaration of Jonathan Eck;
*see also* Twitter Terms of Service, http://twitter.com/en/tos/previous/version_13 (effective May
25, 2018). *Trans-Spec Truck Serv. v. Caterpillar*, 524 F.3d 315, 321 (1st Cir. 2008) (a court may
consider material incorporated by reference in a complaint).

[3] Specifically, users agree that "access to and use of the Services or any Content are at your own
risk[,]" and that Twitter's services "are provided to you on an 'AS IS' and 'AS AVAILABLE'
basis." Compl., Ex. D-1, at § 5. Twitter "DISCLAIM[S] ALL WARRANTIES AND
CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY [OR]
FITNESS FOR A PARTICULAR PURPOSE," and responsibility and liability for "availability
[or] . . . security or reliability of the Services, . . . [and] whether the Services will meet your
requirements or be available on an uninterrupted, secure, or error-free basis." *Id*. Lastly, that
Twitter "SHALL NOT BE LIABLE" for direct or indirect harm "RESULTING FROM . . .
INABILITY TO ACCESS OR USE THE SERVICES . . . [or] UNAUTHORIZED ACCESS,
USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT." *Id.*

video and Bitch slap that commie Bitch who is yelling like a 3-year old!!!" Compl. at ¶ 18(a).

That lock permitted Plaintiff to unlock his account by deleting that Tweet. Compl., Ex. F-1.

On December 2, 2019, the Washington Post's Twitter account tweeted an article entitled: "Lisa Page is a uniquely convenient target for Trump's standard practice of belittling women." Compl., Ex. F-3. And, less than a month after his threat to "Bitch slap [a] commie Bitch," Plaintiff replied to the Washington Post's Tweet with: "Ya, let's all get all cutesy with a fkcn #Traitor who should be hung if found guilty." Compl. at ¶ 18(b). In response, Twitter permanently suspended Plaintiff's account under its Hateful Conduct Policy. *Id*.

Plaintiff appealed his suspension and, after reviewing Plaintiff's appeal, Twitter confirmed the suspension based on its Abusive Behavior Policy. *Id*. at ¶ 20(b).

### 4. Plaintiff Theorizes that Twitter Suspended Him Because He Is White

On May 4, 2019, Plaintiff filed his case against Twitter, asserting violations of (1) 42 U.S.C. § 1981; (2) 42 U.S.C. § 2000a; (3) N.H. RSA 354-A:17; and (4) his constitutional rights.

Plaintiff alleges, in sum, that Twitter discriminated against him because he is white. But Plaintiff, who operated an anonymous account,[4] does not and cannot allege any facts suggesting that the suspension of the Account was racially motivated. Instead, Plaintiff concludes, without more, that because his Tweets displayed conservative tendencies, Twitter must have known he

---

[4] As part of the Complaint, Plaintiff has also moved to proceed anonymously. In determining whether to permit a litigant to proceed anonymously, courts in this district consider: (1) whether the identity of the litigant has been kept confidential; (2) the reasons disclosure is feared or sought to be avoided, and the substantiality of these reasons; (3) the public interest in maintaining the confidentiality of the litigant's identity, versus the public interest in knowing the litigant's identity; (4) the undesirability of an outcome adverse to the litigant and attributable to his refusal to pursue the case at the price of being publicly identified; (5) whether the litigant has illegitimate ulterior motives; and (6) whether the opposition to the litigant's use of a pseudonym by counsel, the public, or the press is illegitimately motivated. *See Doe v. Trustees of Dartmouth College*, No. 18-cv-040-LM, 2018 WL 2048385, at *4-5 (D.N.H. May 2, 2018) (quoting *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011)). Twitter does not take a position on Plaintiff's request, except to say that it is unclear whether the standards for proceeding anonymously have been met.

was white because "Republic and Republican-leaning voters continue to be overwhelmingly white." Compl. at ¶ 23; *see also* ¶ 96 ("it can be reasonably inferred that Twitter suspends Republicans and Conservatives not for their political view or associations, but because they are white."). Plaintiff also reasons that Twitter's rule prohibiting abuse based on race means that "race had something to do with the decision-making process" to ban his account. *Id*. at ¶ 47.

Plaintiff has not alleged facts sufficient to maintain any claims, and his claims would nevertheless be barred under the CDA, so Twitter moves to dismiss this action with prejudice.

## III.   ARGUMENT

### A.   Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). This requires Plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.; *see also Tringali v. Mass. Dep't of Transitional Assistance*, No. 12-cv-124-PB, 2012 WL 5683236, at *4 (D.N.H. Nov. 13, 2012) (dismissing pro se plaintiff's claims because "she has not pleaded sufficient facts" in support). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. And Plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

Although complaints by pro se litigants receive a "deferential reading," "bald assertions, unsupportable conclusions, … and the like need not be credited.'" *Hecking v. Barger*, No. 08-cv-490-JL, 2010 WL 653553, at *1 (D.N.H. Feb. 23, 2010) (quoting *Aulson v. Blanchard*, 83 F.3d

1, 3 (1st Cir. 1996)). Further, "pro se status does not insulate a party from complying with procedural and substantive law." *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997).

