# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

2020 MAY 29  A 11: 47

Sensa Verogna, Plaintiff,                    )

    v.                                    )        Case #: **1:20-cv-00536-SM**

Twitter Inc.,   Defendant.                   )

_____

## PLAINTIFF'S MOTION TO DECLARE TWITTER A "STATE ACTOR" UNDER LAW AND BRIEF AND MEMORANDUM IN SUPPORT

1.      Plaintiff, pro se and proceeding anonymously as, "Sensa", respectfully moves this Court to declare Twitter, Inc., "Twitter", a "State Actor"[1] under the law, or minimally, as it applies to Sensa and within the timeframe of Sensa's COMPLAINT. Twitter, under Federal Authority, while enforcing Section §230, "§230", owed a duty to Sensa under Part I, Articles 22 and 32 of the New Hampshire Constitution and the U.S. Constitution Article [I] Freedom of expression not to discriminate against Sensa based on race or a viewpoint or behavior-based restriction in a public forum. Sensa submits the following brief and memorandum of law in support of his motion for relief pursuant to 28 U.S.C. §§ 2201 and Rule 57 of the Federal Rules of Civil Procedure. Jurisdiction is as stated in the COMPLAINT.

2.      Venue is proper as stated in the COMPLAINT at Paragraphs 8, 9 and 10. Sensa re-alleges and incorporates by reference each paragraph, tweet, article, exhibit or attachments included in this document and in the record to date, as though set forth fully herein.

3.      Rather than regulating the internet like most all other industries, Congress instead chose to entwine themselves with companies like Twitter, essentially relegating it's duties to

29    protect, police and regulate free speech. Scarier is the fact that Twitter further relegates its policing

30    powers to Journalists, who now regulate what American's can and cannot say in a public forum.

31         4.     Twitter deleted Sensa's tweets and banned Sensa's contract under the presumed

32    protections of §230 and through its Health Policies created, in part, to satisfy  Congress while

33    carrying out Executive duties of policing and punishing users within its public forum.

34         5.     §230 deputizes computer network companies such as Twitter "to ensure vigorous

35    [1] As used in supporting brief and herein, "state action" refers to any governmental action that is

36    Federal as it applies to this case enforcement of Federal and State criminal laws to deter and punish

37    trafficking in obscenity, stalking, and harassment and to restrict obscene, lewd, lascivious, filthy,

38    excessively violent, harassing, or otherwise objectionable, <u>whether or not such material is</u>

39    <u>constitutionally protected,</u> and by means of computer in return for legal protections for third-party

40    content, its filtering decisions and theoretically its banning decisions. Twitter's invocation and

41    claims of authority under §230 is likely to unlock the door and circumvent the independent

42    Constitutional protections of New Hampshire residents as users are unaware of their rights within

43    the convoluted context of §230. Eg. Congress the boss and Twitter the Executive with policing

44    powers.

45         6.     The government itself may not deprive the individual" of his liberty "Free Speech",

46    "Freedom to Assemble" and "Due Process rights without "Due Process of the Law." Government

47    itself may not deprive the individual" without "due process of the law." The Clause is phrased as

48    a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and

49    security; while it forbids the State itself to deprive individuals of life, liberty, and property without

50    due process of law, its language cannot fairly be read to impose an affirmative obligation on the

51    State to ensure that those interests do not come to harm through other means." See DeShaney v.

52    Winnebago County Department of Social Services, 489 U.S. 189 (1989).

53        7.      It was said of the case of Dred Scott v. Sandford, that this court, there overruled the

54    action of two generations, virtually inserted a new clause in the Constitution, changed its character,

55    and made a new departure in the workings of the federal government. I may be permitted to say

56    that if the recent amendments are so construed that Congress may not, in its own discretion, and

57    independently of the action or non-action of the States, provide, by legislation of a direct character,

58    for the security of rights created by the national Constitution; if it be adjudged that the obligation

59    to protect the fundamental privileges and immunities granted by the Fourteenth Amendment to

60    citizens residing in the several States, rests primarily, not on the nation, but on the States; if it be

61    further adjudged that individuals and corporations, exercising public functions, or wielding power

62    under public authority, may, without liability to direct primary legislation on the part of Congress,

63    make the race of citizens the ground for denying them that equality of civil rights which the

64    Constitution ordains as a principle of republican citizenship; then, not only the foundations upon

65    which the national supremacy has always securely rested will be materially disturbed, but we shall

66    enter upon an era of constitutional law, when the rights of freedom and American citizenship

67    cannot receive from the nation that efficient protection which heretofore was unhesitatingly

68    accorded to slavery and the rights of the master. (See 1883 U.S. LEXIS 928, 27 L. Ed. 835, 3 S.

69    Ct. 18, 109 U.S. 3. (SCOTUS 1883)

70

71

72    8.    For the reasons stated herein, and in the supporting brief and memorandum of law,

73    this Court should declare that Twitter, Inc., a "State Actor" under the law, OR minimally, that it

74    was, within the time frame of Sensa's Complaint.

