IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Sensa Verogna, Plaintiff,        )
       v.                        )   Case #: **1:20-cv-00536-SM**
Twitter Inc.,  Defendant.        )

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO DECLARE TWITTER'S COMPUTER NETWORK A PUBLIC FORUM UNDER LAW

1. The Declaratory Judgment Act, 28 U.S.C. § 2201, is an enabling Act which confers a discretion on the courts. See Public Service Comm'n v. Wycoff Co., Inc., 344 U.S. 237 (1952)

2. Plaintiff seeks a declaratory judgement and direction from the Court before taking any future action as such direction will afford Plaintiff relief from uncertainty or insecurity and not risk taking future undirected actions. See Amer. Household Products, Inc. v. Evans Manufacturing, Inc., 139 F.Supp.2d 1235, 1239 (N.D. Al. 2001); Cox v. Athens Reg. Med. Cent., 279 Ga. App. 586, 594, 631 S.E.2d 792, 799 (2006); See also Baker v. City of Marietta, 271 Ga. 210, 214, 518 S.E.2d 879, 884 (1999)

3. A declaratory judgement is an equitable tool used by courts to define the legal rights and obligations of parties. In a declaratory judgement action, there may be questions of law and fact for the trial court to decide. See New England Tel. & Tel. Co. v. CONVERSENT COMM. (D.R.I. 2001)

Background

4. On June 26, 2013, Twitter CEO Dick Costolo said at the annual convention of the American Society of News Editors.

> "We think of Twitter as a global town square; public, live, where conversation and media are distributed,"

"We don't do any analysis of information as it pours in. We don't report on the tweets as they come in, we think we're complementary to news organizations. It's the job of journalists to analyze, synthesize and go deeper into information," he added.

5. Sept 5, 2018, Dorcey. Jack Dorsey CEO of Twitter testify before the Senate Intelligence Committee in a hearing on "Foreign Influence Operations and Their Use of Social Media Platforms."

"We believe that the people use Twitter as they would a public square, and they also have the same expectations that they would have in any public space" and "For our part, we see our platform as hosting and serving conversations. Those conversations are in the public, we think there's a lot of benefit to those conversations being in the public but there's obviously a lot of risks as well. We see that news and entertainment are actually byproducts of public conversation and we see our role as helping to not only serve that public conversation so that everyone can benefit even if they don't have a twitter account, but also to increase the health of that conversation as well and "in order to do that we need to be able to measure it. We need to understand what healthy participation looks like in a public square and we need to amplify that."

6. To quote Dorsey (emphasis mine):

"Today we're committing to the people and this committee to do that work and do it openly. We're here to contribute to a healthy public square, not compete to have the only one."

7. September 5, 2018. Dorcey tweets;

" We believe many people use Twitter as a digital public square. They gather from all around the world to see what's happening and have a conversation about what they see."

8. September 5, 2018, Dorcey tweets;

"Twitter cannot rightly serve as a public square if it's constructed around the personal opinions of its makers. We believe a key driver of a thriving public square is the fundamental human right of freedom of opinion and expression."

9. October 16, 2018 Transcript from a Wired conversation, Dorcey states;

"We believe our purpose is to serve the public conversation. A lot of people come to twitter and they don't' really see an app or a service, they see, what kinda looks like a public square, and they have the same sort of expectations of

a public square, and that is what we have to make sure that we get it right." "and also make sure that everyone feels safe to participate in that public square.

10. The U.S. Supreme Court has described social media sites such as Twitter as the "modern public square." Packingham v. North Carolina (2017) 582 U.S. __ [137 S. Ct. 1730, 1737]. As the U.S. Supreme Court noted in Packingham, "[O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose. They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" Id. at p. 1737 (citation omitted) (quoting Reno v. American. See Civil Liberties Union (1997) 521 U. S. 844, 870 [117 S.Ct. 2329]).

11. Section 230 regulates through participating volunteers or whistleblowers the private property of Twitters platform or "computer network" for the publics welfare. See Perry Education Assn. v. Perry Local Educators' Assn., 460 U. S., at 45. Similarly, when the Government has intentionally designated a place or means of communication as a public forum speaker cannot be excluded without a compelling governmental interest. Access to a nonpublic forum, however, can be restricted as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." Id., at 46.

12. The State had in turn made its laws of trespass available to shopping center owners, enabling them to exclude those who wished to engage in expressive activity on their premises.[1]*9*91 Rights of free expression become illusory when a State has operated in such a way as to shut off effective channels of communication. See  PruneYard Shopping Center v. Robins 129, 64 L. Ed. 2d 741, 100 S. Ct. 2035, 447 U.S. 74 (1980)

13. In Food Employees v. Logan Valley Plaza, 391 U.S. 308 (1968), this Court held that the First and Fourteenth Amendments prevented a state court from relying on its law of

97 trespass to enjoin the peaceful picketing of a business enterprise located within a shopping center.
98 The Court concluded that because the shopping center "serves as the community business block"
99 and is open to the general public, "the State may not delegate the power, through the use of its
100 trespass laws, wholly to exclude those members of the public wishing to exercise their First
101 Amendment rights on the premises." Id., at 319

102     14.    Widmar v. Vincent, 454 U.S. 263 (1981) (public university need not create a public
103 forum, but having done so, it may not restrict access so as to exclude some groups based on the
104 religious content of their speech without constitutional justification); Madison Joint School
105 District v. Wisconsin Employment Relations Comm'n, 429 U.S. 167 (1976) (School Board need
106 not create a public forum, but having done so, it cannot restrict who may speak based on the content
107 or viewpoint of the speech).

