IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

DISTRICT OF NH
FILED
2020 JUL -6 P 9: 07
24 HOUR DEPOSITORY

Sensa Verogna, Plaintiff, )
v. ) Case #: **1:20-cv-00536-SM**
Twitter Inc., Defendant. )

---

**PLAINTIFF'S REPLY AND MEMORANDUM OF LAW TO TWITTER, INC.'S OBJECTION TO PLAINTIFF'S MOTION TO DECLARE TWITTER'S COMPUTER NETWORK A PUBLIC FORUM UNDER LAW**

1. Plaintiff, respectfully Replies to Defendant's Objection [Doc. 26], to Plaintiffs Motion to Declare Twitter's Computer Network a Public Forum Under Law [Doc. 16]. Plaintiff also incorporates any Declaratory Act arguments set forth in [Doc. 19] and [Doc. 20]. In support of his reply to the objection, Plaintiff states as follows:

2. Defendants' Default is an admission of the facts cited in the Complaint, See Pitts ex rel. Pitts v. Seneca Sports, Inc., 321 F. Supp.2d 1353, 1357 (S.D. Ga. 2004); Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1204 (5th Cir. 1975), and is sufficient to establish Defendants liability on Plaintiffs stated legal theories in his claims. Here, the Plaintiff has established that Defendants were at the times alleged in the Complaint, a Public Accommodation, a Public Forum, and a State Actor under law, through the well pled facts in his Complaint.

19. Plaintiff's Claim III alleges that Defendant; 1) acting under the color of law in a public forum, and/or 2) operating a public forum and fulfilling functions ordinarily reserved to the state in a public forum, [Doc. 1 @ 166], deprived the Plaintiff of his Constitutional Rights to free speech, political speech and his right to assembly, [Doc. 1 @ 168], using viewpoint-based discriminatory acts to delete the Plaintiff's 2nd tweet and then using a race-based discriminatory Health Policy to ban the Plaintiffs account and access to speak or assemble in a public forum and also the banning

of access to governmental officials' DPF's accounts within their public forum, [Doc. 1 @ 172], by Twitter's bias, anti-white and non-white Workforce, causing injuries and damages. [Doc. 1 @ 173, 174]. Whether by state action or privately, each theory would strip Defendants of any 1st Amendment and 14th Amendment defenses and is not redundant or repetitious, but simply an alternate theory of the claims. The Plaintiff also submits, that even if the Court were to decide that there is no interdependent or symbiotic relationship between the private entity and the state government Lloyd Corp. v. Tanner, supra, and that Twitter was not a state actor, [Doc. 6 & 20], this does not mean that Twitter could not have violated the Plaintiff's constitutional rights as a private owner of a public forum. In deciding whether or not Twitter's computer network is a public forum, the Court should not only look at the nexus between Twitter and the State, but also how Twitter presents itself to the public and the political arenas.

4. For the reasons stated herein, and in the supporting memorandum of law, and the arguments brought in [Doc. 16], this Court should declare that Twitter's computer network is a Public Forum under the law, OR minimally, that it was, within the time frame of Plaintiff's Complaint.

Respectfully,

_____
/s/ Plaintiff, Anonymously as Sensa Verogna
SensaVerogna@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of July 2020, the foregoing document was made upon the Defendant, through its attorneys of record to Jonathan M. Eck jeck@orr-reno.com and Julie E. Schwartz, Esq., JSchwartz@perkinscoie.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Sensa Verogna, Plaintiff,           )
    v.                              )    Case #: **1:20-cv-00536-SM**
Twitter Inc.,  Defendant.           )
_____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S REPLY TO TWITTER, INC.'S OBJECTION TO PLAINTIFF'S MOTION TO DECLARE TWITTER'S COMPUTER NETWORK A PUBLIC FORUM UNDER LAW**

1.  Plaintiff, files this Memorandum of Law in Support of its Reply to Twitter's Objection [Doc. 26], to Plaintiffs Motion to Declare Twitter's Computer Network a Public Forum Under Law [Doc. 16].

2.  Like Plaintiff's previous Motions for Declaratory relief, Plaintiff has complied within the Federal Rules of Civil Procedure, does not feel that it is inappropriate or redundant and believes Twitter's Computer Network is a Public Forum Under the Law. The Plaintiff includes his declaratory relief arguments filed in [Doc. 5] (the "Public Accommodation Motion"); and [Doc. 6]. (the "State Actor Motion") into this reply and vis-versa.

