# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Sensa Verogna, Plaintiff,      )

     v.                  )     Case #: **1:20-cv-00536-SM**

Twitter Inc.,   Defendant.    )

_____

**PLAINTIFF'S REPLY AND MEMORANDUM OF LAW TO TWITTER, INC.'S OBJECTION TO PLAINTIFF'S MOTION TO DECLARE TWITTER'S COMPUTER NETWORK A PUBLIC FORUM UNDER LAW**

1.     Plaintiff, respectfully Replies to Defendant's Objection [Doc. 26], to Plaintiffs Motion to Declare Twitter's Computer Network a Public Forum Under Law [Doc. 16]. Plaintiff also incorporates any Declaratory Act arguments set forth in [Doc. 19] and [Doc. 20]. In support of his reply to the objection, Plaintiff states as follows:

2.     Defendants' Default is an admission of the facts cited in the Complaint, See Pitts ex rel. Pitts v. Seneca Sports, Inc., 321 F. Supp.2d 1353, 1357 (S.D. Ga. 2004); Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1204 (5th Cir. 1975), and is sufficient to establish Defendants liability on Plaintiffs stated legal theories in his claims. Here, the Plaintiff has established that Defendants were at the times alleged in the Complaint, a Public Accommodation, a Public Forum, and a State Actor under law, through the well pled facts in his Complaint.

19.    Plaintiff's Claim III alleges that Defendant; 1) acting under the color of law in a public forum, and/or 2) operating a public forum and fulfilling functions ordinarily reserved to the state in a public forum, [Doc. 1 @ 166], deprived the Plaintiff of his Constitutional Rights to free speech, political speech and his right to assembly, [Doc. 1 @ 168], using viewpoint-based discriminatory acts to delete the Plaintiff's 2nd tweet and then using a race-based discriminatory Health Policy to ban the Plaintiffs account and access to speak or assemble in a public forum and also the banning

of access to governmental officials' DPF's accounts within their public forum, [Doc. 1 @ 172], by

Twitter's bias, anti-white and non-white Workforce, causing injuries and damages. [Doc. 1 @ 173,

174]. Whether by state action or privately, each theory would strip Defendants of any 1st

Amendment and 14th Amendment defenses and is not redundant or repetitious, but simply an

alternate theory of the claims. The Plaintiff also submits, that even if the Court were to decide that

there is no interdependent or symbiotic relationship between the private entity and the state

government Lloyd Corp. v. Tanner, supra, and that Twitter was not a state actor, [Doc. 6 & 20],

this does not mean that Twitter could not have violated the Plaintiff's constitutional rights as a

private owner of a public forum. In deciding whether or not Twitter's computer network is a public

forum, the Court should not only look at the nexus between Twitter and the State, but also how

Twitter presents itself to the public and the political arenas.

    4.    For the reasons stated herein, and in the supporting memorandum of law, and the

arguments brought in [Doc. 16], this Court should declare that Twitter's computer network is a

Public Forum under the law, OR minimally, that it was, within the time frame of Plaintiff's

Complaint.


Respectfully,

_____
/s/ Plaintiff, Anonymously as Sensa Verogna
SensaVerogna@gmail.com


## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of July 2020, the foregoing document was made upon the
Defendant, through its attorneys of record to Jonathan M. Eck  jeck@orr-reno.com and Julie E.
Schwartz, Esq., JSchwartz@perkinscoie.com

1
2
3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

4  Sensa Verogna, Plaintiff,              )
5                    v.                   )        Case #: **1:20-cv-00536-SM**
6  Twitter Inc.,   Defendant.            )
7
8  **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S REPLY TO TWITTER,**
9  **INC.'S OBJECTION TO PLAINTIFF'S MOTION TO DECLARE TWITTER'S**
10 **COMPUTER NETWORK A PUBLIC FORUM UNDER LAW**
11
12         1.       Plaintiff, files this Memorandum of Law in Support of its Reply to Twitter's

13 Objection [Doc. 26], to Plaintiff's Motion to Declare Twitter's Computer Network a Public Forum

14 Under Law [Doc. 16].

15         2.       Like Plaintiff's previous Motions for Declaratory relief, Plaintiff has complied

16 within the Federal Rules of Civil Procedure, does not feel that it is inappropriate or redundant and

17 believes Twitter's Computer Network is a Public Forum Under the Law. The Plaintiff includes his

18 declaratory relief arguments filed in [Doc. 5] (the "Public Accommodation Motion"); and [Doc.

19 6]. (the "State Actor Motion") into this reply and vis-versa.

20         3.       Declaratory relief is appropriate where a litigant needs direction from a court before

21 from taking future action. Such direction will afford the litigant relief from uncertainty or

22 insecurity. See Amer. Household Products, Inc. v. Evans Manufacturing, Inc., 139 F.Supp.2d

23 1235, 1239 (N.D. Al. 2001). And "Although 'the district court's discretion is broad, it is not

24 unfettered.'" St. Paul Ins. Co. v. Trejo, 39 F.3d 585, 590 (5th Cir. 1994) (quoting Travelers Ins.