Courts can dismiss a pro se complaint with prejudice, even *sua sponte*, "[w]here the allegations in the complaint, viewed in the light most favorable to plaintiff, 'are patently meritless and beyond all hope of redemption,' *i.e.*, where it is 'crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile[.]'" *Green v. Concord Baptist Church*, 313 F. App'x 335, 336 (1st Cir. 2009) (citation omitted). This is appropriate where claims are "based on indisputably bogus legal theories or delusional factual scenarios." *Id.*; *see also Every v. Dep't of Veterans Affairs*, No. 15-cv-177-LM, 2016 WL 107947, at *1 (D.N.H. Jan. 8, 2016) (dismissing pro se complaint and explaining that "[t]he central problem with [the] complaint is that there are insufficient facts to piece together any sort of coherent narrative").

**B.    The Communications Decency Act Bars Plaintiff's Claims.**

The CDA protects Twitter from being sued for precisely the conduct alleged here: removing content created by third parties such as Plaintiff. Plaintiff's lawsuit must therefore be dismissed with prejudice. *See* 47 U.S.C. § 230(c)(1); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-22 (1st Cir. 2007) ("*Lycos*").

Section 230(c)(1) of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230's preemption provision further states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Under the CDA, a suit that seeks to block "[a]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under

7

Section 230." *Fair Hous. Council of San Fernando Valley v. Roommates.com*, *LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) ("*Roommates*"). Therefore, courts apply CDA immunity broadly "to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Id.* at 1175. Indeed, First Circuit courts take an expansive view of Section 230's protections and the immunity that it confers on providers like Twitter. *Lycos*, 478 F.3d at 419. That expansive Section 230 protection is critical to avoid the "obvious chilling effect" on speech that intermediary liability would impose on internet platforms such as Twitter. *Id.* at 418-19 (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)).

CDA immunity applies so long as a provider can establish that it is (1) an interactive computer service, (2) the content was created by another "information content provider, and (3) the claims treat the provider as the "publisher" or "speaker of the content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009) (citation omitted). Here, Twitter is (1) an "interactive computer service," (2) the Tweets were created by other "information content providers," and (3) Plaintiff's claims treat Twitter as the "publisher" or "speaker" of the Tweets.

Moreover, Plaintiff's discrimination and civil rights claims do not fall within an exception to CDA immunity. *See, e.g.,* 47 U.S.C. § 230(e)(1)-(5) (listing five exemptions not relevant here); *King v. Facebook, Inc.*, No. 19-CV-01987-WHO, 2019 WL 4221768, at *5 (N.D. Cal. Sept. 5, 2019) (Section 1981 claim brought by user against Facebook for allegedly racially discriminatory removal barred by CDA immunity); *Brittain v. Twitter, Inc.*, No. 19-cv-00114-YGR, 2019 WL 2423375, at *2 (N.D. Cal. June 10, 2019) (illustrated *infra*). Indeed, "what matters is not the name of the cause of action—[but] whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of the content provided." *Barnes*, 570 F.3d at 1101-02. "[C]ourts must ask whether the duty that the plaintiff alleges the

8

defendant violated derives from the defendant's status or conduct as a publisher or speaker. If it does, section 230(c)(1) precludes liability." *Id.* (citations omitted).

Accordingly, as discussed below, CDA immunity bars Plaintiff's lawsuit against Twitter.

**1.      Twitter is an interactive computer service.**

An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ." 47 U.S.C. § 230(f)(2). An "access software provider" is a "provider of software … or enabling tools that … filter, screen, allow, or disallow content; [] pick, choose, analyze, or digest content; or [] transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." *Id.*, § 230(f)(4).

As numerous courts have found, Twitter easily meets the definition of an "interactive computer service" because it provides a service that enables users to communicate on an online platform. *See, e.g.*, *Mezey v. Twitter, Inc.*, No. 1:18-CV-21069-KMM, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018) (holding that Twitter is an interactive computer service); *Brittain*, 2019 WL 2423375 at *2 (granting Twitter's motion to dismiss under the CDA); *Dehen v. Does 1-100*, No. 17cv198-LAB (WCG), 2018 WL 4502336, *3 (S.D. Cal. Sept. 19, 2018) (same); *Frenken v. Hunter*, No. 17-cv-02667-HSG, 2018 WL 1964893, *2 (N.D. Cal. Apr. 26, 2018) (same); *Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 104 (D.D.C. 2016) (same).

**2.      The content was posted by another information content provider.**

It is also beyond dispute that Twitter did not create the relevant content. Instead, Plaintiff identifies Tweets that he created. Therefore, Plaintiff is the "information content provider" under the CDA. 47 U.S.C. § 230(c)(1); *accord Sikhs for Justice "SFJ," Inc.v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1094 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526 (9th Cir. 2017) ("third-party

content" is "content created entirely by individuals . . . other than the interactive computer service provider") (citation omitted); *see also Gavra v. Google, Inc.*, No. 5:12-CV-06547-PSG, 2013 WL 3788241, at *2, n.22 (N.D. Cal. July 17, 2013) (Google not an information content provider where it was "undisputed" that the content was created by a third-party).