75    Respectfully submitted,

76    /s/ Anonymously as Sensa Verogna

77    SensaVerogna@gmail.com

78    **CERTIFICATE OF SERVICE**

79    I hereby certify that on this 29th day of May 2020, I have contracted the foregoing Motion,

80    to be served in hand, directly to the agent of record for Twitter Inc., The Corporation Trust

81    Company Corporation, Trust Center, 1209 Orange Street, Wilmington, DE 19801.

82

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

Sensa Verogna, Plaintiff,            )
      v.                            )    Case #: **1:20-cv-00536-SM**
Twitter Inc.,   Defendant.           )

_____

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO DECLARE TWITTER A "STATE ACTOR" UNDER LAW

1.     The Declaratory Judgment Act, 28 U.S.C. § 2201, is an enabling Act which confers a discretion on the courts. See Public Service Comm'n v. Wycoff Co., Inc., 344 U.S. 237 (1952)

2.     Plaintiff, "Sensa" seeks a declaratory judgement and direction from the Court before taking any future action as such direction will afford Sensa relief from uncertainty or insecurity and not risk taking future undirected actions. See Amer. Household Products, Inc. v. Evans Manufacturing, Inc., 139 F.Supp.2d 1235, 1239 (N.D. Al. 2001); Cox v. Athens Reg. Med. Cent., 279 Ga. App. 586, 594, 631 S.E.2d 792, 799 (2006); (see also Baker v. City of Marietta, 271 Ga. 210, 214, 518 S.E.2d 879, 884 (1999)

3.     Venue is proper as stated in the (Compl. ¶ 8, 9 and 10). Sensa re-alleges and incorporates by reference each paragraph, tweet, article, exhibit or attachments included in this document and in the record to date, as though set forth fully herein.

4.     A declaratory judgement is an equitable tool used by courts to define the legal rights and obligations of parties. In a declaratory judgement action, there may be questions of law and fact for the trial court to decide. See New England Tel. & Tel. Co. v. CONVERSENT COMM. (D.R.I. 2001)

Page **1** of 19

Background

5.     On July 24, 2018 Congressman Ron Wyden a co-sponsor of §230 explains that:

> "§230, provides both a "shield" and a "sword" to internet companies. The "shield" protects tech companies from liability for harmful content posted on their platforms by users. The "sword" refers to the §230's "Good Samaritan" clause, which gives tech companies legal cover for choices they make when moderating user content."

6.     **"It creates a government kind of information police—censorship, information police,"** Senator Ron Wyden (D-Oregon) told Wired in 2019. https://www.wired.com/story/fight-over-section-230-internet-as-we-know-it/

7.     On September 5, 2018, Chairman Walden, led off an Oversight Hearing of United States House Committee on Energy and Commerce Committee by stating;

> **Chairman Walden: "So, Mr. Dorsey, I am going to get straight to the heart of why we are here today. We have a lot of questions about Twitter's business practices including questions about your algorithms content management practices, and how Section §230's safe harbors protect Twitter." See Compl. Exh. Q-2**

> **Mr. Dorsey: "We continue to work with our law enforcement partners on this investigation." See Compl. Exh. Q-1, Pg. 10**
> **Mr. Dorsey: We will remain engaged with law enforcement. See Compl. Exh. Q-1, Pg. 11**

8.     On September 5, 2018, Jack Dorsey, CEO of Twitter, testified verbally to the United States House Committee on Energy and Commerce that Twitter relies on governmental guidance and benefits it receives through §230, and stated, in part;

> **2396   Mr. Dorcey; "Well, we do defend Section §230 because it is the thing that enables us to increase the health in the first place. It enables us to look at the content and look for abuse and take enforcement actions against them accordingly."**

> **2601   Mr. Dorcey; "We have made our singular objective to -- as a company to help improve the health of the content that we see**

65
66
67
68
69
70
71
72

**on the service, and for us that means that people are not using content to silence others or to harass others or to bully each other so that they don't even feel safe to participate in the first place and that is what CDA §230 protects us to do is to actually enforce these actions -- make them clear to people in our terms of service but also to enforce them so that we can take actions."**

73
74
75
76
77
78
79
80
81
82

2600    **Mr. Dorsey: "So, people are responsible for their content. We have made our singular objective to -- as a company to help improve the health of the content that we see on the service, and for us that means that people are not using content to silence others or to harass others or to bully each other so that they don't even feel safe to participate in the first place and that is what CDA §230 protects us to do is to actually enforce these actions -- make them clear to people in our terms of service but also to enforce them so that we can take actions."**

83    9.    On September 5. 2018, Jack Dorsey, CEO of Twitter, testified verbally to the

84    United States House Committee on Energy and Commerce, and stated, in part;

85
86
87

466    **Mr. Pallone. "But we have to make sure that the enforcement mechanism is there."**

88
89
90
91
92

3299    **Mr. Dorsey: "So we are doing a few things. First, we are opening portals that allow partners and journalists to report anything suspicious that they see so that we can take much faster action."**

93
94

1577    **Mrs. McMorris Rodgers. "What are the current policies for prioritizing timely take downs and enforcement?"**

95
96
97
98
99

1580    **Mr. Dorsey. "Yes. So, any sort of violent threat or image is at the top of our priority list in order to review and enforce, and we do have a prioritization mechanism for tweets as we get the reports."**

100
101
102
103
104

2999    **Mr. Dorsey.  "our decisions to these technologies, whether they be companies like ours who are offloading our enforcement actions to algorithms or ranking actions to algorithms or even personally."**

| | | |
|---|---|---|
| 105 | 3305 | Mr. Dorsey. "we have a much stronger partnership with law |
| 106 | | enforcement and federal law enforcement to make sure that we |
| 107 | | are getting a regular cadence of meetings |
| 108 | | |
| 109 | 3668 | Mr. Dorsey. We do -- we do have partnerships with local |
| 110 | | enforcement and law enforcement agencies all over the world |
| 111 | | and we did inform them, as necessary. |
| 112 | | |
| 113 | 2773 | Mr. Griffith.  if you do put the kibosh on somebody's post or |
| 114 | | somebody's Twitter account, can you at least tell them about it |
| 115 | | so that they have some idea so they can do the appeal? Because |
| 116 | | if they don't know about it, they're not likely to appeal, are |
| 117 | | they? |
| 118 | 2780 | Mr. Dorsey. Yes. We need a much more robust way of |
| 119 | | communicating what happened and why also a much more |
| 120 | | robust appeals process. |
| 121 | | |