108     15.    In any event, it seems to me clear that when a local government contracts to use
109 private property for public expressive activity, it creates a public forum. See Denver Area Ed.
110 Telecommunications Consortium, Inc. v. FCC 135 L. Ed. 2d 888, 116 S. Ct. 2374, 518 U.S.
111 727(SCOTUS 1996)

112     16.    "[A]ll private property is held subject to the power of the government to regulate
113 its use for the public welfare." (Agricultural Labor Relations Bd. V. Superior Court (1976) 16
114 Cal.3d 392, 403 [128 Cal. Rptr. 183, 546 P.2d 687]. Twitter posts no signs such as 'NO
115 TRESPASSING[.] PRIVATE PROPERTY[.] on its computer network.

116     17.    The Internet is "not a physical or tangible entity, but rather a giant network which
117 interconnects innumerable smaller groups of linked computer networks." ACLU v. Reno, 924 F.
118 Supp. 824, 830 (E.D. Pa. 1996), aff'd, 117 S.Ct. 2329 (1997).

18. In the unanimous 1980 decision Pruneyard Shopping Center v. Robins, the U.S. Supreme Court affirmed the state court's decision, noting that its own reasoning in Lloyd "does not ex proprio vigore ("of its own force") limit the authority of the State to exercise its police power" (power to regulate the use of private property) "or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." A state may, therefore, in the exercise of its power to regulate, adopt reasonable restrictions on private property, including granting greater freedom to individuals to use such property, so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision. (In this instance it would be a "taking" of a property owner's right to exclude others.) See Robins V. Pruneyard Shopping Center 23 Cal.3d 899, 592 P.2d 341, 153 Cal Rptr 854 (1979)

19. In 1980, the New Jersey Supreme Court articulated three factors when balancing individual expression rights with property rights in the context of free speech at a privately owned university: (1) the nature, purpose and primary use of such private property; (2) the extent and nature of the public's invitation to use that property; and (3) the purpose of the expressive activity undertaken on such property in relation to both the private and public use of the property. The New Jersey Supreme Court reasoned that because the mall owners "have intentionally transformed their property into a public square or market, a public gathering place, a downtown business district, a community," they cannot later deny their own implied invitation to use the space as it was clearly intended. See State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980) and Coalition for Quality Health Care v. New Jersey Department of Banking Insurance, 348 N.J.Super. 272, 791 A.2d 1085 (App.Div.)

20. State Constitutions furnish to individuals the complementary freedoms of speech and assembly and protects the reasonable exercise of those rights. These guarantees extend directly to governmental entities as well as to persons exercising governmental powers. They are also available against unreasonably restrictive or oppressive conduct on the part of private entities that have otherwise assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property. The State Constitution in this fashion serves to thwart inhibitory actions which unreasonably frustrate, infringe, or obstruct the expressional and associational rights of individuals exercised under Article I, paragraphs 6 and 18 thereof. See State v. Schmid, 84 N.J. 535, 549, 423 A.2d 615 (1980)

21. Considering Twitter's past public statements of; "Freedom of expression means little as our underlying philosophy if we continue to allow voices to be silenced because they are afraid to speak up", and "The safety of our users is part of and inseparable from our mission at Twitter and our unwavering support for freedom of expression.", and that Twitters platform is dedicated to public use, is open to the public for the free exchange of ideas and a place for public discourse it is therefore, for all intent and purposes, a public forum which is governed by First Amendment constraints, Plaintiff's rights to free speech and freedom to assembly under the U.S. Constitution and the New Hampshire Constitution should outweigh the protected private-property rights Twitter has in its platform. Twitter would also violate the Presidents' First Amendment Rights and accounts similar to his, if it were found to be throttling, limiting, shadow banning or limiting any of its content or messages in any way.

22. In City of Jamestown v. Beneda, the North Dakota Supreme Court found that restrictions on speech by mall authorities involved state action. In this case, the city of Jamestown owns the mall and the property and leases it to a private developer. Despite the lease, the court

found a government responsibility to protect the people's right of free speech. See City of Jamestown v. Beneda, 477 N.W.2d 830, 837–8 (N.D., 1991).