3.  Declaratory relief is appropriate where a litigant needs direction from a court before from taking future action. Such direction will afford the litigant relief from uncertainty or insecurity. See Amer. Household Products, Inc. v. Evans Manufacturing, Inc., 139 F.Supp.2d 1235, 1239 (N.D. Al. 2001). And "Although 'the district court's discretion is broad, it is not unfettered.'" St. Paul Ins. Co. v. Trejo, 39 F.3d 585, 590 (5th Cir. 1994) (quoting Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc., 996 F.2d 774, 778 (5th Cir. 1993))

4.  "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). Federal courts consequently have

broad discretion to grant or refuse declaratory judgment. See Torch, Inc. v. LeBlanc, 947 F.2d 193, 194 (5th Cir. 1991). As another judge in this district has explained, [t]he federal Declaratory Judgment Act [("DJA")] does not create a substantive cause of action. A declaratory judgment action is merely a vehicle that allows a party to obtain an early adjudication of an actual controversy arising under other substantive law. ... [In sum, t]he DJA is an authorization, not a command. It gives federal courts the competence to declare rights, but it does not impose a duty to do so. Klein v. Fed. Ins. Co., Nos. 7:03-cv-102-D & 7:09-cv-94-D, 2014 WL 4476556, at *9 (N.D. Tex. Sept. 11, 2014) (internal quotation marks omitted).

5. The goals of the Declaratory Judgment Act include: (i) relieving litigants of the old common-law rule that a declaration of rights cannot be adjudicated unless the right has already been violated; (ii) rendering practical help in ending controversies which have not reached a stage where other legal relief is immediately available; (iii) settling uncertainties with respect to rights, status, or other equitable and legal relationships; (iv) avoiding multiple suits; and (v) providing clarity where technical or social changes have placed in doubt one's rights, immunities, status, or privileges. Kendrick v. Everheart, 390 So. 2d 53, 59 (Fla. 1980); Roth v. The Charter Club, Inc., 952 So. 2d 1206, 1207 (Fla. 3d DCA 2007) (holding complaint for declaratory judgment on proper interpretation of statute was sustainable); Jackson v. Fed. Ins. Co., 643 So. 2d 56, 58 (Fla. 4th DCA 1994) (finding justiciable controversy on entitlement to disability benefits after training).

6. Florida law requires that the courts liberally construe and administer the application and scope of Florida's Declaratory Judgment Act, providing the Act with elastic and inclusive boundaries, and liberally allowing a declaratory claim to continue where the plaintiff has pled the elements for a cause of action. Backus v. Howard W. Backus Towing, Inc., 391 So. 2d 378, 380–81 (Fla. 3d DCA 1980) (reversing dismissal of counterclaim for declaratory relief where cause of

action pled, under requisite liberal construction and application); Trafalgar Developers, Ltd. v. Morley, 305 So. 2d 274, 274–75 (Fla. 3d DCA 1974) (affirming trial court's retention of jurisdiction over counterclaim for declaratory relief even after dismissing complaint); Rigby v. Liles, 505 So. 2d 598, 600 (Fla. 1st DCA 1987) (reversing order granting dismissal of action for declaratory relief in statute of limitations dispute where elements for relief were pled).

7. The uniform act authorizes the broader view, since the statute "provides that 'whether or not further relief is or could be claimed,' i. e., whether a coercive remedy like damages, injunction or specific performance (1) is also claimed, (2) could be claimed but is not claimed, or (3) could not be claimed, the declaratory judgment may not on that ground be denied. The New York Court of Appeals recognized in Woolard v. Schaffer Stores Co.7 4 that "while resort to the use of a declaratory judgment is usually unnecessary where an adequate remedy is already provided by another form of action 'no limitation has been placed upon its use.'". Borchard, Declaratory Judgments (1939) 9 Brooklyn L. Rev. 1, 6 Current Legal Thought 59. (1936) 272 N. Y. 304, 5 N. E. (2d) 829.