25 Co. v. La. Farm Bureau Fed'n, Inc., 996 F.2d 774, 778 (5th Cir. 1993))

26         4.       "Since its inception, the Declaratory Judgment Act has been understood to confer

27 on federal courts unique and substantial discretion in deciding whether to declare the rights of

28 litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). Federal courts consequently have

29 broad discretion to grant or refuse declaratory judgment. See Torch, Inc. v. LeBlanc, 947 F.2d 193,

30 194 (5th Cir. 1991). As another judge in this district has explained, [t]he federal Declaratory

31 Judgment Act [("DJA")] does not create a substantive cause of action. A declaratory judgment

32 action is merely a vehicle that allows a party to obtain an early adjudication of an actual

33 controversy arising under other substantive law. ... [In sum, t]he DJA is an authorization, not a

34 command. It gives federal courts the competence to declare rights, but it does not impose a duty

35 to do so. Klein v. Fed. Ins. Co., Nos. 7:03-cv-102-D & 7:09-cv-94-D, 2014 WL 4476556, at *9

36 (N.D. Tex. Sept. 11, 2014) (internal quotation marks omitted).

37      5.     The goals of the Declaratory Judgment Act include: (i) relieving litigants of the old

38 common-law rule that a declaration of rights cannot be adjudicated unless the right has already

39 been violated; (ii) rendering practical help in ending controversies which have not reached a stage

40 where other legal relief is immediately available; (iii) settling uncertainties with respect to rights,

41 status, or other equitable and legal relationships; (iv) avoiding multiple suits; and (v) providing

42 clarity where technical or social changes have placed in doubt one's rights, immunities, status, or

43 privileges. Kendrick v. Everheart, 390 So. 2d 53, 59 (Fla. 1980); Roth v. The Charter Club, Inc.,

44 952 So. 2d 1206, 1207 (Fla. 3d DCA 2007) (holding complaint for declaratory judgment on proper

45 interpretation of statute was sustainable); Jackson v. Fed. Ins. Co., 643 So. 2d 56, 58 (Fla. 4th DCA

46 1994) (finding justiciable controversy on entitlement to disability benefits after training).

47      6.     Florida law requires that the courts liberally construe and administer the application

48 and scope of Florida's Declaratory Judgment Act, providing the Act with elastic and inclusive

49 boundaries, and liberally allowing a declaratory claim to continue where the plaintiff has pled the

50 elements for a cause of action. Backus v. Howard W. Backus Towing, Inc., 391 So. 2d 378, 380–

51 81 (Fla. 3d DCA 1980) (reversing dismissal of counterclaim for declaratory relief where cause of

52   action pled, under requisite liberal construction and application); Trafalgar Developers, Ltd. v.

53   Morley, 305 So. 2d 274, 274–75 (Fla. 3d DCA 1974) (affirming trial court's retention of

54   jurisdiction over counterclaim for declaratory relief even after dismissing complaint); Rigby v.

55   Liles, 505 So. 2d 598, 600 (Fla. 1st DCA 1987) (reversing order granting dismissal of action for

56   declaratory relief in statute of limitations dispute where elements for relief were pled).

57       7.       The uniform act authorizes the broader view, since the statute "provides that

58   'whether or not further relief is or could be claimed,' i. e., whether a coercive remedy like damages,

59   injunction or specific performance (1) is also claimed, (2) could be claimed but is not claimed, or

60   (3) could not be claimed, the declaratory judgment may not on that ground be denied. The New

61   York Court of Appeals recognized in Woolard v. Schaffer Stores Co.7 4 that "while resort to the

62   use of a declaratory judgment is usually unnecessary where an adequate remedy is already

63   provided by another form of action 'no limitation has been placed upon its use.'". Borchard,

64   Declaratory Judgments (1939) 9 Brooklyn L. Rev. 1, 6 Current Legal Thought 59. (1936) 272 N.

65   Y. 304, 5 N. E. (2d) 829.

66       8.       To properly state a sustainable cause of action for declaratory relief, a complainant

67   must allege that (1) there is a bona fide dispute between the parties; (2) the complainant has a

68   justiciable question as to the existence or non-existence of some right, status, immunity, power, or

69   privilege, or some fact upon which their existence may depend; (3) the complainant is in doubt as

70   to the right, status, immunity, power, or privilege; and (4) there is a bona fide, actual, and present

71   need for the declaration. May v. Holley, 59 So. 2d 636 (Fla. 1952); Romo v. Amedex Ins. Co., 930

72   So. 2d 643, 648 (Fla. 3d DCA 2006). All the antagonistic and adverse interests are all before this

73   court, and the relief sought is not merely the giving of legal advice by the courts or the answering

74 | questions propounded from sheer curiosity. City of Sarasota v. Mikos, 613 So. 2d 566, 567 (Fla.

75 | 2d DCA 1993).

76 | 9.    The test for sufficiency of a declaratory relief claim is not whether the claim shows

77 | that the plaintiff will prevail, but whether there is a bona fide dispute and the plaintiff is entitled to

78 | a declaration of rights. Rigby, 505 So. 2d. at 600; Verdecia v. Am. Risk Assur. Co., 494 So. 2d

79 | 294, 294 (Fla. 3d DCA 1986) (reversing dismissal of complaint for declaratory relief); Tavares v.