### 3.    Plaintiff's claims treat Twitter as a publisher.

Plaintiff's claims seek to hold Twitter liable for performing a publisher's traditional editorial functions, specifically, decisions about whether to remove or leave up third-party content. *See, e.g., Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338, 346 (D. Mass. 2017), *aff'd*, No. 17-1898, 2018 WL 17558, *aff'd*, 887 F.3d 542 (1st Cir. 2018) (citing *Lycos*, 478 F.3d at 422); *Roommates*, 521 F.3d at 1170-71 (removal decisions relating to third-party content are "perforce immune under section 230"); *Brittain*, 2019 WL 2423375 at *3 (citing the same); *see Barnes*, 570 F.3d at 1103 ("[R]emoving content is something publishers do").

In *Brittain*, for example, the plaintiff (a political candidate) brought a number of claims against Twitter relating to deletion of his account. *Brittain*, 2019 WL 2423375, at *3. In opposing Twitter's motion to dismiss on CDA grounds, the plaintiff argued that Twitter did not act as a publisher in removing his account because Twitter's platform is a public forum, and Twitter's only appropriate role is as a participant in that forum. *Id.* The court agreed with Twitter that the plaintiff's claims arising from deletion of his account, including purported violations of the First Amendment, "'ultimately arise from Twitter's alleged decision to suspend'" the plaintiff's accounts and therefore sought "to treat Twitter as a publisher under the CDA." *Id.*

As all three requirements for CDA immunity are met, Plaintiff's claims are barred. *See, e.g., King*, 2019 WL 4221768 at *5; *Brittain*, 2019 WL 2423375, at *2. And because Plaintiff cannot plead around CDA immunity, Plaintiff's Complaint should be dismissed without leave to

amend. *See, e.g.*, *Frenken*, 2018 WL 1964893 at *4 (dismissing *pro se* plaintiff's complaint against Twitter without leave to amend because the claims were barred by the CDA); *Mezey*, 2018 WL 5306769 at *1-2 (same); *Dehen*, 2018 WL 4502336 at *4 (same).

## C.    The First Amendment Bars Plaintiff's Claims.

Plaintiff's claims are also barred by the First Amendment. Twitter has a constitutionally protected right to decide which speech to allow on its platform. *See, e.g.*, *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 630–31 (D. Del. 2007) (claims dismissed against Google for its "editorial decisions" regarding third-party content as precluded by the First Amendment and CDA); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (collecting cases and holding that Facebook has a "First Amendment right to decide what to publish and what not to publish on its platform"); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 435 (S.D.N.Y. 2014) (dismissing case where relief sought would violate search engine's First Amendment rights).[5] Therefore, under the First Amendment, Twitter cannot face liability for its decisions about what speech to allow (or not) on its service and platform, and because Plaintiff cannot cure this fundamental flaw through amendment, his claims must be dismissed with prejudice.

## D.    Plaintiff Fails to Plead Any Viable Claims.

Plaintiff's Complaint also fails as a matter of law and should be dismissed with prejudice for the additional reason that Plaintiff has not and cannot state a claim for alleged discrimination or violation of his constitutional rights.

---

[5] Other content hosts, such as cable TV operators and newspapers, receive this protection. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994) ("[B]y exercising editorial discretion over which stations or programs to include in its repertoire, cable programmers and operators seek to communicate messages on a wide variety of topics and in a wide variety of formats.") (internal quotation marks and citation omitted); *Miami Herald Pub. Co.*, 418 U.S. at 258 (newspaper not required to publish op-ed columns it disagrees with).

1.	**The Court Should Dismiss Plaintiff's Section 1981 Claim.**

To state a claim under 42 U.S.C. § 1981, Plaintiff must show that (1) he is a member of a racial minority; (2) the defendant discriminated against him on the basis of race; and (3) the discrimination implicated one or more of the activities listed in the statute, including the right to make and enforce contracts. *Hammond v. Kmart Corp.*, 733 F.3d 360, 362 (1st Cir. 2013). Plaintiff has not alleged facts sufficient to state a Section 1981 claim.

a.	**Plaintiff has not pleaded facts supporting a claim that Twitter discriminated against him.**

As a preliminary matter, Plaintiff has not pleaded any facts to establish Twitter's termination of the Account was "purposefully discriminatory [] and racially motivated." *Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1988). "[A] plaintiff bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (Mar. 23, 2020) (dispensing with plaintiff's argument that it need only meet the lesser "motivating factor" test). "[W]hile the materials the plaintiff can rely on to show causation may change as a lawsuit progresses from filing to judgment, the burden itself remains constant." *Id.* at 1014-15. "Conclusory allegations of generalized racial bias do not establish discriminatory intent," and they are not taken as true. *King v. Friends of Kelly Ayotte*, 860 F. Supp. 2d 118, 128 (D.N.H. 2012) (quoting *Flagg v. Control Data*, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992), *aff'd* 998 F.2d 1002 (3rd Cir. 1993), cert. denied, 510 U.S. 1052 (1994)).