10.    On September 5. 2018, various Congress persons asked Mr. Dorcey if he could "Report back" or "get back to them"  concerning a wide variety of subjects they discussed in the oversight hearing. They stated, in part;

| | | |
|---|---|---|
| 125 | 447 | through the chairman if you could get back to us. |
| 126 | 455 | I am going to ask you to get back to us in writing |
| 127 | 468 | Let me -- let me ask, if you could report back |
| 128 | 486 | please get back to us within the month. |
| 129 | 511 | if we could get a report |
| 130 | 512 | back to the committee within one month of the steps that Mr. |
| 131 | | Dorsey is taking, I would appreciate it. |
| 132 | 2230 | I am hoping that in the hours after this hearing you will get |
| 133 | | back to us |
| 134 | 3543 | So if you can report to us |
| 135 | | |
| 136 | 3581 | Mr. Flores. This is an oversight hearing. |
| 137 | | |

11.    Oversight hearings review or study a law, issue, or an activity, often focusing on the quality of federal programs and the performance of government officials. Hearings also ensure that the executive branch's execution goes with legislative intent, while administrative policies reflect the public interest. Oversight hearings often seek to improve the efficiency,

142 economy, and effectiveness of government operations. The Congressional Research Service
143 describes oversight hearings as;

> 144 Congress has historically engaged in oversight of the executive branch—
> 145 specifically the review, monitoring, and supervision of the implemen-
> 146 tation of public policy. Oversight hearings are one technique a
> 147 committee can use in this evaluation. Hearings may be held because a
> 148 committee has a commitment to review ongoing programs and agencies
> 149 or because it believes that a program is being poorly administered or that
> 150 an agency is unresponsive to the panel. A committee may also hold an
> 151 oversight hearing when a program under its jurisdiction is set to expire
> 152 and needs to be reauthorized in order to continue. (See Congressional
> 153 Research Service 7-5700 www.crs.gov 98-317).

154    12.    On or around April 12, 2019 Speaker Nancy Pelosi (D-Calif.) said during a podcast
155 interview "that a key legal protection for tech firms could be "in jeopardy," saying a 1996 statute
156 [§230] was a "gift" to the industry." And that "It [§230] is a gift to them and I don't think that they
157 are treating it with the respect that they should, and so I think that that could be a question mark
158 and in jeopardy," Pelosi also added that  "it is "not out of the question" that Section §230  could
159 be removed". And when we come to §230, you really get their attention," Pelosi said, referring to
160 the tech companies. "But I do think that for the privilege of §230, there has to be a bigger sense of
161 responsibility on it. And it is not out of the question that that could be removed."

162    13.    Some GOP lawmakers, including Sens. Ted Cruz (Texas) and Josh Hawley (Mo.),
163 have also threatened publicly to alter or repeal §230.

164    14.    Josh Hawley (Mo.), has also stated publicly that "'Big Tech' is subsidized by
165 taxpayers and that Big Tech' gets a huge handout from the federal government. They get this
166 special immunity, this special immunity from suits and from liability that's worth billions of dollars
167 to them every year".

168 Complaint

169     15.     "The injury caused" by Twitter to Sensa and others —the deprivation of free speech

170     rights for posting political views and freedom to assemble thereafter through banning, is most

171     certainly aggravated in a unique way as Twitters' boardroom is led by executives who seek

172     guidance and directives from Congress, content–policy teams led by employees, content

173     moderators, independent contractors, others, in and a part of "Twitter's Workforce" who draft

174     respective public forum' content rules, review complaints about content, and speech and behavior

175     infractions all under the guidance and authority of §230. Even if [its] rules were produced by

176     private consulting firms, it's not unusual for the government to hire private consulting firms and

177     regardless, they have or would have been guided by the municipal or federal powers within the

178     principles of §230  in the formation and the application of those rules used towards U.S. Citizens.

179     Twitters Workforce was in fact working under the direction of Congress to aid in the policing and

180     enforcement of  §230.

181     16. Twitter, as a State Actor, owed a duty to Sensa under Part I, Articles 22 and 32 of the

182     New Hampshire Constitution and the U.S. Constitution Article [I] Freedom of expression not to

183     discriminate against Sensa based on a viewpoint or behavior-based restrictions in a public forum.

184     17.     Twitter is a state actor who, for its own economic benefit of legal protection, acted

185     on behalf of Congress and through §230 to knowingly deny Sensa's both his State and US

186     Constitutional rights and is therefore subject to regulation under the United States Bill of Rights,

187     including the First, Fifth, and Fourteenth Amendments, which prohibit Federal and State

188     governments from violating certain rights and freedoms.

189     Legislative History

190   18.   On June 30, 1995 Christopher Cox (R-CA) and Ron Wyden (D-OR) introduced the

191   Internet Freedom and Family Empowerment Act. It was then referred to the Subcommittee on

192   Telecommunications and Finance on July 10, 1995 and then passed by a near-unanimous vote on

193   the floor. From there it merged into Communications Decency Act of 1995', Section §230, in early

194   1996 where it passed by a near-unanimous vote on the floor, 81-18. Upon review of the

195   Congressional Record, with limited resources, it is void of any mention or debate or finding related

196   to "Free Speech".