23. Also, in 2004, Florida's 1st District Court of Appeals upheld a 2003 decision by Circuit Court Judge Dedee Costello, who overturned a trespassing conviction against Kevin Wood in State of Florida v. Wood. Wood was arrested for trespassing while collecting signatures at a local mall to get his name added to the ballot for the county court clerk position. According to the Osceola News Gazette, Costello wrote that Florida's Constitution "prohibits a private owner of a 'quasi-public' place from using state trespass laws to exclude peaceful political activity." See State v. Wood, 700 So. 2d 401 (Fla. Dist. Ct. App. 1997)

24. The Pennsylvania Supreme Court explained that defendants were entitled to distribute leaflets on the private college campus "because the college had made itself into a public forum" by permitting the public to "walk its campus freely and use many of its facilities" and by "encouraging the public to attend the symposium." See Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Insurance Co., 515 A. 2d 1331 (Pa. 1986)

25. On May 23, 2018 a Southern District of New York in a case concerning whether private property has been dedicated to public use, or whether the government has opened the space for expressive activity concluded that the interactive space of a tweet from the @realDonaldTrump account constitutes a designated public forum. Significantly, the district court concluded that "the interactive space for replies and retweets created by each tweet sent by the @realDonaldTrump account" should be considered a "designated public forum" where the protections of the First Amendment apply. See Knight First Amendment Institute v. Trump, No. 1:17-cv-05205 (S.D.N.Y.) (2019)

26. On July 9, 2019, the U.S. Court of Appeals for the Second Circuit issued a decision affirming the trial court's ruling described above. In its opinion, the appellate court concluded that the President had essentially converted the private @realDonaldTrump Twitter account into a government account by using it for official business. The court further held that the President had opened up the "interactive space" of that platform as a public forum for purposes of the First Amendment by making the account's "interactive features accessible to the public without limitation." Consequently, because the First Amendment prohibits viewpoint discrimination in public forums, the court concluded that the President acted unlawfully when he blocked users from these interactive spaces on the basis of the users' viewpoints. See Knight First Amendment Institute at Columbia University v. Trump, No. 18-1691 (2d Cir. 2019)

27. Berman v. Parker, 348 U. S. 26 (1954), the court held that such economic development qualified as a valid public use under both the Federal and State Constitutions. 268 Conn., at 40, 843 A. 2d, at 527. On the other hand, it is equally clear that a State may transfer property from one private party to another if future "use by the public" is the purpose of the taking; the condemnation of land for a railroad with common-carrier duties is a familiar example Kelo v. New London, 545 U.S. 469 (2005)

28. Today, one of the most important places to exchange views is cyberspace, particularly social media, which offers "relatively unlimited, low-cost capacity for communication of all kinds," See Packingham v. North Carolina 368 N. C. 380, 777 S. E. 2d 738, (2017) as quoted in Reno v. American Civil Liberties Union, 521 U. S. 844, 870, (1997)

29. The government can designate new public forums by making "an affirmative choice" to create a space that is open for public expression. The Supreme Court has recognized that the Internet in general, and social media in particular, has become a critical forum for the

209 expression of protected speech. And the federal courts of appeals have held that the government
210 can create public forums on the Internet.

211 30. Sometimes, the government opens public property for public expression even
212 though the public property is not a traditional public forum. These are designated public forums.
213 After opening a designated public forum, the government is not obligated to keep it open.
214 However, as long as the government does keep the forum open, speech in the forum receives the
215 same First Amendment protections as speech in traditional public forums. Examples of designated
216 public forums include municipal theaters and meeting rooms at state universities.

217 31. Airports generally are not designated public forums but rather nonpublic forums,
218 because they are places where people congregate to travel, not to speak (see, for example,
219 International Society for Krishna Consciousness, Inc. v. Lee, 502 U.S. 1022, 1992). Similarly, a
220 public-school during school hours is a nonpublic forum and not a designated public forum because
221 it is dedicated to teaching and learning, not to freedom of expression (see, for example, Bethel
222 School District No. 403 v. Fraser, 478 U.S. 675, 1986).

223 32. Twitter has become a critical public forum for the expression of protected speech
224 and the federal courts of appeals has held that the government can create public forums within
225 Twitter's public forum computer network such the accounts Plaintiff interacted with such as the
226 @realDonaldTrump account and other government officials' accounts who use their Twitter
227 accounts for official business and where the protections for viewpoint discrimination of the First
228 Amendment apply in such designated DPF's.

229 33. Applying any four-factor test would be useless as Twitter voluntarily submitted to
230 being a public forum.

34. Plaintiff's Rights to Free Speech were violated when Twitter deleted Plaintiff's 2nd actioned Tweet from their Public Forum as stated in Plaintiff's Claim III.

35. Plaintiff's Rights of Assembly were violated when Twitter banned him from a Public Forum and other Designated Public Forums, DPF's, such as President, Donald Trump as stated in Plaintiff's Complaint Claim III.

Respectfully,

/s/ Plaintiff, Anonymously as Sensa Verogna

SensaVerogna@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June 2020, the foregoing document was made upon the Defendant, through its attorneys of record to Jonathan M. Eck  jeck@orr-reno.com and Julie E. Schwartz, Esq., JSchwartz@perkinscoie.com