8. To properly state a sustainable cause of action for declaratory relief, a complainant must allege that (1) there is a bona fide dispute between the parties; (2) the complainant has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their existence may depend; (3) the complainant is in doubt as to the right, status, immunity, power, or privilege; and (4) there is a bona fide, actual, and present need for the declaration. May v. Holley, 59 So. 2d 636 (Fla. 1952); Romo v. Amedex Ins. Co., 930 So. 2d 643, 648 (Fla. 3d DCA 2006). All the antagonistic and adverse interests are all before this court, and the relief sought is not merely the giving of legal advice by the courts or the answering

74 questions propounded from sheer curiosity. City of Sarasota v. Mikos, 613 So. 2d 566, 567 (Fla.
75 2d DCA 1993).

76    9.    The test for sufficiency of a declaratory relief claim is not whether the claim shows
77 that the plaintiff will prevail, but whether there is a bona fide dispute and the plaintiff is entitled to
78 a declaration of rights. Rigby, 505 So. 2d. at 600; Verdecia v. Am. Risk Assur. Co., 494 So. 2d
79 294, 294 (Fla. 3d DCA 1986) (reversing dismissal of complaint for declaratory relief); Tavares v.
80 Allstate Ins. Co., 342 So. 2d 551, 553 (Fla. 3d DCA 1977) (holding that dispute over contract
81 coverage sustained an action for declaratory relief).

82    10.    That the declaration of rights requested may result in a judgment against the
83 plaintiff does not destroy the plaintiff's right to such a declaration. Tavares, 342 So. 2d at 553.
84 Thus, a motion to dismiss a claim for declaratory relief can only be granted if the plaintiff failed
85 to establish the existence of any justiciable controversy; it is reversible error for a court to analyze
86 whether the plaintiffs would be entitled to a declaration in their favor. Keen v. Fla. Sheriffs' Self-
87 Insurance Fund, 854 So. 2d 844, 845 (Fla. 4th DCA 2003) (reversing order granting motion to
88 dismiss where court interpreted contract in granting motion);

89    11.    Specifically, with regard to a pre-answer motion to dismiss a declaratory judgment
90 action, the only issue presented for consideration is "whether a cause of action for declaratory
91 relief is set forth, not . . . whether the plaintiff is entitled to a favorable declaration" (North Shore
92 Towers Apts. Inc. v Three Towers Assoc., 104 AD3d 825, 827 [2013] [internal quotation marks
93 and citation omitted]; see Hallock v State of New York, 32 NY2d 599, 603 [1973]). However,
94 "where the court, deeming the material allegations of the complaint to be true, is nonetheless able
95 to determine, as a matter of law, that the Twitter is entitled to a declaration in his or her favor, the
96 court may enter a judgment making the appropriate declaration" (DiGiorgio v 1109-1113

97  Manhattan Ave. Partners, LLC, 102 AD3d 725, 728 [2013]), See Matter of Dashnaw v Town of
98  Peru, NY Sip Op 07913 [111 AD3d 1222].

99  12. "The federal Declaratory Judgment Act is procedural. Farmers Alliance Mut. Ins.
100 Co. v. Jones, 570 F.2d 1384, 1386 (10th Cir. 1978). It "does not create substantive rights for parties
101 . . . [but] merely provides another procedure whereby parties may obtain judicial relief." Martinez
102 v. City of Santa Fe, No. 14-cv-0016 SMV/KBM, 4 (D.N.M. Sep. 24, 2014)

103 13. "It does not hold that the fact that a plaintiff is not entitled to a favorable declaration
104 is a proper basis for the exercise of the trial court's discretion .... But the fact that the party seeking
105 to set the judicial machinery in motion is on the wrong side of a controversy cannot be ascertained
106 prior to the court's consideration and determination thereof, and it cannot be said that a declaration
107 embodying that determination would not be necessary or proper merely because the plaintiff
108 entertained a misconception of law. Thus, as previously noted, it has been held that where the
109 plaintiff is not entitled to a favorable declaration, the court should render a judgment embodying
110 such determination and should not merely dismiss the action. (Anderson, Declaratory Judgments,
111 p. 271.)" (Maguire, supra, at pp. 730-731.) Patel v. Athow, [Civ. No. 31887. Court of Appeals of
112 California, First Appellate District, Division Four. October 23, 1973.]

113 14. There are no parallel proceedings underway in any state court that would provide
114 for ventilation of the issues.) as described in Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995).
115 No constitutional grounds are being sought regarding constitutionality of government conduct. El
116 Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992) suggesting that adjudicating
117 constitutional rights in declaratory actions is never appropriate.