80 | Allstate Ins. Co., 342 So. 2d 551, 553 (Fla. 3d DCA 1977) (holding that dispute over contract

81 | coverage sustained an action for declaratory relief).

82 | 10.    That the declaration of rights requested may result in a judgment against the

83 | plaintiff does not destroy the plaintiff's right to such a declaration. Tavares, 342 So. 2d at 553.

84 | Thus, a motion to dismiss a claim for declaratory relief can only be granted if the plaintiff failed

85 | to establish the existence of any justiciable controversy; it is reversible error for a court to analyze

86 | whether the plaintiffs would be entitled to a declaration in their favor. Keen v. Fla. Sheriffs' Self-

87 | Insurance Fund, 854 So. 2d 844, 845 (Fla. 4th DCA 2003) (reversing order granting motion to

88 | dismiss where court interpreted contract in granting motion);

89 | 11.    Specifically, with regard to a pre-answer motion to dismiss a declaratory judgment

90 | action, the only issue presented for consideration is "whether a cause of action for declaratory

91 | relief is set forth, not . . . whether the plaintiff is entitled to a favorable declaration" (North Shore

92 | Towers Apts. Inc. v Three Towers Assoc., 104 AD3d 825, 827 [2013] [internal quotation marks

93 | and citation omitted]; see Hallock v State of New York, 32 NY2d 599, 603 [1973]). However,

94 | "where the court, deeming the material allegations of the complaint to be true, is nonetheless able

95 | to determine, as a matter of law, that the Twitter is entitled to a declaration in his or her favor, the

96 | court may enter a judgment making the appropriate declaration" (DiGiorgio v 1109-1113

97  Manhattan Ave. Partners, LLC, 102 AD3d 725, 728 [2013]), See Matter of Dashnaw v Town of
98  Peru, NY Sip Op 07913 [111 AD3d 1222].

99        12.      "The federal Declaratory Judgment Act is procedural. Farmers Alliance Mut. Ins.
100  Co. v. Jones, 570 F.2d 1384, 1386 (10th Cir. 1978). It "does not create substantive rights for parties
101  . . . [but] merely provides another procedure whereby parties may obtain judicial relief." Martinez
102  v. City of Santa Fe, No. 14-cv-0016 SMV/KBM, 4 (D.N.M. Sep. 24, 2014)

103        13.      "It does not hold that the fact that a plaintiff is not entitled to a favorable declaration
104  is a proper basis for the exercise of the trial court's discretion .... But the fact that the party seeking
105  to set the judicial machinery in motion is on the wrong side of a controversy cannot be ascertained
106  prior to the court's consideration and determination thereof, and it cannot be said that a declaration
107  embodying that determination would not be necessary or proper merely because the plaintiff
108  entertained a misconception of law. Thus, as previously noted, it has been held that where the
109  plaintiff is not entitled to a favorable declaration, the court should render a judgment embodying
110  such determination and should not merely dismiss the action. (Anderson, Declaratory Judgments,
111  p. 271.)" (Maguire, supra, at pp. 730-731.) Patel v. Athow, [Civ. No. 31887. Court of Appeals of
112  California, First Appellate District, Division Four. October 23, 1973.]

113        14.      There are no parallel proceedings underway in any state court that would provide
114  for ventilation of the issues.) as described in Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995).
115  No constitutional grounds are being sought regarding constitutionality of government conduct. El
116  Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992) suggesting that adjudicating
117  constitutional rights in declaratory actions is never appropriate.

118        15.      The First Circuit concluded that the controversy between Arkema and Honeywell
119  regarding the '120 and '882 patents is "of sufficient immediacy and reality to warrant the issuance

120    of a declaratory judgment." MedImmune, 549 U.S. at 127, 127 S.Ct. 764. Arkema Inc. v.

121    Honeywell Int'l., Inc., 706 F.3d 1351, 1356 (Fed. Cir. 2013) (quoting S. Rep. No. 73–1005, at 2–

122    3 (1934)). And unlike *Zajac, LLC v. Walker Indus.*, No. 2:15-cv-507-GZS, 2016 WL 3962830, at

123    *6–7 (D. Me. July 21, 2016), the Plaintiff here, does seek a declaratory remedy from the Court that

124    would clarify and advance the resolution of the dispute(s) between Twitter and himself. Curran v.

125    Camden Nat'l Corp., 477 F. Supp. 2d 247 (D. Me. 2007). Additionally, the Plaintiff cannot find

126    the *Trans v. Bank* or *Saenz v. Rod's Prod. Servs., LLC* cases proffered by Twitter and thus cannot

127    comment on their relations to this case.

128         16.     Plaintiff agrees that his latest motion for declaratory relief is not a motion for

129    summary judgment and therefore not improper or premature at this stage of the litigation. And, if

130    in fact the Plaintiff has chosen the wrong legal mechanism to bring forth these declaratory motions,

131    the Court should not just summarily dismiss them. And, if not answered by the Court, how will

132    the Plaintiff know whether or not he can in fact make proper Constitutional claims against a private

133    company for operating what the Plaintiff believes to be a Public Forum. Without the Courts

134    answer, Plaintiff is left in the dark as to how to proceed with his Constitutional Claims as there are

135    unanswered questions of law that need to be answered by a judge.