Moreover, several courts have held that a plaintiff's political beliefs are not protected by Section 1981. *See, e.g., Dartmouth Review v. Dartmouth Coll.*, 709 F. Supp. 32, 37 (D.N.H. 1989) ("Even if the Review's actions were perceived by certain members of the Dartmouth community to be racially motivated, this creates an inference of bias based on plaintiffs' political convictions, not an inference of racial animus. As *Albert* makes clear, such an inference does not

support a claim for relief under section 1981."). This is so even where a plaintiff argues that a political belief is one "favored by" a particular racial minority. *Albert*, 851 F.2d at 573 ("There is no authority . . . to support the proposition that a non-minority plaintiff may bring a Section 1981 action for retaliation by another as a consequence of the plaintiff's support of political or other causes favored by minorities.").

Finally, courts can and do dismiss claims of racial discrimination where there is no evidence that the defendant was aware of the plaintiff's race. *See, e.g.*, *Drake v. Mitch Rosen Extraordinary Gunleather, LLC*, No. 16-CV-527-JL, 2017 WL 1076396, at *5 n.2 (D.N.H. Jan. 17, 2017) (dismissing claims under Section 1981 and Title II where plaintiff alleged that his only communications with defendant were "by mail, by e-mail, and over the telephone," such that "there appear[ed] to be no factual basis for his conclusory assertion that [defendant] understood that [plaintiff's] race was African American.").

Here, Plaintiff alleges no facts that his race was the cause of his suspension from Twitter. In fact, Plaintiff has not even alleged any facts to suggest that Twitter knew his race, given that his Twitter account was pseudonymous and Twitter does not require accountholders to submit any information identifying their race. All of Plaintiff's allegations with respect to race are conclusory. *See, e.g.,* Compl. at ¶ 14 ("Twitter banned Sensa from using many of the services offered at Twitter.com . . . due to his race."); ¶ 25 ("Twitter's Health Policies have shown to have a strong bias against and have displayed a racially discriminatory animus toward Republicans or Conservatives, who are, like Sensa, generally white."); ¶ 42 ("It's plausible to infer that Twitters [sic] Health Policy was built to find whites and not non-whites and was not designed to target non-whites which allows left leaning or liberal stuff").[6] Plaintiff must allege

---

[6] To the extent Plaintiff is suggesting that he was discriminated against, not for his race, but for his conservative beliefs, that suggestion fails for several reasons. As with his race claims, he does

more than an unfounded accusation that Twitter unfairly enforces its rules. Plaintiff fails to offer

any non-conclusory allegations that he would not have been banned but for his race.

> **2.    The Court Should Dismiss Plaintiff's 42 U.S.C. § 2000a Claim.**

Plaintiff's discrimination claim under 42 U.S.C. § 2000a ("Title II") fails as well. To state

a claim, "a plaintiff must plausibly plead that he: (1) is a member of a protected class; (2)

attempted to exercise the right to full benefits and enjoyment of a place of public

accommodations; (3) was denied those benefits and enjoyment; and (4) was treated less

favorably than similarly situated persons who are not members of the protected class." *Drake*,

2017 WL 1076396, at *2.

> **a.    Twitter is not a "place of public accommodation" under Title II.**

First, Plaintiff has failed to allege that Twitter is a "place of public accommodation."

Section 2000a(b) defines a "place of public accommodation" as follows:

> (1) any inn, hotel, motel, or other establishment which provides lodging to transient
> guests, other than an establishment located within a building which contains not more
> than five rooms for rent or hire and which is actually occupied by the proprietor of such
> establishment as his residence;

> (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility
> principally engaged in selling food for consumption on the premises, including, but not
> limited to, any such facility located on the premises of any retail establishment; or any
> gas station;

---

not allege that Twitter knew his political beliefs, much less was motivated by them. More, none
of the causes of action brought by Plaintiff could support a claim for "political affiliation"
discrimination. *See Keating v. Carey*, 706 F.2d 377, 383–84 (2d Cir. 1981) ("§ 1981, however
generously construed, does not prohibit discrimination on the basis of political affiliation"); 42
U.S.C. § 2000a (listing only "race, color, religion, or national origin" as protected categories);
*Lincoln v. Mendler*, No. CV 18-4542, 2018 WL 4205421, at *2 (E.D. La. Sept. 4, 2018)
(dismissing § 2000a claim based on alleged "discrimination against 'openly conservative and
traditional' viewpoint"); N.H. RSA 354-A:17 (listing only "age, sex, gender identity, race, creed,
color, marital status, physical or mental disability or national origin" as protected categories).

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

While Plaintiff alleges that Twitter constitutes a "place of public accommodation" under Title II because it "hosts many events open to the public" where it "supplies food and beverages" for attendees at its offices nationwide, and because its San Francisco office "houses an on-site bakery and sandwich shop" (Compl. at ¶ 98), nowhere does he allege that he was denied access to or excluded from any of these physical facilities. Rather, his claims focus on his alleged exclusion from Twitter's *online platform*.