197   19.   Findings by Congress found that the Internet and other interactive computer

198   services have flourished..... with a minimum of government regulation, offer a forum for a true

199   diversity of political discourse and increasingly Americans are relying on interactive media for a

200   variety of political, educational, cultural, and entertainment services. See § 230(a)

201   20.   Congress then promulgated within § 230(b), United States policy intended to

202   promote the Internet, (b)(1), preserve a competitive free market unfettered by Federal or State

203   regulation, (b)(2), empower parents to restrict their children's access to objectionable or

204   inappropriate online material, (b)(4), and to ensure vigorous enforcement of Federal criminal laws

205   to deter and punish trafficking in obscenity, stalking, and harassment by means of computer. (b)(5).

206   21.   Congress then implemented protections under § 230(c) states:

207   **(c)PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE**
208   **MATERIAL**
209      **(1)TREATMENT OF PUBLISHER OR SPEAKER**
210      No provider or user of an interactive computer service shall be treated as the
211      publisher or speaker of any information provided by another information content
212      provider.

213      **(2)CIVIL LIABILITY** No provider or user of an interactive computer service shall
214      be held liable on account of—
215         **(A)** any action voluntarily taken in good faith to restrict access to or
216         availability of material that the provider or user considers to be obscene,

217  <u>lewd, lascivious, filthy, excessively violent, harassing, or otherwise</u>
218  <u>objectionable, whether or not such material is constitutionally protected;</u>
219  or
220  **(B)** any action taken to enable or make available to information content
221  providers or others the technical means to restrict access to material
222  described in paragraph (1).
223

224  22.    Congress, through § 230(d) placed only 1 obligation upon interactive computer

225  services to "notify such customer that parental control protections (such as computer hardware,

226  software, or filtering services) are commercially available that may assist the customer in limiting

227  access to material that is harmful to minors."

228  <u>The Public Function Test</u>
229

230  23.    The Supreme Court reiterated the distinction of State Action on more than one

231  occasion. See, e. g., Evans v. Abney, 396 U.S. 435, 445 (1970); Moose Lodge No. 107 v. Irvis,

232  407 U.S. 163, 171-179 (1972)

233  24.    Subsequent discussion in Burton made clear, the dispositive question in any state-

234  action case is not whether any single fact or relationship presents a sufficient degree of state

235  involvement, but rather whether the aggregate of all relevant factors compels a finding of state

236  responsibility. See generally Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972)

237  25.    The Supreme Court has organized a factual inquiry around two conditions it has

238  found necessary for a finding of state action. To constitute state action: (1) "the deprivation must

239  be caused by the exercise of some right or privilege created by the State or by a rule of conduct

240  imposed by the State or by a person for whom the State is responsible," and (2) "the party charged

241  with the deprivation must be a person who may fairly be said to be a state actor." See Lugar, 457

242  U.S. at 937; See Georgia v. McCollum, 505 U.S. 42, 50-51 (1992). (holding scheme created by

243  statute satisfied first prong of test.), and with these tests, address the essential question of whether

244   the government is responsible in some way for the conduct of which plaintiff complains. (See

245   Blum v. Yaretsky, 457 U.S. 991, 1004 (1982); See Edmonson, 500 U.S. at 632.

246   26.   The second inquiry is whether the private party charged with the deprivation can

247   be described as a state actor. See Lugar v. Edmondson Oil Co., Inc., 457 U.S. 941-942 (1982). In

248   resolving that issue, the Court in Edmonson found it useful to apply three principles: (1) "the extent

249   to which the actor relies on governmental assistance and benefits"; (2) "whether the actor is

250   performing a traditional governmental function"; and (3) "whether the injury caused is aggravated

251   in a unique way by the incidents of governmental authority." See Edmonson v. Leesville Concrete

252   Co. 500 U.S., at 621-622. (SCOTUS 1991)

253   27.   In past rulings, the First Federal Court has stated that "[A] private entity will be

254   deemed "a state actor if (1) it assumes a traditional public function when it undertakes to perform

255   the challenged conduct, or (2) an elaborate financial or regulatory nexus ties the challenged

256   conduct to the State, or (3) a symbiotic relationship exists between the private entity and the

257   State.". See, e.g., Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 (1st Cir.1999) See

258   also Barrios-Velazquez v. Asociacion De Empleados, 84 F.3d 487, 491-94 (1st Cir.1996). Other

259   District Courts have added the requirement that "where the state has exercised coercive power or

260   has provided such significant encouragement, either overt or covert that the action of the private

261   party must in law be deemed to be that of the state." See Lewis v. Law-Yone, 813 F. Supp. 1247,

262   1254 (N.D.Tex.1993) (quoting Blum, 457 U.S. at 1004, 102 S. Ct. 2777); see also Jackson v.

263   Metro. Edison Co., 419 U.S. 345, 357, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974)

264   28.   Courts have found state action present in the exercise by a private entity of powers

265   traditionally exclusively reserved to the State. See, e.g., Nixon v. Condon, 286 U. S. 73 (1932)

Page **9** of **19**

266   (election); Terry v. Adams, 345 U. S. 461 (1953) (election); Marsh v. Alabama, 326 U. S. 501

267   (1946) (company town); Evans v. Newton, 382 U. S. 296 (1966) (municipal park). Conduct that

268   is formally "private" may become so entwined with governmental policies or so impregnated

269   with a governmental character as to become subject to the constitutional limitations placed upon

270   state action.