118 15. The First Circuit concluded that the controversy between Arkema and Honeywell
119 regarding the '120 and '882 patents is "of sufficient immediacy and reality to warrant the issuance

of a declaratory judgment." MedImmune, 549 U.S. at 127, 127 S.Ct. 764. *Arkema Inc. v. Honeywell Int'l., Inc.*, 706 F.3d 1351, 1356 (Fed. Cir. 2013) (quoting S. Rep. No. 73-1005, at 2-3 (1934)). And unlike *Zajac, LLC v. Walker Indus.*, No. 2:15-cv-507-GZS, 2016 WL 3962830, at *6–7 (D. Me. July 21, 2016), the Plaintiff here, does seek a declaratory remedy from the Court that would clarify and advance the resolution of the dispute(s) between Twitter and himself. *Curran v. Camden Nat'l Corp.*, 477 F. Supp. 2d 247 (D. Me. 2007). Additionally, the Plaintiff cannot find the *Trans v. Bank* or *Saenz v. Rod's Prod. Servs., LLC* cases proffered by Twitter and thus cannot comment on their relations to this case.

16. Plaintiff agrees that his latest motion for declaratory relief is not a motion for summary judgment and therefore not improper or premature at this stage of the litigation. And, if in fact the Plaintiff has chosen the wrong legal mechanism to bring forth these declaratory motions, the Court should not just summarily dismiss them. And, if not answered by the Court, how will the Plaintiff know whether or not he can in fact make proper Constitutional claims against a private company for operating what the Plaintiff believes to be a Public Forum. Without the Courts answer, Plaintiff is left in the dark as to how to proceed with his Constitutional Claims as there are unanswered questions of law that need to be answered by a judge.

17. Here, the relief Plaintiff seeks—a declaration that Twitter is a "public forum"—is a necessary component of his Constitutional claims in Claim III. It most certainly would not be a waste of judicial resources as the horse must be put back in front of the kart if in fact the Plaintiff misconstrued the legal mechanisms of which motions or actions to bring first.

18. The Plaintiff agrees, in part, that the "public does not generally have a First Amendment right to access private property for expression." or nor "does property lose its private character merely because the public is generally invited to use it for designated purposes." Lloyd

Corp. v. Tanner, 407 U.S. 551, 569 (1972). Or simply because Twitter has many users that create or share content, alone, does not transform a private social media company into a public forum. Fed. Agency of News LLC v. Facebook. The Plaintiff does not claim that Twitter would "transform" into a state actor solely by providing a forum for speech as in Prager v. Google. And that Twitter, as well as being a state actor, owns a computer network that is a "public forum" within the meaning of the First Amendment. And contrary to Twitters arguments, the Ninth Circuit has not interpreted § 230 to grant immunity for causes of action alleging constitutional violations. Roommates.Com , 521 F.3d at 1164.

19. Twitter, in its Objection relies on the inapplicable notion that only state actors can provide a forum for speech, [Doc. 26], completely ignoring the relationship between the First Amendment and the modern Internet. This case does not concern obscenity or any other form of unprotected speech, it concerns free and political speech that strikes at the heart of the First Amendment. "[N]either property rights nor contract rights are absolute. . . . Equally fundamental with the private right is that of the public to regulate it in the common interest. PruneYard, id. 74. And it is well established that private companies may establish public fora in certain circumstances. Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 801 (1985). The fact that Twitter is a private company does not mean the First Amendment is inapplicable to users' Twitter accounts. The key question is whether the user has opened up a forum for expressive activity to the public. See Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017).

20. The guarantees of the First Amendment are effectuated against potential state interference through the Fourteenth Amendment by limiting the extent to which states can restrict individuals in the exercise of rights of speech and assembly. Alleged here, a private computer network was acting under the authority of state government. Hence, the state nexus requirement

that triggers the application of the First Amendment is not readily met in the case of a private computer network. See, e.g., Grafton v. Brooklyn Law School, 478 F.2d 1137, 1143 (2 Cir.1973); Blackburn v. Fisk Univ., 443 F.2d 121, 123 (6 Cir.1971); see generally Annot., "Action of Private Institution of Higher Education as Constituting State Action, or Action Under Color of Law, for Purposes of Fourteenth Amendment and 42 U.S.C.A. § 1983," 37 A.L.R.Fed. 601 (1978). Under the nexus analysis, a government "`can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" San Francisco Arts & Athletics,