136         17.     Here, the relief Plaintiff seeks—a declaration that Twitter is a "public forum"—is

137    a necessary component of his Constitutional claims in Claim III. It most certainly would not be a

138    waste of judicial resources as the horse must be put back in front of the kart if in fact the Plaintiff

139    misconstrued the legal mechanisms of which motions or actions to bring first.

140         18.     The Plaintiff agrees, in part, that the  "public does not generally have a First

141    Amendment right to access private property for expression." or nor "does property lose its private

142    character merely because the public is generally invited to use it for designated purposes." Lloyd

143   Corp. v. Tanner, 407 U.S. 551, 569 (1972). Or simply because Twitter has many users that create

144   or share content, alone, does not transform a private social media company into a public forum.

145   Fed. Agency of News LLC v. Facebook. The Plaintiff does not claim that Twitter would

146   "transform" into a state actor solely by providing a forum for speech as in Prager v. Google. And

147   that Twitter, as well as being a state actor, owns a computer network that is a "public forum" within

148   the meaning of the First Amendment. And contrary to Twitters arguments, the Ninth Circuit has

149   not interpreted § 230 to grant immunity for causes of action alleging constitutional violations.

150   Roommates.Com , 521 F.3d at 1164.

151        19.     Twitter, in its Objection relies on the inapplicable notion that only state actors can

152   provide a forum for speech, [Doc. 26], completely ignoring the relationship between the First

153   Amendment and the modern Internet. This case does not concern obscenity or any other form of

154   unprotected speech, it concerns free and political speech that strikes at the heart of the First

155   Amendment. "[N]either property rights nor contract rights are absolute. . . . Equally fundamental

156   with the private right is that of the public to regulate it in the common interest. PruneYard, id. 74.

157   And it is well established that private companies may establish public fora in certain

158   circumstances. Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 801 (1985).

159   The fact that Twitter is a private company does not mean the First Amendment is inapplicable to

160   users' Twitter accounts. The key question is whether the user has opened up a forum for expressive

161   activity to the public. See Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017).

162        20.     The guarantees of the First Amendment are effectuated against potential state

163   interference through the Fourteenth Amendment by limiting the extent to which states can restrict

164   individuals in the exercise of rights of speech and assembly. Alleged here, a private computer

165   network was acting under the authority of state government. Hence, the state nexus requirement

166   that triggers the application of the First Amendment is not readily met in the case of a private

167   computer network. See, e.g., Grafton v. Brooklyn Law School, 478 F.2d 1137, 1143 (2 Cir.1973);

168   Blackburn v. Fisk Univ., 443 F.2d 121, 123 (6 Cir.1971); see generally Annot., "Action of Private

169   Institution of Higher Education as Constituting State Action, or Action Under Color of Law, for

170   Purposes of Fourteenth Amendment and 42 U.S.C.A. § 1983," 37 A.L.R.Fed. 601 (1978). Under

171   the nexus analysis, a government "`can be held responsible for a private decision only when it has

172   exercised coercive power or has provided such significant encouragement, either overt or covert,

173   that the choice must in law be deemed to be that of the State.'" San Francisco Arts & Athletics,

174        21.    Inc. v. United States Olympic Committee, 483 U.S. 522, 546, 107 S. Ct. 2971, 2986,

175   97 L. Ed. 2d 427 (1987), quoting Blum v. Yaretsky, 457 U.S. at 1004, 102 S.Ct. at 2786. Indeed,

176   "the party seeking to establish that action of a private party violated the Constitution must be able

177   to point to the specific act or actions of the government which in fact motivated the private action."

178   Ponce, 760 F.2d at 378 (citation omitted); see also Cohen v. President and Fellows of Harvard

179   College, 568 F. Supp. 658, 660 (D.Mass.1983) (Tauro, J.) (nexus analysis "focus[es] on whether

180   the challenged action of the private entity was compelled or influenced by the government."). In

181   the present case, the plaintiff has offered evidence of such involvement by Congress in the decision

182   by Twitter to ban Plaintiff's 2nd tweet and the subsequent banning of his account or access to a

183   public forum.

184        22.    [i]t is, of course, well-established that a State in the exercise of its police power

185   may adopt reasonable restrictions on private property so long as the restrictions do not amount to

186   a taking without just compensation.... To protect free speech and petitioning is a goal that surely

187   matches the protecting of health and safety, the environment, aesthetics, property values and other

188   societal goals that have been held to justify reasonable restrictions on private property rights.

189   [Robins v. Prune Yard Shopping Center, supra, 23 Cal.3d at 908, 592 P.2d at 346, 153 Cal. Rptr.

190   at 859.] The California Supreme Court has also found that such restrictions upon private property

191   could properly be imposed in order to protect the rights of free speech and petition, viz: State v.