Twitter's online platform is not a "place of public accommodation" for purposes of Title II. *See Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 541 (E.D. Va. 2003), *aff'd*, No. 03-1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004); *Ebeid v. Facebook, Inc.*, No. 18-CV-07030-PJH, 2019 WL 2059662, at *6 (N.D. Cal. May 9, 2019) (internal citations omitted). In *Noah*, for example, the court considered whether an AOL chat room could constitute a "place a public accommodation" under Title II and determined that it could not. 261 F. Supp. 2d at 541-45. The court noted that Title II refers to actual physical structures, and "[a]lthough a chat room may serve as a *virtual* forum through which AOL members can meet and converse in cyberspace, it is not an 'establishment,' under the plain meaning of that term as defined by the statute." *Id.* "[A] chat room does not exist in a particular physical location, indeed it can be accessed almost anywhere," and it therefore "lacks the physical presence necessary to constitute a place of public accommodation under Title II…." *Id.*

Likewise, in *Ebeid*, the court dismissed the plaintiff's claim that his suspension from Facebook violated Title II based in part on its conclusion that Facebook is not a place of public accommodation, regardless of the physical location of the company's servers. 2019 WL 2059662, at *6. The court noted that the "plaintiff's use of and the service provided by Facebook's online platform 'is unconnected to entry into a public place or facility,' and therefore 'the plain language of Title II makes the statute inapplicable.'" *Id.*

Here, as in *Noah* and *Ebeid*, Twitter's online platform does not constitute a "place of public accommodation," and Plaintiff cannot sustain a claim under Title II.

> **b.    Plaintiff has not alleged any discrimination.**

Second, as discussed in Section D.1.a, *supra*, Plaintiff cannot establish that he was treated less favorably because he is white. This element of a Title II claim is evaluated "substantially similar" to that of a claim brought under Section 1981. *See, e.g.*, *Drake*, 2017 WL 1076396, at *3 (explaining that because plaintiff failed to plead facts showing that he was treated less favorably than similarly situated persons who are not members of a protected class for purposes of his Section 1981 claim, he necessarily failed to state a claim under Section 2000a); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104-06 (2d Cir. 2001) ("[f]or the same reasons that the plaintiffs cannot prevail on their § 1981 claims, they can not do so under § 2000a"). Accordingly, for the same reasons, Plaintiff cannot establish this element of his Title II claim.

> **3.    The Court Should Dismiss Plaintiff's N.H. RSA 354-A:17 Claim.**

> **a.    Plaintiff has not exhausted his administrative remedies.**

First, Plaintiff has not satisfied the administrative prerequisites to bring a claim under New Hampshire's anti-discrimination in public accommodation law, N.H. RSA 354-A:17. This law is found in New Hampshire's anti-discrimination statute, N.H. RSA Chapter 354-A, which

permits a plaintiff to bring a civil action under the statute only "if certain preconditions are met." *Munroe v. Compaq Computer Corp.*, 229 F. Supp. 2d 52, 67 (D.N.H. 2002).

Indeed, "RSA 354-A:21-a, I requires that the plaintiff first make a timely filing of the complaint with the New Hampshire Commission on Human Rights [(the "NHCHR")]." *Wilson v. Port City Air*, *Inc*., No. 13-cv-129-JD, 2013 WL 2631860, at *2 (D.N.H. June 12, 2013). And then a plaintiff must wait a minimum of 180 days after the filing of that NHCHR complaint to bring a civil action. N.H. RSA 354-A:21-a. "Failure to do so precludes a claim under RSA 354-A in court." *Id.*; *see also Carney v. Town of Weare*, No. 15-cv-291-LM, 2017 WL 680384, at *6 (D.N.H. Feb. 21, 2017) ("A plaintiff's failure to exhaust administrative remedies, such as the charging requirement here, is an affirmative defense."). Any ruling by the NHCHR must be reviewed by a state superior court. *Munroe*, 229 F. Supp. 2d at 67. And "[a] litigant may not use supplemental jurisdiction to have a federal court instead of a state court perform judicial review of a state administrative agency decision that a state statute assigns to state court." *Id.* ("[Plaintiff] forfeited her state law claim because she did not follow the statutory procedure that created the private right of action."). As a result, Plaintiff is statutorily barred from bringing a claim under N.H. RSA 354-A:17 at this time.[7]

**b.    Regardless, Plaintiff cannot state a claim for discrimination.**

Even if Plaintiff had exhausted his administrative remedies, his claim would still fail. N.H. RSA 354-A:17 provides that "[i]t shall be an unlawful discriminatory practice for any

---

[7] There is case law that suggests New Hampshire's administrative resolution statute "is not an exclusive remedy," such that a plaintiff could pursue either administrative or judicial review. *See Douglas v. Coca-Cola Bottling Co. of N. New England, Inc.*, 855 F. Supp. 518, 522 (D.N.H. 1994); *In re Perkins*, 147 N.H. 652 (2002). But those cases were abrogated when the statute was amended in 2000 to include the choice of forum provision compelling administrative review prior to court action. *See Munroe*, 229 F. Supp. 2d at 67 (recognizing that the introduction of the forum provision in 2000 significantly changed the judicial review process contemplated by the statute).

person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the . . . race . . . of any person . . . directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof[.]" As with his claims under Sections 1981 and 2000a, Plaintiff has not alleged that his suspension was the result of discriminatory animus, for the reasons already articulated in those sections.

        i.       **Twitter is not a "place of public accommodation" under New Hampshire law.**

As with his Title II claim, Plaintiff has not alleged that Twitter is a "place of public accommodation" under New Hampshire law. A "place of public accommodation" is defined as:

> any inn, tavern or hotel, whether conducted for entertainment, the housing or lodging of transient guests, or for the benefit, use or accommodations of those seeking health, recreation or rest, any restaurant, eating house, public conveyance on land or water, bathhouse, barbershop, theater, golf course, sports arena, health care provider, and music or other public hall, store or other establishment which caters or offers its services or facilities or goods to the general public. 'Public accommodation' shall not include any institution or club which is in its nature distinctly private.