271        29.    If a private actor is engaged in inherently governmental functions, or if the

272   government delegates the operation of one of its traditional and quintessential functions to a

273   private actor, then the private actor will be deemed to be a state actor subject to constitutional

274   limitations. See NCAA v. Tarkanian, 488 U.S. 179, 195 (1988); Flagg Bros., Inc. v. Brooks, 436

275   U.S. 149, 163-64 (1978); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349-50 (1974);

276   Evans v. Newton, 382 U.S. 296, 299 (1966), ("When private individuals or groups are endowed

277   by the State with powers or functions governmental in nature, they become agencies or

278   instrumentalities of the State and subject to its constitutional limitations."). See Marsh v.

279   Alabama, 326 U.S. 501, 506 (1946)

280        30.    The rationale for the doctrine is equally clear. "The fact that the government

281   delegates some portion of [its] power to private [actors] does not change the governmental

282   character of the power exercised.'" Without the public function doctrine, the government could

283   circumvent constitutional proscriptions on its power merely by delegating important governmental

284   functions to theoretically private entities. The public function doctrine thus requires the courts to

285   look behind the State's decision to provide such services through a private entity. See Jackson, 419

286   U.S. at 371 (Marshall, J., dissenting)

31.     Courts struggle with the doctrine has been definitional - which government functions are "so intimately associated with our concept of sovereignty that the state ought not be permitted to authorize [their] exercise by a private party without the same degree of protection that would apply if the sovereign itself were conducting [the function?] See The Supreme Court, 1977 Term, 92 HARV. L. REV. 57, 128 (1978)

32.     When Congress enacted § 1983 as the statutory remedy for violations of the Constitution, it specified that the conduct at issue must have occurred "under color of" state law; thus, liability attaches only to those wrongdoers "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." See Monroe v. Pape, 365 U.S. 167, 172 (1961). As stated in United States v. Classic, 313 U.S. 299, 326 (1941)

33.     "[P]rivate actors may align themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp of 1983." See Roche v. John Hancock Mutual Life Insurance Co., 81 F.3d 249, 253-54 (1st Cir.1996)

34.     In this case, Congress would be specifically responsible for the particular activity of which Sensa complains because they subbed Executive Authority to Twitter, and Twitter would be held responsible for its own misuse of that authority. See Blum, 457 U.S. at 1004-05 Id. at 1004.

State Actor

35.     Twitter was transformed into a state actor based upon willful participation in joint action with the state or its agents, See Dennis v. Sparks, 449 U.S. 24, 27, 101 S. Ct. 183, 186, 66 L. Ed. 2d 185 (1980), and a State may delegate authority to a private party such as Twitter and

308  thereby make Twitter a state actor. (See National Collegiate Athletic Assn. v. Tarkanian (SCOTUS
309  1988).

310      36.      Constitutional liability should attach to wrongdoers such as Twitter 'who carry a
311  badge of authority through Congress and represent it in some capacity.', (See NCAA v. Tarkanian,
312  488 U.S. 179, 191 (1988) (quoting Monroe v. Pape), and because Congress cannot be allowed to
313  shed so easily its constitutional limitations, these private actors function as a sort of substitute
314  State.' In a very real sense, Twitter was performing a public function when it deleted Sensa's Tweet
315  and banned him from the public forum and became an agent of the State. See West v. Atkins, 487
316  U.S. 42 (1988)

317  Delegation

318      37.      Congress delegated governmental power to Twitter. It is that delegation of
319  governmental enforcement authority that, for limited purposes, turned Twitter into state actors.
320  (See 83 Note, Governmental Action and the National Association of Securities Dealers, 184 47
321  FORDHAM L. REv. 585, 595 (1979).

322      38.      Even in Flagg, the Supreme Court's narrowest conception of the public function
323  doctrine, intimated that a private party might be a state actor when exercising power delegated by
324  the State to provide police protection. See FIagg Bros., 436 U.S. at 163. Through §230, Congress
325  created the legal framework that governed Twitters conduct. (See North Georgia Finishing, Inc. v.
326  Di-Chem, Inc., 419 U.S. 601 (1975); if it delegates its authority to the private actor. (See West v.
327  Atkins, 487 U.S. 42 (1988)

328  39.     Likewise, the enforcement of federal law, and the imposition of penalties, such as

329  Twitter banning Sensa, (especially penalties not available in civil litigation) for such violations,

330  are quintessential government functions. See Cf NCAA v. Tarkanian, 488 U.S. 179, 195-96 (1988)

331  <u>Compulsion and Encouragement</u>

332  40.     Under §230, Twitter was encouraged to ferret out violations of federal law, they are

333  also encouraged to punish the violators. See § 230(b)5. Both legal schemes amount to "compulsion

334  of sovereign authority" and implicate constitutional protections. See Skinner v. Railway

335  Executives' Ass'n, 489 U.S. Id at. 614 (1989)

336  41.     State commandment through statutory enactment is such a strong basis for finding

337  state action that a court is likely to find state action even if Twitter would have taken the same

338  action independently of the existence of the statute. By enacting §230, Congress reserved for itself

339  the decision as to whether what was fair speech, and it decided on obscene, lewd, lascivious, filthy,

340  excessively violent, harassing, or otherwise objectionable, whether or not such material is

341  constitutionally protected" When Congress commanded a particular result, it has saved to itself

342  the power to determine that result and thereby "to a significant extent" has "become involved" in

343  it, in fact, Congress removed that decision from the sphere of private choice. It has thus effectively

344  determined that a person's Tweets are regulated and restricted from containing obscene, lewd,

345  lascivious, filthy, excessively violent, harassing, or otherwise objectionable, material whether or

346  not such material is constitutionally protected or not and that persons who traffic in obscenity,

347  stalking, or harassment by means of computer can be punished.