21. Inc. v. United States Olympic Committee, 483 U.S. 522, 546, 107 S. Ct. 2971, 2986, 97 L. Ed. 2d 427 (1987), quoting Blum v. Yaretsky, 457 U.S. at 1004, 102 S.Ct. at 2786. Indeed, "the party seeking to establish that action of a private party violated the Constitution must be able to point to the specific act or actions of the government which in fact motivated the private action." Ponce, 760 F.2d at 378 (citation omitted); see also Cohen v. President and Fellows of Harvard College, 568 F. Supp. 658, 660 (D.Mass.1983) (Tauro, J.) (nexus analysis "focus[es] on whether the challenged action of the private entity was compelled or influenced by the government."). In the present case, the plaintiff has offered evidence of such involvement by Congress in the decision by Twitter to ban Plaintiff's 2nd tweet and the subsequent banning of his account or access to a public forum.

22. [i]t is, of course, well-established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation.... To protect free speech and petitioning is a goal that surely matches the protecting of health and safety, the environment, aesthetics, property values and other societal goals that have been held to justify reasonable restrictions on private property rights.

<215>[Robins v. Prune Yard Shopping Center, supra, 23 Cal.3d at 908, 592 P.2d at 346, 153 Cal. Rptr. at 859.] The California Supreme Court has also found that such restrictions upon private property could properly be imposed in order to protect the rights of free speech and petition, viz: State v. Schmid, 84 N.J. 535, 567 (1980). In Supreme Court cases, such as Marsh v. Alabama, supra; Lloyd Corp. v. Tanner, supra, and Prune Yard Shopping Center v. Robins, supra, all recognize generally that the more private property is devoted to public use, the more it must accommodate the rights which inhere in individual members of the general public who use that property. Since it is our State Constitution which we are here expounding, it is also fitting that we look to our own strong traditions which prize the exercise of individual rights and stress the societal obligations that are concomitant to a public enjoyment of private property. See Vasquez v. Glassboro Service Ass'n, supra, *563 83 N.J. at 100-101; State v. Shack, supra, 58 N.J. at 305-308; Zelenka v. Benevolent & Protective Order of Elks, supra, 129 N.J. Super. at 386-387.

23. Notwithstanding the primary thrust of the First Amendment against state governmental interference with expressional freedoms, the guarantees of this Amendment may under appropriate conditions be invoked against nongovernmental bodies. In particular settings, private entities, including educational institutions or in this case, computer networks, may so impact upon the public or share enough of the essential features of governmental bodies as to be engaged functionally in "state action" for First Amendment purposes. The more focused inquiry therefore must be turned to those circumstances that can subject an entity of essentially nongovernmental or private character to the requirements imposed by the First Amendment. State v. Schmid, 84 N.J. 535, 567 (1980). New Hampshire Courts have construed Part I, Article 22 of the New Hampshire Constitution to be more protective than the First Amendment of the United States Constitution in the context of time, place, and manner restrictions and have employed the

same standard to assess the constitutionality of these types of restrictions as is used under the Federal Constitution. Biondolillo, 164 N.H. at 373; Doyle, 163 N.H. at 221. Those focusing upon the scope of the public's invitation and the nature of the expressional activities in relation to the use of private property, the applicability of the First Amendment is less clear. This question brings us to the heart of the problem the need to balance within a constitutional framework legitimate interests in private property with individual freedoms of speech and assembly State v. Schmid, 84 N.J. 535, 567 (1980).

24. Nevertheless, as private property becomes, on a sliding scale, committed either more or less to public use and enjoyment, there is actuated, in effect, a counterbalancing between expressional and property rights. Marsh v. Alabama, supra, 326 U.S. at 506, 66 S.Ct. at 278, 90 L.Ed. at 268. State v. Schmid, held that under the State Constitution, the test to be applied to ascertain the parameters of the rights of speech and assembly upon privately owned property and the extent to which such property reasonably can be restricted to accommodate these rights involves several elements. This standard must take into account (1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property. This is a multi-faceted test which must be applied to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly.

25. Thus, in balancing the right of Twitter to possess and protect its property against the Plaintiffs' freedom of expression in view of the particular activity being conducted in its public forum, the Court should determine that the right of expression should prevail. Similarly, in State

v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980), appeal dismissed sub nom. In Princeton University v. Schmid, it was held that Princeton University, a private institution, could not, in view of state constitutional guarantees, arbitrarily deny political activists permission to disseminate information peacefully in a reasonable manner where the University had a policy of encouraging public political debate on its property. Campaign v. Connecticut General Life Insurance Co., 515 A. 2d 1331 (Pa. 1986) A traditional public forum is a forum which "by long tradition or by governmental fiat [has] been devoted to assembly and debate...." Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45, 103 S. Ct. 948, 954, 74 L. Ed. 2d 794 (1983).