192   Schmid, 84 N.J. 535, 567 (1980). In Supreme Court cases, such as Marsh v. Alabama, supra; Lloyd

193   Corp. v. Tanner, supra, and Prune Yard Shopping Center v. Robins, supra, all recognize generally

194   that the more private property is devoted to public use, the more it must accommodate the rights

195   which inhere in individual members of the general public who use that property. Since it is our

196   State Constitution which we are here expounding, it is also fitting that we look to our own strong

197   traditions which prize the exercise of individual rights and stress the societal obligations that are

198   concomitant to a public enjoyment of private property. See Vasquez v. Glassboro Service Ass'n,

199   supra, *563 83 N.J. at 100-101; State v. Shack, supra, 58 N.J. at 305-308; Zelenka v. Benevolent

200   & Protective Order of Elks, supra, 129 N.J. Super. at 386-387.

201       23.   Notwithstanding the primary thrust of the First Amendment against state

202   governmental interference with expressional freedoms, the guarantees of this Amendment may

203   under appropriate conditions be invoked against nongovernmental bodies. In particular settings,

204   private entities, including educational institutions or in this case, computer networks, may so

205   impact upon the public or share enough of the essential features of governmental bodies as to be

206   engaged functionally in "state action" for First Amendment purposes. The more focused inquiry

207   therefore must be turned to those circumstances that can subject an entity of essentially

208   nongovernmental or private character to the requirements imposed by the First Amendment. State

209   v. Schmid, 84 N.J. 535, 567 (1980). New Hampshire Courts have construed Part I, Article 22 of

210   the New Hampshire Constitution to be more protective than the First Amendment of the United

211   States Constitution in the context of time, place, and manner restrictions and have employed the

212    same standard to assess the constitutionality of these types of restrictions as is used under the

213    Federal Constitution. Biondolillo, 164 N.H. at 373; Doyle, 163 N.H. at 221. Those focusing upon

214    the scope of the public's invitation and the nature of the expressional activities in relation to the

215    use of private property, the applicability of the First Amendment is less clear. This question brings

216    us to the heart of the problem the need to balance within a constitutional framework legitimate

217    interests in private property with individual freedoms of speech and assembly State v. Schmid, 84

218    N.J. 535, 567 (1980).

219      24.     Nevertheless, as private property becomes, on a sliding scale, committed either

220    more or less to public use and enjoyment, there is actuated, in effect, a counterbalancing between

221    expressional and property rights. Marsh v. Alabama, supra, 326 U.S. at 506, 66 S.Ct. at 278, 90

222    L.Ed. at 268. State v. Schmid, held that under the State Constitution, the test to be applied to

223    ascertain the parameters of the rights of speech and assembly upon privately owned property and

224    the extent to which such property reasonably can be restricted to accommodate these rights

225    involves several elements. This standard must take into account (1) the nature, purposes, and

226    primary use of such private property, generally, its "normal" use, (2) the extent and nature of the

227    public's invitation to use that property, and (3) the purpose of the expressional activity undertaken

228    upon such property in relation to both the private and public use of the property. This is a multi-

229    faceted test which must be applied to ascertain whether in a given case owners of private property

230    may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals

231    of the constitutional freedoms of speech and assembly.

232      25.     Thus, in balancing the right of Twitter to possess and protect its property against

233    the Plaintiffs' freedom of expression in view of the particular activity being conducted in its public

234    forum, the Court should determine that the right of expression should prevail. Similarly, in State

235   v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980), appeal dismissed sub nom. In Princeton University

236   v. Schmid, it was held that Princeton University, a private institution, could not, in view of state

237   constitutional guarantees, arbitrarily deny political activists permission to disseminate information

238   peacefully in a reasonable manner where the University had a policy of encouraging public

239   political debate on its property. Campaign v. Connecticut General Life Insurance Co., 515 A. 2d

240   1331 (Pa. 1986) A traditional public forum is a forum which "by long tradition or by governmental

241   fiat [has] been devoted to assembly and debate...." Perry Education Assn. v. Perry Local Educators'

242   Assn., 460 U.S. 37, 45, 103 S. Ct. 948, 954, 74 L. Ed. 2d 794 (1983).

243        26.     Whether speech is constitutionally protected requires an analysis of whether the

244   "speech is of public or private concern, as determined by all the circumstances of the case,"

245   including whether the challenged activities take place in a traditional public forum. Id. at 1215.

246   The Plaintiff should have the right to speak freely on the very subjects being discussed publicly

247   on Twitters public forum as they can't invite numerous politicians, other users to speak and express

248   their views, or express views themselves, and then arbitrarily (discriminatory) deny the plaintiff

249   an opportunity to express himself freely on the same subjects. (See Attached Declaration, Exhibit

250   A 1-36). Hence, the Plaintiff suffered a constitutional impairment of his Federal and State

251   constitutional rights of speech and assembly and his banning should be undone. "Speech deals

252   with matters of public concern when it can be fairly considered as relating to any matter of political,

253   social, or other concern to the community . . . ." Id. at 1216. Speech on matters of public concern

254   "is at the heart of the First Amendment's protection." Id. at 1215 (quotation omitted). "That is

255   because speech concerning public affairs is more than self-expression; it is the essence of self-

256   government." Indeed, the Supreme Court has concluded that the content of protected speech

257   "cannot be restricted simply because it is upsetting or arouses contempt."