N.H. RSA 354-A:2. Like Title II, all of the examples are physical structures, and the catch-all requires the defendant to be an "establishment." *Id.*; *see also Establishment*, *Black's Law Dictionary* (11th ed. 2019) ("An institution or place of business."). Thus, Twitter's online platform cannot constitute a "place of public accommodation."

        ii.      **Plaintiff has not alleged any discrimination.**

As with Plaintiff's claims under Section 1981 and Title II, and for the same reasons articulated in Section D.1.a, *supra*, Plaintiff has not sufficiently alleged racial discrimination with respect to his New Hampshire public accommodation claim.

**3.     Plaintiff's Constitutional Rights Claims Also Must Fail Because There is No State Action**

Plaintiff's claims for violations of constitutional rights, including for violations of his

First Amendment and Due Process rights, fail because Twitter is a private company, and there is

no state action. *See DeLima v. YouTube, LLC*, No. 17-CV-733-PB, 2018 WL 4473551, at *4

(D.N.H. Aug. 30, 2018), *report and recommendation adopted sub nom. DeLima v. YouTube Inc*.,

No. 17-CV-733-PB, 2018 WL 4471721 (D.N.H. Sept. 18, 2018), *aff'd sub nom. DeLima v.

YouTube, Inc.*, No. 18-1666, 2019 WL 1620756 (1st Cir. Apr. 3, 2019), cert. denied, 140 S. Ct.

555 (2019) (dismissing claims for discrimination and constitutional rights violations with

prejudice as Twitter is a private company, and the plaintiff had failed to allege any state action).

It is axiomatic that "the constitutional guarantee of free speech is a guarantee only against

abridgment by government, federal or state." *Hudgens v. N.L.R.B.*, 424 U.S. 507, 513 (1976); *see

also McGuire v. Reilly*, 386 F.3d 45, 60 (1st Cir. 2004) ("Obviously, only the government can

violate First Amendment rights: every First Amendment claim thus requires state action in some

sense."); *Nat'l A–1 Adver., Inc. v. Network Sols., Inc.,* 121 F. Supp. 2d 156, 165-66

(D.N.H.2000) ("By its very terms, the [First] Amendment proscribes governmental conduct, not

conduct undertaken by private citizens."); *Falzarano v. United States*, 607 F.2d 506, 511 (1st

Cir. 1979) ("The fourteenth amendment's [prohibition against denial of due process] runs only

against states, not against private entities.").

While Plaintiff claims that Twitter is a "State Actor," Compl. at ¶ 121, "[i]t is only in rare

circumstances that private parties can be viewed as state actors." *Estades-Negroni v. CPC Hosp.

San Juan Capestrano*, 412 F.3d 1, 5 (1st Cir. 2005) (citation omitted). The First Circuit has

explained that such "rare circumstances" exist only where: (1) the state has exercised coercive

power or has provided such significant encouragement that the challenged conduct must in law

be deemed to be that of the state; (2) where the state was a joint participant in the challenged

conduct; or (3) where, in engaging in the challenged conduct, the private party performed a

public function that has been traditionally the "exclusive prerogative" of the state. *Id.* (citations

omitted). Ultimately, the test is whether "it can be said that the State is *responsible* for the

specific conduct of which the plaintiff complains." *Brentwood Acad. v. Tenn. Secondary Sch.

Athletic Assoc.*, 531 U.S. 288, 295 (2001) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982))

(emphasis in original).

 Here, Plaintiff has failed to plead facts that would support a finding of any state action.

As to the state compulsion test, there is no suggestion that the government "coerced,"

"encouraged," or even conferred with Twitter regarding its conduct with respect to Plaintiff's

Tweets. As to the joint participant test, there is no suggestion that the government "so far

insinuated itself into a position of interdependence with [Twitter] that it should be considered a

joint participant in" its decision to delete his Tweets. *Estades-Negroni*, 412 F.3d at 6.

 As to the public function test, Plaintiff has failed to plead that in deleting his Tweets,

Twitter performed an exclusively public function. The Supreme Court has explained that for a

private entity to be deemed a state actor, the challenged conduct must be one of the "very few"

functions that has been "*exclusively* reserved to the state." *Flagg Bros., Inc. v. Brooks*, 436 U.S.

149, 158 (1978) (emphasis added). Examples of such functions include the conduct of elections

and the governance of a town. *Logiodice v. Tr. of Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir.

2002).

 While Plaintiff suggests that Twitter "exhibits all the features of a public forum," Compl.

at ¶ 106, courts have uniformly rejected claims which attempt to treat online platforms such as

Twitter as state actors on these grounds. *See, e.g.*, *Freedom Watch, Inc. v. Google, Inc.*, 368 F.