348  42.     "A State normally can be held responsible for a private decision only when it has

349  exercised coercive power or has provided such significant encouragement, either overt or covert,

350   that the choice must be deemed to be that of the State." See Blum v. Yaretsky, 457 U.S. 991, 1004

351   (1982). To the latter point, see Flagg Bros. v. Brooks, 436 U.S. 149, 166 (1978); Jackson v.

352   Metropolitan Edison Co., 419 U.S. 345, 357 (1974). Here Congress clearly indicated in the

353   relevant regulation of §230 through its strong preference for punishing, and its desire to share the

354   fruits of such intrusions in the interests of a booming internet. This encouragement, endorsement

355   and participation in the private activity created state action. See Skinner at. 615-16.

356       43.    Whether such a "close nexus" exists here depends on whether Congress "has

357   exercised coercive power in threatening publicly to abolish §230 or threating Anti-Trust

358   Regulations or by providing encouragement, either publicly or through Oversight Hearings or

359   enforcement meetings, the choice must in law be deemed to be that of the Congress." Ibid. See

360   Flagg Bros., supra, at 166; Jackson, supra, at 357; Moose Lodge No. 107 v. Irvis, 407 U.S. 163,

361   173 (1972); Adickes v. S.H. Kress & Co., 398 U. S. supra, at 170 (1970); Action taken by private

362   entities with the mere approval or acquiescence of the State is not state action. Blum, supra, at

363   1004-1005; Flagg Bros., supra, at 154-165; Jackson, supra, at 357.

364       44.    Congress's involvement with §230 lends weight and authority for Twitter to

365   facilitate the enforcement of its public forum. See Cf. Adickes v. S.H. Kress & Co., 398 U. S. 144

366   (1970); Reitman v. Mulkey, 387 U. S. 369 (1967); Railway Employes' Dept v. Hanson, 351 U. S.

367   225 (1956); Shelley v. Kraemer, 334 U. S. 1 (1948). (Quoting Jackson v. Metropolitan Edison Co.,

368   419 U.S. 345 (1974)

369   Policing

370       45.    28 U.S. Code § 2671 of the Federal Law Enforcement Officers' Good Samaritan

371   Act of 1998 defines a "Federal agency" .. to include... corporations such as Twitter. In its limited

372 role, Twitter is a federal actor deputized to carry out an essential enforcement role of §230. Twitter

373 exercised "powers traditionally exclusively reserved to the State." See Jackson v. Metropolitan

374 Edison Co., 419 U.S. 345, 349-52 (1974), by enforcing §230 at the demand and under the

375 supervision of Congress.

376       46.    When enforcing §230, Twitter was exercising a delegated public function subject

377 to constitutional limitations. See U.S. Const. art. 11, § 3 (stating enforcement of federal law is a

378 power delegated to the Executive branch of the federal government); See also TRIBE, supra note

379 5, at § 4-11 (discussing Executive branch duties of law enforcement), and also means that this is

380 not a situation that involves merely the resolution of private disputes. (See Flagg Bros., 436 U.S.

381 at 157).

382 Constitutional Requirements

383       47.    Section §1983 addresses itself to grievances inflicted "under color of any statute,

384 ordinance, [or] regulation . . . of any State . . . ." The regulatory regime imposed by Pennsylvania

385 on respondent utility seems to fit this statute like a glove. Electrical service, being a necessity of

386 life under the circumstances of this case, is an entitlement which under our decisions may not be

387 taken without the requirements of procedural due process. See Fuentes v. Shevin, 407 U.S. 67, 80

388 (1972); Goldberg v. Kelly, 397 U.S. 254 (1970); Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d

389 153 (CA6 1973)

390       48.    Similar in nature to this case, federal court cases have held that SROs are state

391 actors when they engage in enforcement proceedings;  See Intercontinental Indus., Inc. v.

392 American Stock Exch., 452 F.2d 935, 941 (5th Cir. 1971) (stating that AMEX is a state actor);

393 United States v. Sloan, 388 F. Supp. 1062, 1064 (S.D.N.Y. 1975) (noting that the proper remedy

394   for dismissal by the NYSE for claiming a Fifth Amendment privilege is a suit for denial of due

395   process) a prerequisite of which is a determination that the NYSE is a state actor; Villani v. New

396   York Stock Exch., 348 F. Supp. 1185, 1188 n.l (S.D.N.Y. 1972) (stating that NYSE is bound by

397   due process requirements of Fifth Amendment), affd sub nom Sloan v. New York Stock Exch.,

398   489 F.2d 1 (2nd Cir. 1973); Crimmins v. American Stock Exch., 346 F. Supp. 1256, 1259

399   (S.D.N.Y. 1972); Harwell v. Growth Programs, Inc., 315 F. Supp. 1184, 1188 (W.D. Tex. 1970)

400   (stating that NASD is a state actor)

401   Summary

402       49.     State action is present here because Twitter has a partnership with Congress through

403   §230, and it provides an essential public service of performing law enforcement functions, which

404   are required to be supplied on a reasonably continuous basis 230, and hence performs a public

405   function and transforms Twitter into a State Actor.