26. Whether speech is constitutionally protected requires an analysis of whether the "speech is of public or private concern, as determined by all the circumstances of the case," including whether the challenged activities take place in a traditional public forum. Id. at 1215. The Plaintiff should have the right to speak freely on the very subjects being discussed publicly on Twitters public forum as they can't invite numerous politicians, other users to speak and express their views, or express views themselves, and then arbitrarily (discriminatory) deny the plaintiff an opportunity to express himself freely on the same subjects. (See Attached Declaration, Exhibit A 1-36). Hence, the Plaintiff suffered a constitutional impairment of his Federal and State constitutional rights of speech and assembly and his banning should be undone. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." Id. at 1216. Speech on matters of public concern "is at the heart of the First Amendment's protection." Id. at 1215 (quotation omitted). "That is because speech concerning public affairs is more than self-expression; it is the essence of self-government." Indeed, the Supreme Court has concluded that the content of protected speech "cannot be restricted simply because it is upsetting or arouses contempt."

27. The nature, purpose, and generally, its "normal" or primary use of Twitters private property Computer Network is to; "serve the public conversation" and is a "global town square" and has an "important role in our democracy and governments around the world. In the United States, all 100 Senators, 50 governors, and nearly every member of the House of Representatives currently reach their constituents through Twitter accounts." [Doc. 1, Exhibit Q-1]. Twitter is dependent upon public access and itself acknowledges that many people use Twitter as a digital public square. [Doc. 1, Exhibit Q-2 @ 243]. Twitter also holds itself out to the public as a community resource and partners with news organizations on a regular basis to live-stream congressional hearings and political events, providing the public access to important developments in our democracy. The notion that Twitter would silence any political perspective is antithetical to our commitment to free expression. Exhibit Q-1. Pg. 2. Exhibit Q-2, @ 238.

28. Twitter opened up their social media site to other's speech, by allowing members of the public to enter its facilities and enter and post on their computer network and allowed their computer network to be used as a public forum for a public official of national prominence and the purpose of the expressional activity undertaken upon Twitters Computer Network is entirely for the publics or the Governments use of the property.

29. Twitter has a policy of encouraging public political debate on its Computer Network. Twitter enabled the White House and media broadcasters to have a dynamic experience on Twitter, publishing and promoting live video event pages to millions of people on Twitter during President Trump's State of the Union address in 2017. In total, more than 39 media broadcasters including ABC, Bloomberg, CBS, Fox News, PBS NewsHour, Reuters, Univision, and USA Today participated. Additionally, the White House and Senate GOP both published the entire live video on Twitter reaching over 3.4 million viewers. Doc. 1, Exhibit Q-1.

30. So when Twitter invites former US Secretary of State Madeleine Albright [Attached Declaration, Exhibit A-27]. or Tulsi Gabbard [Doc. 1, Exhibit ] to its Washington DC facility to speak about political issues such as the death penalty, to a live event at Twitter, or when Twitter hosts a live event from Atlanta facility with Rep John Lewis speaking about Black Lives Matter, or when Twitter tweets out that it supports the Black Caucus to talk about equal access for citizens, [Attached Declaration, Exhibit A-28], or allows other political or government officials to post political statements or opinions concerning, Gun Control, [Attached Declaration, Exhibit A-29], death sentencing, [Attached Declaration, Exhibit A-30], health care and unemployment, [Attached Declaration, Exhibit A-31], Black Lives Matter, [Att. Declaration, Exhibit A-32] it opens itself up to free or political speech in that same forum.

31. By its continuous invitation to politicians, government officials and to the public, Twitter has created an atmosphere ripe for free speech and political debate and the discriminatory denial of access to the Plaintiff because of his race and strong political views regarding the death penalty for traitors, was improper.

Respectfully,

/s/ Plaintiff, Anonymously as Sensa Verogna
SensaVerogna@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of July 2020, the foregoing document was made upon the Defendant, through its attorneys of record to Jonathan M. Eck  jeck@orr-reno.com and Julie E. Schwartz, Esq., JSchwartz@perkinscoie.com