258   27. The nature, purpose, and generally, its "normal" or primary use of Twitters private

259 property Computer Network is to; "serve the public conversation" and is a "global town square"

260 and has an "important role in our democracy and governments around the world. In the United

261 States, all 100 Senators, 50 governors, and nearly every member of the House of Representatives

262 currently reach their constituents through Twitter accounts." [Doc. 1, Exhibit Q-1]. Twitter is

263 dependent upon public access and  itself acknowledges that many people use Twitter as a digital

264 public square.  [Doc. 1, Exhibit Q-2 @ 243]. Twitter also holds itself out to the public as a

265 community resource and partners with news organizations on a regular basis to live-stream

266 congressional hearings and political events, providing the public access to important developments

267 in our democracy. The notion that Twitter would silence any political perspective is antithetical to

268 our commitment to free expression. Exhibit Q-1. Pg. 2. Exhibit Q-2, @ 238.

269   28. Twitter opened up their social media site to other's speech, by allowing members

270 of the public to enter its facilities and enter and post on their computer network and allowed their

271 computer network to be used as a public forum for a public official of national prominence and

272 the purpose of the expressional activity undertaken upon Twitters Computer Network is entirely

273 for the publics or the Governments use of the property.

274   29. Twitter has a policy of encouraging public political debate on its Computer

275 Network. Twitter enabled the White House and media broadcasters to have a dynamic experience

276 on Twitter, publishing and promoting live video event pages to millions of people on Twitter

277 during President Trump's State of the Union address in 2017. In total, more than 39 media

278 broadcasters including ABC, Bloomberg, CBS, Fox News, PBS NewsHour, Reuters, Univision,

279 and USA Today participated. Additionally, the White House and Senate GOP both published the

280 entire live video on Twitter reaching over 3.4 million viewers. Doc. 1, Exhibit Q-1.

281    30.    So when Twitter invites former US Secretary of State Madeleine Albright

282 [Attached Declaration, Exhibit A-27]. or Tulsi Gabbard [Doc. 1, Exhibit ] to its Washington DC

283 facility to speak about political issues such as the death penalty, to a live event at Twitter, or when

284 Twitter hosts a live event from Atlanta facility with Rep John Lewis speaking about Black Lives

285 Matter, or when Twitter tweets out that it supports the Black Caucus to talk about equal access for

286 citizens, [Attached Declaration, Exhibit A-28], or allows other political or government officials to

287 post political statements or opinions concerning, Gun Control, [Attached Declaration, Exhibit A-

288 29], death sentencing, [Attached Declaration, Exhibit A-30], health care and unemployment,

289 [Attached Declaration, Exhibit A-31], Black Lives Matter, [Att. Declaration, Exhibit A-32] it

290 opens itself up to free or political speech in that same forum.

291    31.    By its continuous invitation to politicians, government officials and to the public,

292 Twitter has created an atmosphere ripe for free speech and political debate and the discriminatory

293 denial of access to the Plaintiff because of his race and strong political views regarding the death

294 penalty for traitors, was improper.

295 Respectfully,

296
297
298    _____
299    /s/ Plaintiff, Anonymously as Sensa Verogna
        SensaVerogna@gmail.com

300

301               **CERTIFICATE OF SERVICE**

302 I hereby certify that on this 6th day of July 2020, the foregoing document was made upon the
303 Defendant, through its attorneys of record to Jonathan M. Eck  jeck@orr-reno.com and Julie E.
304 Schwartz, Esq., JSchwartz@perkinscoie.com

305

                        Page **13** of **13**

**DECLARATION IN SUPPORT OF PLAINTIFF'S REPLY TO TWITTER, INC.'S OBJECTION TO PLAINTIFF'S MOTION TO DECLARE TWITTER'S COMPUTER NETWORK A PUBLIC FORUM UNDER LAW**
**Case #: 1:20-cv-00536-SM**

Plaintiff, proceeding anonymously as Sensa Verogna, provides as follows:

I, Sensa Verogna, hereby declare as follows:

1.    I am a New Hampshire resident over eighteen and have personal knowledge of facts below. If called upon to testify, I could and would testify competently as to the matters contained herein.

2.    The resident States of all information described in the PLAINTIFF'S REPLY AND MEMORANDUM OF LAW TO TWITTER, INC.'S OBJECTION TO PLAINTIFF'S MOTION TO DECLARE TWITTER'S COMPUTER NETWORK A PUBLIC FORUM UNDER LAW, were obtained by public records conducting google searches and the relevant government and public sites.

3.    Attached EXHIBIT A, is a collection of Twitter Inc.

I declare under penalty of perjury that the foregoing is true and correct. Signed this 6th day of July 2020 in the State of New Hampshire.

/s/ Anonymously as Sensa Verogna

SensaVerogna@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of July 2020, I have contracted the foregoing Declaration, to be served in hand, directly to the agent of record for Twitter Inc., The Corporation Trust Company Corporation, Trust Center, 1209 Orange Street, Wilmington, DE 19801.