Supp. 3d 30, 40 (D.D.C. 2019) (holding that Twitter and [Facebook] are not subject to First

Amendment as "private businesses . . . do not become 'state actors' based solely on the provision

of their social media sites to the public"), *aff'd*, No. 19-7030 (D.C. Cir. May 27, 2020); *Nyabwa*

*v. Facebook*, No. 2:17-CV-24, 2018 WL 585467, *1 (S.D. Tex. Jan. 26, 2018) (explaining that

although "social media sites like Facebook and Twitter have become the equivalent of a public

forum for sharing ideas and commentary," there is no support for "a cause of action against

[these private entities] for a violation of the free speech rights protected by the First

Amendment."); *Prager Univ. v. Google LLC*, No. 17-CV-06064-LHK, 2018 WL 1471939, at *8

(N.D. Cal. Mar. 26, 2018), *aff'd*, 951 F.3d 991 (9th Cir. 2020) (explaining that "private entities

who created their own . . . social media website and make decisions about whether and how to

regulate content that has been uploaded on that website" are not subject to First Amendment);

*Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 628 (E.D. Va. 2019) ("[Facebook and Twitter]

are indisputably private companies" for purposes of First Amendment); *Langdon*, 474 F. Supp. at

631-32 (finding Google is a private entity that is "not subject to constitutional free speech

guarantees" and asserting that the Supreme Court "has routinely rejected the assumption that

people who want to express their views in a private facility . . . have a constitutional right to do

so").

      Plaintiff does not—and cannot—allege that any of Twitter's conduct occurred at the

behest of a state or federal government, let alone that there was sufficient coercion or

cooperation to constitute state action. These causes of action should be dismissed; and because

Twitter cannot be a state actor, the dismissal should be with prejudice.[8]

---

[8] Plaintiff is incorrect that Twitter could be held liable for a First Amendment violation because "federal courts of appeals has held that the government can create public forums within Twitter's public forum." Compl. at ¶ 108. This assertion appears to be a misinterpretation of a line of cases holding that social media accounts *belonging to public officials* may constitute public forums

**D.      Alternatively, the Case Should be Transferred to the Northern District of California.**

        If the claims against Twitter are not dismissed, they should be transferred to the Northern

District of California pursuant to Twitter's UA, which provides that "[a]ll disputes related to

these Terms of the Services [provided by Twitter] will be brought solely in the federal or state

courts located in San Francisco County, California . . ." Compl., Ex. D-1, at § 6.

        This clause is mandatory, applicable, enforceable and, under 28 U.S.C. § 1404(a),

requires transfer of any surviving claims. *See Atl. Marine Const. Co. v. U.S. Dist. Court for W.

Dist. of Tex.*, 571 U.S. 49, 58-59 (2013) (clarifying that Section § 1404(a) is the proper

mechanism to enforce a forum-selection clause); *Song fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53,

60 (D.D.C. 2014) (transferring claims against YouTube to the Northern District of California

because "[a]llowing Plaintiffs to proceed in this District, when their claims all relate to conduct

based on YouTube's Terms of Service, would undermine the very purpose of forum selection

clauses."); *Darnaa, LLC v. Google, Inc.*, No. 15-cv-03221-RMW, 2015 WL 7753406, at *2

(N.D. Cal. Dec. 2, 2015), *on reconsideration in part*, No. 15-cv-03221-RMW, 2016 WL

6540452 (N.D. Cal. Nov. 2, 2016) (finding YouTube's Terms of Service enforceable); *Wingo v.

Twitter, Inc.*, No. 14-2643, 2014 WL 7013826, at *1, *3 (W.D. Tenn. Dec. 12, 2014)

(transferring an action to the Northern District of California under Twitter's Terms of Service).

---

under certain circumstances. *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (holding that a public official's social media account, to the extent that it is "intentionally opened for public discussion," "repeatedly used . . . as an official vehicle for governance," and "accessible to the public without limitation" is a type of public forum, such that President Trump's blocking of users who expressed views with which he disagreed violated the First Amendment); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) (holding that public official who used Facebook "as a tool of governance" exercised state action when banning a constituent from her page). In each of these cases, the challenged conduct was carried out by a public official, *not* by the online platform on which its content was hosted.

First, the forum selection clause is mandatory rather than permissive. *See Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 17 (1st Cir. 2009) ("[M]andatory forum selection clauses contain clear language indicating that jurisdiction and venue are appropriate exclusively in the designated forum.") (citation omitted). Twitter's forum selection clause provides that all disputes will be brought "solely" in San Francisco County. Therefore, the only federal venue where covered claims can be brought in is the Northern District of California. Mandatory forum selection clauses are presumptively valid and should be enforced absent a strong showing that enforcement would be unfair or unreasonable. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593 95 (1991) (upholding the validity of a forum selection clause in a form contract).

Second, the scope of the forum selection clause applies to this dispute. The First Circuit has emphasized that "it is the language of the forum selection clause itself that determines which claims fall within its scope." *Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 47 (1st Cir. 2014) (citation omitted). Here, Twitter's clause covers "all" claims relating to Twitter's services, which includes Twitter suspending the Account. Plaintiff's claims therefore fall within the scope of the relevant clauses.