406       50.     Twitter, primarily acting as instrumentalities or agencies of the United States and

407   local New Hampshire law enforcement agencies, chose to be a "Good Samaritan" in carrying out

408   the wishes of Section §230 and converts a private entity like Twitter into a state actor or is

409   equivalent to state action—because the private entity [Twitter] is voluntarily performing a

410   traditional, exclusive public functions such as regulating criminal and non-criminal speech and

411   behaviors at a local and State level.

412       51.     Twitter does in fact "police" it's public forum at the direction of the Federal

413   Government and Congress which enables it to take enforcement actions against those that

414   Congress believes to be law breakers of obscenity, disturbing the peace, fighting words, or in

415   Twitters case in which it "police(s)" "behaviors", which are all policing powers traditionally

416 performed by local police, departments or municipalities which are generally considered State

417 actions. This, in effect, turns Twitters operation into a governmental function that serves public

418 interest and to which they receive "benefits" of Executive status in the form of legal immunity and

419 in the savings of legal fees in return for policing it's designated public forum under the government

420 created §230. Twitter also benefits from §230 as they use it as a authoritive bully whip upon its

421 users without any retribution or due process rights afforded to users like Sensa. Twitter also

422 leverages and benefits in the use of §230 as it is instrumental in producing and enforcing its own

423 Health Policies and even brazened them to promulgate a new Health Policy that now polices

424 "behaviors" that are routinely protected by the States through their prospective Constitutions or

425 local criminal laws.

426       52.     Private individuals and corporations, exercising public functions, or wielding

427 power under public authority, without liability and through direct primary legislation of Congress,

428 tread on the rights of free speech and due process rights under the US and New Hampshire

429 Constitutions.

430 Twitter has wrapped itself in 230

431       53.     Twitter, willfully participating and acting in accordance with their authority

432 through 230, deprived Sensa of his Constitutional rights. Twitter, entwined with governmental

433 policies, members of Congress and the President has become so impregnated with government

434 character and therefore should be subject to constitutional limitations placed upon state action. It

435 can also be fairly stated that Twitter, having to answer to Congress, the United States Attorney

436 General, honorable, William Barr and the President of the United States regarding Twitters use of

437

438

439    230 suggests coercive power. (See Affidavit, Exhibit A, in support of this motion, Executive

440    exercise of coercive power).

441        54.    It is because Congress delegated to Twitter Executive policing powers through 230

442    by which Sensa was injured. Twitter, endowed by 230 acted as an instrument of Congress. Twitter

443    also has a symbiotic relationship with Congress through 230 to which it assumed the traditional

444    Constitutional and Executive duties of policing speech and other criminal acts which are enforced

445    by State and Local Law Enforcement Agencies, and was in fact acting for Congress and relied on

446    governmental assistance to police its public forum and received many benefits for its work.

447        55.    For the reasons stated herein, and in the supporting brief and memorandum of law,

448    and all that is attached, this Court should declare that Twitter, Inc., a "State Actor" under the law,

449    OR minimally, that it was, within the time frame of Sensa's Complaint.

450                                    **PRAYER FOR RELIEF**

451        WHEREFORE, as there is a substantial likelihood that Sensa will succeed on the merits of

452    his claims, Sensa seeks the following relief in this action;

453        Declare Twitter, Inc., a "State Actor" under the law, OR minimally, that it was, within the

454    time frame of Sensa's Complaint.

455
456                                Respectfully submitted,
457
458
459                                /s/ Anonymously as Sensa Verogna
460                                SensaVerogna@gmail.com
461
462
463
464

465   CERTIFICATE OF SERVICE

466   I hereby certify that on this 29th day of May 2020, I have contracted the foregoing Brief, to be
467   served in hand, directly to the agent of record for Twitter Inc., The Corporation Trust Company
468   Corporation, Trust Center, 1209 Orange Street, Wilmington, DE 19801

469

470

471

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
## TO DECLARE TWITTER A "STATE ACTOR" UNDER LAW

### Case #: 1:20-cv-00536-SM

**Page(s)**

**Constitutions and Bill of Rights**

Part I, Articles 22 and 32 of the New Hampshire Constitution…………………………………...6

U.S. Constitution Article [I]…………………………………………………………………………6

United States Bill of Rights, including the First, Fifth, and Fourteenth Amendments………….. 6

U.S. Const. art. 11, § 3……………………………………………………………………….......14

**Federal Laws and Codes**

Communications Decency Act of 1995' 47 U.S. Code §230………….…...2,3,5,6,12,13,14,15,16,17

§ 230(a)…………………………………………………………………………………………7

§ 230(b)(1), (2), (3), (4)………………………………...……………………………………7

§ 230(b)5……………………………………………………………………………………….7,12

§ 230(c)……………………………………………………………………………………...……7

§ 230(d)…………………………………………………………………………………...………7

§ 230 (e)……………………………………………………………………………...…………8

Section §1983…………………………………………………………………………….......15

Congressional Research Service 7-5700 www.crs.gov 98-317)……………………………………5

(See 83 Note, Governmental Action and the National Association of Securities

Dealers, 184 47 FORDHAM L. REv. 585, 595 (1979)……………………………………………12

28 U.S. Code § 2671, Good Samaritan Act of 1998………………………………………...…14

TRIBE, supra note 5, at § 4-11……………………………………………………………………14

**Supreme Court**

Public Service Comm'n v. Wycoff Co., Inc.