Page 1 of 1

# EXHIBIT A- Twitter Public Policy, @Policy

## CONSTITUTIONAL ISSUES

 **Twitter Public Policy** ✔ @Policy · May 28
This EO is a reactionary and politicized approach to a landmark law. #Section230 protects American innovation and freedom of expression, and it's underpinned by democratic values. Attempts to unilaterally erode it threaten the future of online speech and Internet freedoms.

💬 6.6K          ⟲ 5.9K          ♡ 13.5K          ↑

EXHIBIT A-1

 **Twitter Public Policy** ✔ @Policy · Jun 15
We stand with @MariaRessa and journalists around the world who are being persecuted for doing their jobs and holding power to account. Governments should not impinge on the fundamental values of a #FreePress.

It must end now.

EXHIBIT A-2

 **Twitter Public Policy** ✔ @Policy · Apr 29
That's why we've joined 200+ organizations and industry peers in urging the US Congress 🇺🇸 to prioritize access to broadband in their next #COVID19 stimulus package. #WeNeedBroadband

 Joint Letter to Congress on Broadband in Stimulus Bills | Public Knowledge
🔗 publicknowledge.org

EXHIBIT A-3

 **Twitter Public Policy** ✔ @Policy · Oct 8, 2019
Twitter stands with the entire LGBTQ community today and every day. Together, our voices will not be silenced.

You belong here. #RiseUpOct8

EXHIBIT A-4

 **Twitter Public Policy** ✔ @Policy · May 3 ⌄

Whether it's reporting from the front lines of conflict or in the throes of a social justice movement, what journalists bring to us from every corner of the world 🌍 is brave analysis and facts - of which, we couldn't be without.

💬 4          ⟲ 12          ♡ 28                    ⬆

EXHIBIT A-5

  Twitter Public Policy Retweeted

**Facebook Newsroom** ✔ @fbnewsroom · May 15, 2019 ⌄

Facebook Joins Other Tech Companies to Support the Christchurch Call to Action

EXHIBIT A-6

 **Twitter Public Policy** ✔ @Policy · Jan 28, 2019 ⌄

On this #DataPrivacyDay, a reminder that at Twitter we believe privacy is a fundamental right, not a privilege. Learn more about our privacy policy here: twitter.com/privacy.

EXHIBIT A-7

## **IMMIGRATION ISSUES**

 **Twitter Public Policy** ✔ @Policy · Oct 4, 2019 ⌄

At Twitter, we believe diversity is a source of strength and continue to advocate for sound US policies like #DACA. We're joining 140+ US companies and associations today in an amicus brief to the Supreme Court to support #Dreamers.

EXHIBIT A-8

 **Twitter Public Policy** ✔ @Policy · Jun 19 ⌄

To mark #WorldRefugeeDay on June 20th, let the world know that you stand #WithRefugees by tweeting using the hashtags below.

The hashtags have been translated into 12 different languages to increase the reach of this important conversation.

EXHIBIT A-9



**Twitter Public Policy** ✔ @Policy · Jun 22

Statement on US high-skilled immigration proclamation:

"This proclamation undermines America's greatest economic asset: its diversity. People from all over the world come here to join our labor force, pay taxes, and contribute to our global competitiveness on the world stage.

💬 850          🔁 799          ♡ 1.6K          ⬆️

EXHIBIT A-10



**Twitter Public Policy** ✔ @Policy · Jun 22

"Unilaterally and unnecessarily stifling America's attractiveness to global, high-skilled talent is short-sighted and deeply damaging to the economic strength of the United States." —@jesirae

💬 120          🔁 129          ♡ 448          ⬆️

EXHIBIT A-11



**Twitter Public Policy** ✔ @Policy · Jun 18

#Dreamers make us better.

Thank you to the US Supreme Court for affirming our belief that our diversity is a source of strength, and #Dreamers should be here to stay.

> ✔ **Twitter Public Policy** ✔ @Policy · Oct 4, 2019
>
> At Twitter, we believe diversity is a source of strength and continue to advocate for sound US policies like #DACA. We're joining 140+ US companies and associations today in an amicus brief to the Supreme Court to support #Dreamers.
>
> cnbc.com/2019/10/04/maj...

EXHIBIT A-12



**Twitter Public Policy** ✔ @Policy · Feb 11, 2019

There is broad, bipartisan support to #ProtectDreamers, and the United States Congress must act on a permanent solution. @Twitter and @Jack stand with #Dreamers alongside 100+ US businesses and industry leaders. Learn more here:

EXHIBIT A-13

 **Twitter Public Policy** ✔ @Policy · Dec 5, 2019    ⌄
Collecting social media identifiers from visa applicants, including personal Twitter handles, has a chilling effect on that conversation. For these reasons, we remain strongly opposed to the U.S. Department of State's social media registration requirements.

EXHIBIT A-14

## HUMAN RIGHTS ISSUES

 **Twitter Public Policy** ✔ @Policy · Dec 9, 2019    ⌄
We hope 2020 brings more openness & willingness from governments to permit & empower public conversation online. At Twitter, we'll continue to #StandUp4HumanRights.