Third, the forum selection clause is enforceable. Plaintiff bears the heavy burden of proof to establish that a forum selection clause should not be enforced, and cannot do so. *See M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 17 (1972) (explaining that the party arguing that a forum selection clause is inapplicable "bear[s] a heavy burden of proof"); *In re Mercurio*, 402 F.3d 62, 66 (1st Cir. 2005) (recognizing the "'heavy burden of proof'" to overcome a forum selection clause on inconvenience grounds); *Claudio-De Leon*, 775 F.3d at 48 (same).

In the First Circuit, courts consider four factors to determine whether a forum selection clause is unenforceable: (1) whether the clause was the product of "fraud or overreaching;" (2)

"enforcement would be unreasonable and unjust;" (3) proceedings "in the contractual forum will be so gravely difficult and inconvenient that [the party challenging the clause] will for all practical purposes be deprived of [her] day in court;" or (4) "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *Rafael Rodríguez Barril, Inc. v. Conbraco Indus., Inc.*, 619 F.3d 90, 93 (1st Cir. 2010) (alteration in original). None of those factors suggests that the clauses at issue here are unenforceable.

First, Plaintiff is an admitted Twitter account holder and agreed to the UA, which obviates any argument that the clauses are fraudulent or unreasonable, or that enforcing them would be inconvenient. *See* Compl., Ex. D-1, at § 2 ("[Twitter's] Terms of Service . . . govern your access to and user of our services. . . . By using the Services, you agree to be bound by these Terms"); *see also, e.g.*, *Brittain*, 2019 WL 8137718, at *2 (enforcing Twitter's forum selection clause and noting that "Twitter's Terms, to which Brittain assented when he registered for an account, are valid and enforceable"); *Wingo*, 2014 WL 7013826, at *3 (enforcing Twitter's forum selection clause as to a user who agreed to the Terms when he signed up for his account); *Twitter, Inc. v. Skootle Corp.*, No. 12-1721-SI, 2012 WL 2375486, at *6 (N.D. Cal. June 22, 2012) (rejecting inconvenience argument where litigant agreed to terms of service as "insufficient to show that enforcement of the forum selection clause would be so gravely difficult as to deprive him of his day in court"). Nothing in Plaintiff's Complaint suggests that he agreed to these provisions only through fraud, and if Plaintiff did not want to agree to them, he simply could have not used the services.

Additionally, as the Supreme Court held in *Atlantic Marine*, while a district court ordinarily evaluates the "convenience of parties and witnesses" on a motion to transfer, a forum

selection clause changes this analysis. 571 U.S. at 62. A forum selection clause "represents the parties' agreement as to the most proper forum," and it should be given "controlling weight in all but the most exceptional cases." *Id*. at 63 (internal quotation marks and citation omitted). By consenting to the forum selection clause, Plaintiff "has waived . . . the right to challenge the preselected forum as inconvenient." *See Wingo*, 2014 WL 7013826, at *3. "As a consequence, a district court may consider arguments about public-interest factors only." *Atl. Marine*, 571 U.S. at 64. Here, transferring the case would not violate the public policy of New Hampshire. To the contrary, the purpose of a forum selection clause "is, at least in part, to protect defendants and give them a voice as to where a dispute will be heard and resolved." *Claudio-De Leon*, 775 F.3d at 47 (citing *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22-23 & n.3 (1st Cir. 2011); *C. Pappas Co. v. E. & J. Gallo Winery*, 565 F. Supp. 1015, 1018 (D. Mass. 1983)). Transferring the case is therefore consistent with this state's public policy.

Taken together, there is no reason to override "the presumption of enforceability" that requires Plaintiff to bring his complaint against Twitter in the Northern District of California. Therefore, if any claims survive, they should be transferred accordingly.

## IV.    CONCLUSION

For the reasons above, Twitter respectfully requests that the Court dismiss Plaintiff's claims with prejudice. Alternatively, any surviving claims against Twitter should be transferred to the Northern District of California.

Respectfully submitted,

**Twitter, Inc.**

By its attorneys,

ORR & RENO, PROFESSIONAL ASSOCIATION

Dated:  June 1, 2020          By:          /s/ Jonathan M. Eck
                                        Jonathan M. Eck, Esq. (NH Bar #17684)
                                        45 S. Main Street, P.O. Box 3550
                                        Concord, NH  03302
                                        (603) 223-9100
                                        jeck@orr-reno.com

                                        Julie E. Schwartz, Esq. (*motion for pro hac vice
                                        admission to be filed*)
                                        Perkins Coie LLP
                                        3150 Porter Drive
                                        Palo Alto, CA  94304-1212
                                        (650) 838-4490
                                        JSchwartz@perkinscoie.com

### CERTIFICATE OF SERVICE

I, Jonathan M. Eck, certify that on this date service of the foregoing document was made upon the Plaintiff, *pro se*, via email.

Dated:  June 1, 2020                    /s/ Jonathan M. Eck
                                        Jonathan M. Eck, Esq. (NH Bar #17684)