       344 U.S. 237 (1952) ………………………………………………...………………2

Evans v. Abney

    396 U.S. 435, 445 (1970)…………………………………………………...…………...……8

Moose Lodge No. 107 v. Irvis

    407 U.S. 163, 173, 171-179 (1972)……………………………………………………8,13

Lugar v. Edmondson Oil Co., Inc.

    457 U.S. 937, 941-942 (1982)……………..………………………………………..…..8,9

Georgia v. McCollum

    505 U.S. 42, 50-51 (1992)………………………………………………...…………………8

Blum v. Yaretsky

    457 U.S. 991, 1004 (1982) and at 1004, 102 S. Ct. 2777) ……………...…………….9, 11

    457 U.S. at 1004-05 Id. at 1004…………………………………………………………14

Edmonson v. Leesville Concrete Co.

    Edmonson, 500 U.S. at 632 and at 621-622. (1991)..………………………………………9

Jackson v. Metro. Edison Co.

    419 U.S. 345, 349-50, 357, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974)..…………….......9,10,14

Nixon v. Condon

    286 U. S. 73 (1932) …………………………………………………………..…………9

Terry v. Adams

    345 U. S. 461 (1953)………………………………………………………………....……..9

Marsh v. Alabama

    Marsh v. Alabama, 326 U. S. 501 (1946) (company town)………………………………10

Evans v. Newton

    382 U. S. 296 (1966) ………………………..………………………………..…………10

NCAA v. Tarkanian

    488 U.S. 179, 191, 195-96 (1988) …………………………………………….10,12, 13

The Supreme Court

    1977 Term, 92 HARV. L. REV. 57, 128 (1978) ……………………………………....…11

Monroe v. Pape

    365 U.S. 167, 172 (1961)……………………………………………………………………11

United States v. Classic

    313 U.S. 299, 326 (1941)……………………………………………………………………11

Dennis v. Sparks

    449 U.S. 24, 27, 101 S. Ct. 183, 186, 66 L. Ed. 2d 185 (1980)……………………………11

West v. Atkins

    487 U.S. 42 (1988)……………………………………………………………………………12

North Georgia Finishing, Inc. v. Di-Chem, Inc.

    419 U.S. 601 (1975)…………………………………………………………………………12

West v. Atkins

    487 U.S. 42 (1988)……………………………………………………………………………12

Skinner v. Railway Executives' Ass'n

    489 U.S. Id at. 614, 15-16 (1989)………………………………………………………13, 14

Flagg Bros., Inc. v. Brooks

    436 U.S. supra, at 154-165 (1978)…………………………………….……………10,12,14,15

Adickes v. S.H. Kress & Co.

    398 U. S. 140, 144, supra, at 170 (1970)……………………………………………..……14

Reitman v. Mulkey

    387 U. S. 369 (1967)…………………………………………………………………………14

Railway Employes' Dept v. Hanson

    351 U. S. 225 (1956)…………………………………...………………………………………14

Shelley v. Kraemer

    334 U. S. 1 (1948)……………………………………………………………………..………14

Fuentes v. Shevin

    407 U.S. 67, 80 (1972)……………………………………………………………...………15

Goldberg v. Kelly

    397 U.S. 254 (1970)...............................................................15

DeShaney v. Winnebago County Department of Social Services

    489 U.S. (1989)............................................................ Motion, pg.2

1883 U.S. LEXIS

    928, 27 L. Ed. 835, 3 S. Ct. 18, 109 U.S. 3.........................Motion, pg. 3

**Federal Courts**

Amer. Household Products, Inc. v. Evans Manufacturing, Inc.

    139 F.Supp.2d 1235, 1239 (N.D. Al. 2001).....................................1

Baker v. City of Marietta

    271 Ga. 210, 214, 518 S.E.2d 879, 884 (1999)..................................1

Cox v. Athens Reg. Med. Cent.

    279 Ga. App. 586, 594, 631 S.E.2d 792, 799 (2006).............................1

New England Tel. & Tel. Co. v. CONVERSENT COMM.

    (D.R.I. 2001)..............................................................1

Perkins v. Londonderry Basketball Club

    196 F.3d 13, 18 (1st Cir.1999)...............................................9

Barrios-Velazquez v. Asociacion De Empleados

    84 F.3d 487, 491-94 (1st Cir.1996)...........................................9

Lewis v. Law-Yone

    813 F. Supp. 1247, 1254 (N.D.Tex.1993)......................................9

Roche v. John Hancock Mutual Life Insurance Co.

    81 F.3d 249, 253-54 (1st Cir.1996)..........................................11

Palmer v. Columbia Gas of Ohio, Inc.

    479 F.2d 153 (CA6 1973).....................................................15

Intercontinental Indus., Inc. v. American Stock Exch.

    452 F.2d 935, 941 (5th Cir. 1971) ...........................................15

United States v. Sloan

    388 F. Supp. 1062, 1064 (S.D.N.Y. 1975) ……………………………………………..15

Villani v. New York Stock Exch.

    348 F. Supp. 1185, 1188 n.l (S.D.N.Y. 1972)…………...……………………...…….16

Sloan v. New York Stock Exch.

    489 F.2d 1 (2nd Cir. 1973)..……………………………………………..……...…..16

Crimmins v. American Stock Exch.

    346 F. Supp. 1256, 1259 (S.D.N.Y. 1972)..……………………………………...……16

Harwell v. Growth Programs, Inc.

    315 F. Supp. 1184, 1188 (W.D. Tex. 1970)..…………………………..………………16