EXHIBIT A-15

 **Twitter Public Policy** ✔ @Policy · Dec 9, 2019    ⌄
2019 has been an historic year of public activism, protest, and holding power to account. From Hong Kong to Venezuela and beyond, we're humbled to stand shoulder to shoulder with activists and NGOs who use Twitter to fight for our #HumanRights. 👇

EXHIBIT A-16

 **Twitter Public Policy** ✔ @Policy · Dec 9, 2019
Empowering voices to join the public conversation is core to Twitter's mission. 🌍🌏🌎

It is a mission that we celebrate on #HumanRightsDay — and strive to carry out every day.

Show this thread

EXHIBIT A-17

## VOTING

 **Twitter Public Policy** ✔ @Policy · Feb 11    ⌄
The #2020Census is a vital, participatory process. We're working w/ @uscensusbureau to ensure the conversation around this civic event remains healthy, including the launch of a search prompt to point people to the authoritative source of information.

EXHIBIT A-18



**Twitter Public Policy** ✔ @Policy · May 12

It's more important than ever that those who wish to vote have the option to do so on or *before* Election Day. @Twitter supports @VoteEarlyDay along with dozens of other businesses to ensure everyone knows their voting options ahead of the 2020 US elections. 🇺🇸

EXHIBIT A-19

## **WORLD POLITICS**



**Twitter Public Policy** ✔ @Policy · May 29

As #MentalHealthAwareness month comes to a close, we supported the @WHO to answer FAQs on how to deal with the anxieties and mental health issues people are facing during #COVID19.

See below for guidance and key resources from @WHO 👇

EXHIBIT A-20



**Twitter Public Policy** ✔ @Policy · Mar 4

On Twitter, there is a critical mass of:

◆ expert organizations
◆ official government accounts
◆ health professionals and
◆ epidemiologists

Our goal is to elevate & amplify the right message from the right source.

EXHIBIT A-21



**Twitter Public Policy** ✔ @Policy · Dec 10, 2019

A friendly reminder to the US Congress that we still support strong #NetNeutrality 🌠 protections. 👇



🔵 **Twitter Public Policy** ✔ @Policy · Mar 6, 2019

Thank you to Members of Congress for introducing and supporting legislation today to restore strong #NetNeutrality 🌠 protections for Internet users and innovators. 🙏 We look forward to continuing to work with Congress in a bipartisan manner on this critical Internet issue.

EXHIBIT A-22



EXHIBIT A-23

## <u>ENVIRONMENTAL ISSUES</u>



EXHIBIT A-24



EXHIBIT A-25



**Twitter Public Policy** ✔ @Policy · Apr 22
As we work to address the critical needs of our planet, we know we're better together, standing in partnership with a diverse coalition:

◆ @UNEP
◆ @UNFCC
◆ @UNDP
◆ @Greenpeace
◆ @voice4planet
◆ @LetMeBreathe_IN
◆ @WWF
◆ @350
◆ @Fridays4Future
◆ @WeDontHaveTime0

EXHIBIT A-26

## **OTHER POLITICAL ISSUES**



**Twitter Public Policy** ✔ @Policy · Nov 12, 2019
Thank you for your insight and humor, Secretary @madeleine Albright.

You're welcome to join our team any time.

EXHIBIT A-27



**Twitter Public Policy** ✔ @Policy · Mar 5
As partners of the bipartisan @HBCUCaucus Partnership Challenge, we look forward to continuing to work together to ensure equal access to 21st-century opportunities for all.

#HBCUSTEAM #PowerofPartnerships

> 🔺 **The Black Caucus** ✔ @TheBlackCaucus · Mar 3
> The third annual #HBCUSTEAM Day of Action officially kicks off today.
>
> The @TheBlackCaucus is proud support our Member @RepAdams Founder and Co-Chair of the HBCU Caucus to welcome the 102 #HBCUs to Capitol Hill!
>
> #HBCUStrong

EXHIBIT A-28



**Beto O'Rourke** ✓ @BetoORourke · Sep 15, 2019

Leaving millions of weapons of war on the streets because Trump and McConnell are "at least pretending to be open to reforms"?

That calculation and fear is what got us here in the first place. Let's have the courage to say what we believe and fight for it.

EXHIBIT A-29



**Joe Biden** ✓ @JoeBiden · Jul 25, 2019

Since 1973, over 160 individuals in this country have been sentenced to death and were later exonerated. Because we can't ensure that we get these cases right every time, we must eliminate the death penalty.

EXHIBIT A-30



**Joe Biden** ✓ @JoeBiden · 23h

Donald Trump wants to declare this health crisis over and unemployment solved so that he can get back to his campaign rallies. But he's wrong — on both fronts.

We need a president who will actually do the work needed to get us through these crises.

◯ 5.2K          ↻ 19.2K          ♡ 92.9K          ⬆

EXHIBIT A-31



**Kamala Harris** ✓ @KamalaHarris · Jul 5

Absolutely heartbreaking. Summer Taylor was only 24-years-old, peacefully protesting for Black Lives Matter when they were struck by a car. Thinking of their family during this difficult time and everyone in the movement today.

◯ 18.2K          ↻ 17.7K          ♡ 85.3K          ⬆

EXHIBIT A-32



EXHIBIT A-33