DISTRICT OF NH
FILED

2020 AUG -6 P 7 05

Sensa Verogna, Plaintiff,  )
    v.  )  Case #: 1:20-cv-00536-SM
Twitter Inc., Defendant.  )

---

PLAINTIFF'S RULE 5.1 MOTION AND MOL CHALLENGING THE
CONSTITUTIONALITY OF TITLE 47 U.S. CODE § 230

1. The "Plaintiff", proceeding anonymously as Sensa Verogna, challenges the Constitutionality of Title 47 U.S. Code § 230 and submits that he has proper standing [See Doc. 1], and that such relief will further clarify any uncertainty as to the United States' culpability or liability through respondeat superior, through its policing partner Twitter, or other, or is Twitter alone liable for violations of the Plaintiff's Rights. The relief sought will also alert, narrow down or clarify issues effecting both current parties. *See Komorowski v. Boston Store,* 263 Ill. App. 88, 93-96 (1931). (recovery may be permitted against the client of a private police agency, even though the service contract specifically provided that the agency would assume full responsibility for the private police operations).

> Congress: "We want you to stop censoring speech"
> Big Tech: We are only doing what YOU told us too!

2. In part, Congress, lacks authority under Article I, Section 8 of the Constitution' as it regulates speech without the due process of laws and violates Plaintiff's and other U.S. and New Hampshire Citizens' Constitutional rights under Articles [I], [V] and [XIV] of the Constitution, and Part I, Article 22 of the New Hampshire Constitution and because the President must preserve, protect, and defend the Constitution it also requires the President to disregard unconstitutional statutes.

3. Venue is proper as stated in [Doc.1, at Paragraphs 8, 9 and10]. Plaintiff re-alleges and incorporates by reference each paragraph, tweet, article, exhibit or attachments on the "Docket" or "Doc.", as though set forth fully herein.

4. Plaintiff has noticed, within 28 U.S. Code § 2403 and Fed. R. C. P. Rule 5.1, the United States Attorney General, Honorable William P. Barr, by certified mail to the U.S. Department of Justice, 950 Pennsylvania Avenue, NW Washington, DC 20530-0001, and states support thereof within the attached Memorandum of Law, "MOL", which contains no more than 13,000 words, uses a monospaced faced font and contains less than 1,300 lines and within Fed. R C.P., Rule, 32(a)(7)(B). Plaintiff's questions are:

A. Is §230 unconstitutional because it abridges free speech?

B. Is §230 unconstitutional because it contains content-based restrictions?

C. Does §230 regulate speech without providing for due process of law?

D. Does §230 impermissibly violate the nondelegation doctrine and the separation of powers by placing exercise powers traditionally reserved to the State to a private entity?

E. Does §230 violate a citizens' First Amendment rights under the U.S. Constitution or the New Hampshire Constitution.

F. Did Congress lack authority under the Commerce Act because §230 is criminal in nature or that it is purely non-economic?

G. Does §230 impermissibly violate the nondelegation doctrine and the separation of powers by placing exercise powers traditionally reserved to the State to a private entity?

H. Does §230 encroach on States' policing powers to regulate free speech.

I. Is §230 unconstitutional because it is too narrowly drawn, vague or too broad as (1) it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; (2) it authorizes or even encourages arbitrary and discriminatory enforcement.

J. Does §230 provide explicit standards to prevent arbitrary or discriminatory enforcement for those who apply it?

**K.** Are there less restrictive means available, therefore making §230 unconstitutional?

**WHEREFORE**, Plaintiff invites this Court and the United States Attorney General to stop the oppression of American's free speech in public forums and find Title 47 U.S. Code § 230 unconstitutional under both the U.S. Constitution and the Constitution of the State of New Hampshire.

Respectfully,

/s/ **Plaintiff, Anonymously as Sensa Verogna**
SensaVerogna@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of August 2020, the foregoing document was made upon the Defendant, through its attorneys of record to Jonathan M. Eck  jeck@orr-reno.com and Julie E. Schwartz, Esq., JSchwartz@perkinscoie.com, and to the United States Attorney General as noted above.

I declare under penalty of perjury that the foregoing is true and correct. Signed this 6th day of August 2020 in the State of New Hampshire.

/s/ **Anonymously as Sensa Verogna**
SensaVerogna@gmail.com

4

Plaintiff Verogna, Plaintiff, )
    v.               )     Case #: 1:20-cv-00536-SM
Twitter Inc., Defendant.   )

_____

**PLAINTIFF'S MOL IN SUPPORT OF PLAINTIFF'S RULE 5.1 MOTION
TO DECLARE TITLE 47 U.S. CODE §230 UNCONSTITUTIONAL UNDER LAW**

1. Congress, under the Commerce Act unlawfully, unreasonably and contrary to law, exceeded its constitutional bounds granted by the U.S. Constitution Article I, section 8, by enacting Title 47 U.S. Code "§230". As stated by one of its authors Senator Ron Wyden (D-Oregon), §230 "creates a government kind of information police—censorship, information police." §230 was, at least publicly, designed to give regular citizens a voice to be heard, but instead has disastrously caused the opposite and given the powerful even more power to oppress citizens free speech in public or private forums.

2. Congress's §230 Encouragement Provision threatens to stifle the free exchange of ideas online under the First amendment about one of the most contentious and important political questions of our time. United States v. Williams, 553 U.S. 285, 293 (2008) Such a result is antithetical to our nation's unique and profound commitment to the protection of speech. New York Times v. Sullivan, 376 U.S. at 270 (1964) The history of the law of free expression

1

is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly. It follows that all content-based restrictions on speech must give us more than a moment's pause. §230 does not meet the burden the First Amendment imposes. *United States v. Playboy Entertainment Group, Inc.* 98-1682) 529 U.S. 803 (2000) 30 F. Supp. 2d 702, affirmed.

3.    Congress has historically engaged in oversight of the executive branch. The government delegates the operation of one of its traditional and quintessential functions to private individuals or groups are endowed by the State with powers or functions governmental in nature and become agencies or instrumentalities in fact, and that the government delegates some portion of [its] power to private [actors] does not change the governmental character of the power exercised. Conspicuously missing from any debates concerning §230 passage were any of the fundamental criticisms of private policing characterized by the La Follette or Homestead investigations. Absent were questions about the "delegation of the sovereign power of the State to private hands." Incredibly, no one had asked before whether the thousands of private screeners conducting searches in public space or forums ought to be public or private. Scandals involving private police are numerous. For a discussion of examples, see SOUTH, supra note 53, at 100-03. For a recent example, see William Wan & Erin Ailworth, Street Vendors Allege Extortion, L.A. TIMES, May 18, 2004,

54 at B 1 (reporting allegations by street vendors that guards
55 employed by Los Angeles business improvement district extorted
56 money from them).

57     4. §230 lacks the precision that the First Amendment
58 requires when a statute regulates the content of speech. In order
59 to deter hateful or harmful speech, §230 effectively suppresses
60 large amounts of speech that adults have a constitutional right to
61 speak, receive and to address to one another. Further, the
62 interests §230 proclaims to satisfy, does not justify an
63 unnecessarily broad suppression of speech addressed to adults. The
64 most glaring defect of §230 is the blatant disregard for
65 Constitutional Free Speech in violation of Plaintiff's First
66 Amendment rights as it instructs interactive computer services to
67 restrict access to materials even if "such material is
68 constitutionally protected" or "otherwise objectionable" which on
69 its face is unconstitutional under the First Amendment and Article
70 22.

71     5. §230 is not a valid exercise of Congress' commerce powers
72 as public speech or the criminal nature of speech are entirely
73 noneconomic. Similarly, true threats or inciteful crimes of speech
74 are not, economic activity and are more aptly to be governed by
75 State or local Criminal laws. The economic necessities outlined in
76 §230 should not provide cover for government-supported
77 infringements of speech as exchanging ideas is free and no money

78 | is exchanged. Additionally, the "crimes" of "Free Speech" that

79 | §230 seeks to sensor and punish are addressed, or could be readily

80 | addressed within criminal statutes by numerous Federal, State and

81 | Local Authorities, which in turn would provide Due Process to its

82 | Citizens.

83 | 6. A congressional enactment such as §230 can be

84 | invalidated upon a plain showing that Congress has exceeded its

85 | constitutional bounds. United States v. Lopez, 514 U.S. 549, 568,

86 | 577-578. In our federal system, the National Government possesses

87 | only limited powers; the States and the people retain the

88 | remainder. The Federal Government "can exercise only the powers

89 | granted to it.

90 | **Section §230**

91 | 7. Findings by Congress found that the Internet and other

92 | interactive computer services have flourished... with a minimum of

93 | government regulation and offer a forum for a true diversity of

94 | political discourse and Increasingly Americans are relying on

95 | interactive media for a variety of political, educational,

96 | cultural, and entertainment services. (§230(a)). 47 U.S. Code §230

97 | - Protection for private blocking and screening of offensive

98 | material).

99 | 8. Congress then promulgated within §230(b), United States

100 | policy intended to promote the Internet, (b)(1), preserve a

101 | competitive free market unfettered by Federal or State regulation,

(b)(2), empower parents to restrict their children's access to objectionable or inappropriate online material, (b)(4), and to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer. (b)(5).

9.   Congress implemented protections under §230(c)(2)(A), which states, in part:

> Civil liability No provider or user of an interactive computer service shall be held liable on account of—
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected;

10.   §230 (e) titled, "Effect on other laws", states, in part:

> (3) STATE LAW. Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

11.   Congress, through §230(d) then placed only 1 obligation upon interactive computer services to "notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors."

12.   §230 has 3 basic components, "indecent materials" [5] (which includes speech), §230(c)(2)(A); "vigorous enforcement" §230(b)(5); and Executive police authority with and "safe harbors"

135 for private police. [5] Indecent materials is describe as, "material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected"

140     13. Lexico powered by Oxford' describes materials prohibited by §230

142   Obscene; (of the portrayal or description of sexual matters) offensive or disgusting by accepted standards of morality and decency. Offensive to moral principles; repugnant. Synonyms; 'using animals' skins for fur coats is obscene' pornographic, indecent, salacious, smutty, X-rated, lewd, rude, dirty, filthy, vulgar, foul, coarse, crude, gross, vile, nasty, disgusting, offensive, shameless, immoral, improper, immodest, impure, indecorous, indelicate, unwholesome, scabrous, off color, lubricious, risqué, ribald, bawdy, suggestive, titillating, racy, erotic, carnal, sensual, sexy, lascivious, lecherous, licentious, libidinous, goatish, degenerate, depraved, amoral, debauched, dissolute, prurient.

154 Lewd; Crude and offensive in a sexual way. 'she began to gyrate to the music and sing a lewd song'. Synonyms; pornographic, indecent, salacious, smutty, X-rated, lewd, rude, dirty, filthy, vulgar, foul, coarse, crude, gross, vile, nasty, disgusting, offensive, shameless, immoral, improper, immodest, impure, indecorous,

indelicate, unwholesome, scabrous, off color, lubricious, risqué, ribald, bawdy, suggestive, titillating, racy, erotic, carnal, sensual, sexy, lascivious, lecherous, licentious, libidinous, goatish, degenerate, depraved, amoral, debauched, dissolute, prurient: Opposite: pure, decent offensive to moral principles; repugnant. "using animals' skins for fur coats is obscene"

Lascivious (of a person, manner, or gesture) feeling or revealing an overt and often offensive sexual desire. "he gave her a lascivious wink". Synonyms; lecherous, lewd, lustful, licentious, libidinous, goatish, salacious, wanton, lubricious, prurient, dirty, smutty, filthy, naughty, suggestive, indecent, ribald.

Filthy; 1Disgustingly dirty. 'a filthy hospital with no sanitation' 1.1Obscene and offensive. Synonyms; 'filthy language' obscene, indecent, dirty, smutty, rude, improper, corrupt, coarse, bawdy, unrefined, indelicate, vulgar, lewd, racy, raw, off color, earthy, ribald, risqué, licentious.

Excessively violent: Excessive; More than is necessary, normal, or desirable; immoderate. 'he was drinking excessive amounts of brandy'. Synonyms; immoderate, intemperate, imprudent, overindulgent, unrestrained, unrestricted, uncontrolled, uncurbed, unbridled, lavish, extravagant, exorbitant, extortionate, unreasonable, outrageous, undue, uncalled for, extreme, inordinate, unwarranted, unnecessary, needless, disproportionate, too much.

**Violent**; Using or involving physical force intended to hurt, damage, or kill someone or something. 'a violent confrontation with riot police'. Synonyms; brutal, vicious, savage, harsh, rough, **aggressive, bullying, threatening, terrorizing, fierce, wild, intemperate, hot-headed, hot-tempered, bloodthirsty, ferocious, berserk, frenzied, powerful, forceful, hard, sharp, smart, strong, vigorous, mighty, hefty, harsh, thunderous, savage, ferocious, fierce, brutal, vicious, destructive, damaging, painful.**

**Harassing;** Harass; 1Subject to **aggressive pressure or** intimidation. 'being harassed at work can leave you feeling confused and helpless'. 1.1Make repeated small-scale attacks on (an enemy) 'the squadron's task was to harass the retreating enemy forces'. Synonyms; pester, badger, hound, harry, plague, torment, **bedevil, persecute, bother, annoy, exasperate, worry, disturb, trouble, agitate, provoke, vex.**

**Objectionable;** Arousing distaste or opposition; unpleasant or offensive. 'I find his theory objectionable in its racist undertones'. Synonyms; offensive, unpleasant, disagreeable, **distasteful, displeasing, unacceptable, off-putting, undesirable, obnoxious.**

**Commerce Powers**

14. U.S. Constitution. Article I, section 8 specifically provides that "Congress shall have the power to lay and collect

taxes, duties, imposts and excises, to pay debts and provide for the common defense and general welfare of the United States."

15.   The enumerated powers of Congress, particularly the Commerce Clause, historically have been interpreted expansively. Wickard v. Filburn, 317 U.S. 111 (1942), (interpreting the Commerce Clause as providing Congress with broad powers to regulate).

16.   The Constitution authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, §8, cl. 3. Precedents read that to mean that Congress may regulate "the channels of interstate commerce," "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce." Morrison, supra, at 609 (quotation marks omitted). Perez v. United States, 402 U. S. 146 (1971)

17.   The Supreme Court has identified three broad categories of activity that Congress may regulate under its commerce power. Perez v. United States, supra, at 150; see also Hodel v. Virginia Surface Mining & Reclamation Assn., supra, at 276-277. First, Congress may regulate the use of the channels of interstate commerce. Darby, 312 U. S., at 114; Heart of Atlanta Motel, supra, at 256 (" `[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.' " (quoting Caminetti v. United States, 242 U.S. 470, 491 (1917)

Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Shreveport Rate Cases, 234 U.S. 342 (1914); Southern R. Co. v. United States, 222 U.S. 20 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); Perez, supra, at 150 ("[F]or example, the destruction of an aircraft (18 U.S.C. § 32), or . . . thefts from interstate shipments (18 U.S.C. § 659)"). Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, Jones & Laughlin Steel, 301 U. S., at 37, i.e., those activities that substantially affect interstate commerce. Wirtz, supra, at 196, n. 27. The Perez Court concluded that, "consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce." Justice Breyer focused, for the most part, on the threat that firearm possession in and near schools poses to the educational process and the potential economic consequences flowing from that threat. Post, at 5-9. See also, United States v. Morrison, 18 Const. Comment. 563, 567 (2002) Id. at 558 (identifying "three broad categories of activity that Congress may regulate under its commerce power"), Id. at 558-59 (stating that the instrumentality part of the Lopez three-part framework also

255  authorizes regulation to "protect . . . persons or things in
256  interstate commerce").

257      18.  Supporters of §230 would argue that; (1) adverse speech
258  in a Public Forum is a serious problem; (2) that problem, in turn,
259  has an adverse effect on internet growth; and (3) that adverse
260  effect on internet growth, in turn, represents a substantial threat
261  to trade and commerce. Under this rationale, Congress could just
262  as easily looked at adverse speech as "fall[ing] on the commercial
263  side of the line" because it provides a "valuable service--namely,
264  to equip [computer networks] with the tools they need to remove
265  "perceived" adverse speech in public or private forums. And
266  although Congress has authority under the Commerce Clause to
267  regulate numerous commercial activities that substantially affect
268  interstate commerce and also affect commercial speech. That
269  authority, though broad, does not include the authority to regulate
270  each and every aspect of free speech as §230 does. "The [federal]
271  government is acknowledged by all to be one of enumerated powers.
272  The principle, that it can exercise only the powers granted to it
273  . . . is now universally admitted. But the question respecting the
274  extent of the powers actually granted, is perpetually arising, and
275  will probably continue to arise, as long as our system shall
276  exist." Id., at 405. As in Lopez, the Court here should find that
277  §230 suppresses free speech which are purely local activities and
278  should be beyond the reach of federal power. Id., at 598.

279  19.  §230 is directed at the personal users and not the
280  computer network itself. In this case, §230 sides with Twitter's
281  belief of quality of free speech and not quantity of free speech
282  is  what  rules  and  is  one  of  the  many  reasons  §230  is
283  unconstitutional.

284  **A.  Is §230  unconstitutional because it abridges free speech?**

285  20.  "Th[e First]  [A]mendment, then, we may take it for
286  granted, does not forbid the abridging of speech. But, at the same
287  time, it does forbid the abridging of the freedom of speech." Gertz
288  v. Robert Welch, Inc., 418 U.S. 323, 382 (1974) §230 places a
289  content-based  blanket  restriction  on  speech  and  abridges  the
290  freedom of speech in allowing and permitting that free speech be
291  regulated by private companies. Reno v. American Civil Liberties
292  Union,  521  U.S.  844  (1997)(holding  that  the  CDA's  "indecent
293  transmission" and "patently offensive display" provisions abridge
294  "the freedom of speech" protected by the First Amendment. Pp. 864-
295  885.

296  21.  John  Morris,  former  Commerce  Department's  National
297  Telecommunications and Information Administration stated before
298  leaving,  "the  government  should  not  try  to  impose  speech
299  regulations on private platforms. As politicians from both sides
300  of the political spectrum have historically urged, the government
301  should  not  be  in  the  business  of  regulating  speech."  FTC
302  Commissioner Noah Phillips said the FTC's antitrust and consumer

303 | protection authorities are "not authorities to police the First
304 | Amendment itself." Plaintiff argues that Congress is already in
305 | the business of regulating speech through §230 as it has already
306 | interpreted what speech is indecent and which speech is not. The
307 | problem with §230 is that no objective standards exist for what
308 | constitutes "indecent" speech and seeks to regulate speech based
309 | on its substantive content, a goal that is anathema to the First
310 | Amendment.

311 |   22. Certain categories of speech are completely unprotected
312 | by the First Amendment. That list includes (i) child pornography,
313 | (ii) obscenity, and (iii) "fighting words" or "true threats."
314 | "[f]ree public expression cannot be burdened with governmental
315 | predictions or assessments of what a discrete populace will think
316 | about good or bad 'taste.'" *Stanton by Stanton v. Brunswick School*
317 | *Dept.*, 577 F. Supp. 1560 , 1572, 1574 (D. Me. 1984) It is clear
318 | that §230 is overbroad. both on its face and as applied and clearly
319 | abridges free speech because the indecent materials it seeks to
320 | exclude, could be a very many things.

321 |   23. It is firmly settled that under our Constitution the
322 | public expression of ideas may not be prohibited merely because
323 | the ideas are themselves offensive to some of their hearers. *Cox*
324 | *v. Louisiana (I)*, [379 U.S. 536 [85 S. Ct. 453, 13 L. Ed. 2d 471]
325 | (1965)]; *Edwards v. South Carolina,* [372 U.S. 229, 83 S. Ct. 680,
326 | 9 L. Ed. 2d 697 (1963)]; *Terminiello v. Chicago,* [337 U.S. 1, 69

S. Ct. 894, 93 L. Ed. 1131 (1949)]; *cf. Cantwell v. Connecticut,* 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); *Doe v. University of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989). The Constitution protects both elegant and vulgar speech because "a society can be truly strong only when it is truly free.", *Ginzburg v. United States,* 383 U.S. 463, 498 (Stewart, J., dissenting) Censorship of speech and expression, even unpopular ones, only "reflects a society's lack of confidence in itself. It is a hallmark of an authoritarian regime." Id.

24. In *Marsh v. Alabama, 326 U.S. 501 (1946),* the United States Supreme Court held that the individual right to distribute literature enjoyed a "preferred position" under the First Amendment, and that private ownership was immaterial because Chickasaw served a "public function" and had "all the characteristics of any other American town." And that "Marsh and the shopping-center cases clearly establish that some private properties fulfill public functions amenable to constitutional protection," For example, the Minnesota Supreme Court in *Abbariao v. Hamline University School of Law* noted that "[t]he requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities.", 258 N.W.2d 108, 113 (Minn. 1977). New York's highest court was among the courts to apply Abbariao favorably in *Tedeschi v. Wagner Coll.,* 404 N.E.2d 1302, 1305 (N.Y. 1980).

351    25.  In *R.A.V. v. City of St. Paul,* 505 U.S. 377 (1992),
352 Justice Antonin Scalia explained that by singling out "specified
353 disfavored topics," the City Council had engaged in content-based
354 and viewpoint discrimination that failed to satisfy strict
355 scrutiny. "The mere fact that expressive activity causes hurt
356 feelings, offense, or resentment does not render the expression
357 unprotected."

358    26.  In *UWM Post v. Board of Regents of the University of*
359 *Wisconsin*, Plaintiffs argued that the UW Rule had overbreadth
360 difficulties because it was a content-based rule which regulates
361 a substantial amount of protected speech. The court ruled
362 unconstitutional a policy prohibiting speech that: "Demean[s] the
363 race, sex, religion, color, creed, disability, sexual orientation,
364 national origin, ancestry or age of the individual or individuals;
365 [and]… [c]reate[s] an intimidating, hostile or demeaning
366 environment for education, university related work, or other
367 university-authorized activity." In striking down the code, the
368 court ruled that "the suppression of speech, even where the
369 speech's content appears to have little value and great costs,
370 amounts to governmental thought control." 774 F. Supp. 1163 (E.D.
371 Wis. 1991).

372    27.  In *Police Department of Chicago v. Mosley*, the Supreme
373 Court explained the great import of protecting speech from content-
374 based regulation. [A]bove all else, the First Amendment means that

375 | government has no power to restrict expression because of its
376 | message, its ideas, its subject matter, or its content. To permit
377 | the continued building of our politics and culture, and to assure
378 | self-fulfillment for each individual, our people are guaranteed
379 | the right to express any thought, free from government censorship.
380 | The essence of this forbidden censorship is content control. Any
381 | restriction on expressive activity because of its content would
382 | completely undercut the "profound national commitment to the
383 | principle that debate on public issues should be uninhibited,
384 | robust, and wide-open." 408 U.S. 92, 95-96 (1972) (citations
385 | omitted). These categories of speech are considered to be of such
386 | slight social value that any benefit that may be derived from them
387 | is clearly outweighed by their costs to order and morality.
388 | *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). The
389 | categories include fighting words, obscenity and, to a limited
390 | extent, libel. *Collin v. Smith,* 578 F.2d 1197, 1202 (7th Cir.1978),
391 | cert. denied, 439 U.S. 916 (1978)

28. In *Bair v. Shippensburg University*, the district court found Shippensburg University's speech code, which stated that "[t]he expression of one's beliefs should be communicated in a manner that does not provoke, harass, intimidate or harm another," to be in violation of the First Amendment. In finding the school's code unconstitutional, the court held that "regulations that prohibit speech on the basis of listener reaction alone are

unconstitutional both in the public high school and university settings," and further noted that not even codes that attempt to ban so-called "fighting words" pass constitutional muster. 280 F. Supp. 2d 357 (M.D. Pa. 2003) In *College Republicans at San Francisco State University v. Reed*, the Court issued a preliminary injunction barring SFSU and other schools in the California State University system from enforcing several challenged policies, including a requirement that students "be civil to one another" and act in accordance with SFSU's "goals, principles, and policies." Judge Brazil also limited the CSU system's ability to enforce a policy prohibiting "intimidation" and "harassment," holding that the policy could only be applied to conduct that "reasonably is concluded to threaten or endanger the health or safety of any other person." 523 F. Supp. 2d 1005 (N.D. Cal. 2007). In *Smith v. Tarrant County College District*, a federal district court found restrictions on symbolic speech on campus maintained by Tarrant County College (TCC) to be unconstitutional. The court found that TCC's reliance on a policy prohibiting "disruptive activities" to restrict students from holding an "empty holster" protest violated the First Amendment. The court further ruled that TCC's sweeping prohibition on "cosponsorship," which forbade students and faculty from holding campus events in association with any "off-campus person or organization," prevented TCC students "from speaking on campus on issues of any social

423  importance" and was therefore "overly broad" and "unconstitutional
424  on its face." 694 F. Supp. 2d 610 (N.D. Tex. 2010)

425  29. §230's "indecent materials" provisions abridges "the
426  freedom of speech" protected by the First Amendment. As demonstrate
427  in paragraph 13, the words or expressions allow could possibly
428  mean a lot of things… to a lot of different people. Is a lascivious
429  wink indecent? Looking at the plain language of §230, it is simply
430  impossible to discern any limitation on its scope or any conceptual
431  distinction between protected and unprotected conduct.

432  30. §230 is also facially overbroad because a substantial
433  number of its applications such as removing speech "taken in good
434  faith" and speech "otherwise objectionable" are unconstitutional
435  and viewpoint discriminatory on their  face because it fails to
436  provide people of ordinary intelligence a reasonable opportunity
437  to understand what conduct it prohibits and it authorizes or even
438  encourages arbitrary and discriminatory enforcement.

439  31. Even assuming §230 has a plainly legitimate sweep that
440  targets obscene, lewd, lascivious, filthy, excessively violent,
441  harassing, the regulation can be used to censor any expression or
442  word that is critical, negative, or controversial or is capable of
443  a critical, negative, or controversial interpretation regardless
444  of whether it constitutes an accusation of moral turpitude or
445  whether the speech is "constitutionally protected or not".

18

**B.   Is §230   unconstitutional because it contains content-based restrictions?**

32.   The Supreme Court has recognized several different types of laws that restrict speech, and subjects each type of law to a different level of scrutiny. Content-based restrictions "are presumptively unconstitutional regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Sable Communications v. FCC,* 492 U.S. 115 (1989). In Police Department of Chicago v. Mosley (1972) Justice Thurgood Marshall wrote for the Court that "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."

33.   Core political speech is the most highly guarded form of speech because of it's purely expressive nature and its importance to a functional republic. Restrictions or regulations that require examining the content of speech to be applied must pass strict scrutiny. *Sable*

34.   §230 is a content-based speech restriction and cannot satisfy strict scrutiny. *Sable* §230 is content based because it restricts communication because of the message conveyed and thus, regulates speech based on its content which regulates a substantial amount of protected speech exceeding any unprotected speech such

as, (i) child pornography, (ii) obscenity, and (iii) "fighting words" or "true threats."

C. Does §230 regulate speech without providing for due process of law?

35. §230 violates the Fifth Amendment Due Process Clause by [v]esting the coercive police power of the government in Twitter, an interested private part[y]. Dep't of Transp. v. Ass'n of Am. Railroads, 575 U.S. (2015)

36. §230 violates Article III, Section 2 as it does not provides for the right to trial by jury in all criminal cases, and the requirement that the trial be held in the state where the crime was committed.

37. §230 prohibits the freedom of speech under the U.S. Constitution Article [I] Freedom of expression and the Due Process and Equal Protections clauses within Articles [IV] and [XIV] and allows these freedoms to be regulated in a discriminatory manner.

D. Does §230 impermissibly violate the nondelegation doctrine and the separation of powers by placing exercise powers traditionally reserved to the State to a private entity?

38. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Under this principle, Congress has the power to preempt state law. Crosby v.

National Foreign Trade Council,530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) However, in considering whether a state statute is preempted, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.' " *Arizona v. United States*, U.S., 132 S.Ct. 2492, 2501, 183 L.Ed.2d 351 (2012) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); citing *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)) The Tenth Amendment makes explicit that states preserve some realm of exclusive sovereignty, stating, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. §230 does not override, due to the content of its provisions, section 22 and is a provision that makes certain amendments either more difficult or impossible to pass, making such amendments inadmissible. §230 should not override Article 22 of the NH Constitution.

39. To determine whether the contract violated Part I, Article 22 of the New Hampshire Constitution, two questions must be answered: (1) What type of forum is the arena; and (2) Can the challenged restriction survive the constitutional scrutiny appropriate to the regulation of expression in that type of forum. Multimedia Pub. v. Greenville-Spartanburg Airport, 991 F.2d 154,

158 (4th Cir. 1993); Cornelius v. NAACP Legal Defense Ed. Fund, 473 U.S. 788, 797 (1985). An entrenched clause or entrenchment clause of a basic law or constitution is a provision that makes certain amendments either more difficult or impossible to pass, making such amendments inadmissible. Overriding an entrenched clause may require a supermajority, a referendum, or the consent of the minority party. Congress subbed out the Executive's job to private police and therefore usurped the Judicial remedies available to Citizens such as due process. Section 22 of the New Hampshire Constitution protects free and political speech, which is reasonably exercised, on platforms even when the platforms are privately owned.

40. The Supremacy Clause does not independently grant any power to the federal government. Instead, the Supremacy Clause, and the doctrine of federal preemption that arises from it, is essentially a choice-of-law provision, stating that where valid federal and state and local laws are in conflict, the federal laws prevail. The clause itself makes clear that federal law is supreme only when those laws are made "in pursuance" of the Constitution and "under the authority of the United States." U.S. CONST., Art. VI, cl. 2., Printz v. U.S., 521 U.S. 898, 924-25 (1997) (noting that the validity of a federal law is a prerequisite for application of the Supremacy Clause).

41. §230 does not meet the constitutional imperative of "separation of powers" that invests the power to prosecute solely in the executive branch and not to private owners of public forums such as Twitter. In the American system, the parties "frame the issues for decision" while the courts take the role of "neutral arbiter of matters the parties present.", Greenlaw v. United States, 554 U.S. 237, 243 (2008)

42. §230 violates the nondelegation doctrine and the separation of powers principle by placing policing powers and executive authority in the hands of a private entity [Twitter] that participates in the very industry. Dep't of Transp. v. Ass'n of Am. Railroads, 575 U.S. 176 177 (2015) Speech that incites is more aptly to be governed by State Criminal laws.

E.    Does §230 violate a citizens' First Amendment rights under the U.S. Constitution or the New Hampshire Constitution.


## Constitutional Rights

43.    Articles under the U.S. Constitution

Article [I] (Amendment 1 - Freedom of expression and religion)

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Article [V] (Amendment 5 - Rights of Persons)

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, <u>nor be deprived of life, liberty</u>, or property, <u>without due process of law</u>; nor shall private property be taken for public use, without just compensation.

Article [XIV] (Amendment 14 – Rights Guaranteed: Privileges and Immunities of Citizenship, Due Process, and Equal Protection)

1: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

44. The First Amendment guarantees freedoms concerning religion, expression, assembly, and the right to petition. It guarantees freedom of expression by prohibiting Congress from restricting the rights of individuals to speak freely.

45. The Fifth Amendment of the US Constitution creates a number of rights relevant to civil legal proceedings and requires that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property", which §230 does not.

46. As the Supreme Court has recognized, the Internet is where people "engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017)

24

47.  "The freedom of speech and of the press, and the right of the people peaceably to assemble and consult for their common good, and to apply to the government for redress of grievances, shall not be infringed." *ANNALS OF CONGRESS 434* (1789) Madison had also proposed language limiting the power of the states in a number of respects, including a guarantee of freedom of the press. Id. at 435. Although passed by the House, the amendment was defeated by the Senate. "Amendments to the Constitution, Bill of Rights and the States," supra. 377 Id. at 731 (August 15, 1789)

48.  The Due Process Clause of the Fourteenth Amendment applies only against the states, but it is otherwise textually identical to the Due Process Clause of the Fifth Amendment, which applies against the federal government; both clauses have been interpreted to encompass identical doctrines of procedural due process and substantive due process. Procedural due process is the guarantee of a fair legal process when the government tries to interfere with a person's protected interests in life, liberty, or property, and substantive due process is the guarantee that the fundamental rights of citizens will not be encroached on by government. The Due Process Clause of the Fourteenth Amendment also incorporates most of the provisions in the Bill of Rights, which were originally applied against only the federal government, and applies them against the states.

620    49.  While expressions in public may be regulated in a
621 nondiscriminatory manner, expression cannot be prohibited. "The
622 privilege of a citizen of the United States to use the streets and
623 parks for communication of views on national questions may be
624 regulated in the interest of all. It is not absolute, but relative,
625 and must be exercised in subordination to the general comfort and
626 convenience, and in consonance with peace and good order; but it
627 must not, in the guise of regulation, be abridged or denied."
628 Freedom of speech and of assembly for any lawful purpose are rights
629 of personal liberty secured to all persons, without regard to
630 citizenship, by the due process clause of the Fourteenth Amendment.
631 P. 307 U. S. 519. *Hague v. Committee for Industrial Organization*,
632 307 U.S. 496 (1939)

633    50.  The Due Process Clause of the Fourteenth Amendment
634 provides: "[N]or shall any State deprive any person of life,
635 liberty, or property, without due process of law." In 1883, in *The*
636 *Supreme Court in the Civil Rights Cases*, 109 U.S. 3, affirmed the
637 essential dichotomy set forth in that Amendment between
638 deprivation by the State, subject to scrutiny under its provisions,
639 and private conduct, "however discriminatory or wrongful," against
640 which the Fourteenth Amendment offers no shield. *Shelley v.*
641 *Kraemer*, 334 U.S. 1 (1948)

642    51.  Given the prevalence of balancing tests in free speech
643 case law and adjudication of other constitutional rights,

26

644    —inviolably carries strong implications. Unless —inviolably in

645    Article 22 is surplusage, the term elevates speech and press above

646    other interests. Where the right to free speech is weighed against

647    other rights or interests, the presumption ought to thus be

648    strongly in favor of free speech. This is not to say that the

649    rights in Article 22 should be read as absolutes—rather, once the

650    general extent of protected activity is understood, it should not

651    be readily circum-scribed. KEITH WERHAN, FREEDOM OF SPEECH: A

652    REFERENCE GUIDE TO THE UNITED STATES CONSTITUTION 78-79 (2004)

653    (outlining free speech analysis under the First Amendment and

654    describing different levels of scrutiny), e.g., Alonzi v.

655    Northeast Generation Servs. Co., 156 N.H. 656, 662, 940 A.2d 1153,

656    1159 (2008) (describing levels of scrutiny applicable to equal

657    protection challenges).

658        52. Part 1, Bill of Rights, of the New Hampshire State
659    Constitution states;

660        [Art.] 22. [Free Speech; Liberty of the Press.] Free
661        speech and Liberty of the press are essential to the
662        security of Freedom in a State: They ought, therefore,
663        to be inviolably preserved.
664        June 2, 1784, Amended 1968 to include free speech..

665        [Art.] 32. [Rights of Assembly, Instruction, and
666        Petition.] The People have a right, in an orderly and
667        peaceable manner, to assemble and consult upon the
668        common good, give instructions to their
669        Representatives, and to request of the legislative
670        body, by way of petition or remonstrance, redress of
671        the wrongs done them, and of the grievances they
672        suffer.
673        June 2, 1784

674    53.   Part I, Article 22 of the New Hampshire Constitution
675  provides:  "Free  speech  and  liberty  of  the  press  which  are
676  inviolably preserved." Similarly, the First Amendment prevents the
677  passage  of  laws  "abridging  the  freedom  of  speech."  U.S.  CONST.
678  amend. I. It applies to the states through the Fourteenth Amendment
679  to  the  United  States  Constitution.  *Lovell  v.  Griffin,*  303  U.S.
680  444, 450 (1938)

681    54.   State action jurisprudence, even in its most restrictive
682  interpretations, re-quires that constitutional protections apply
683  in federally related §230 actions in the same manner as they apply
684  when such actions are pursued by Congress. A level playing field
685  for   parties   in   this   limited   dual-enforcement   system   is
686  constitutionally mandated.

687    55.   Today,  there  are  still  no  New  Hampshire  Supreme  Court
688  opinions indicating that free speech rights under Article 22 are
689  stronger than under the First Amendment, but the door remains open.
690  *Opinion  of  the  Justices,*  121  N.H.  434,  436,  430  A.2d  191,  193
691  (1981) (indicating that −the New Hampshire Constitution guarantees
692  the  same  right  to  free  speech  and  association  as  the  First
693  Amendment in the context of campaign contribution restrictions).

694    56.   Our inquiry into whether the speech at issue is protected
695  by   the   First   Amendment   is   straightforward.   The   individual
696  plaintiffs seek to engage in political speech, Stip. ¶¶ 46–52, and
697  such "speech on matters of public concern" "fall within the core

28

of First Amendment protection," *Engquist v. Ore. Dep't of Agric.,* 553 U.S. 591, 600, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008)

57. §230 restricts the right of individuals to speak freely in public forums and violates freedom of speech rights under Part I, Article 22 of the New Hampshire Constitution which are inviolably preserved for New Hampshire Citizens and should not be subject to encroachment by any new regulations.

F. Did Congress lack authority under the Commerce Act because §230 is criminal in nature or that it is purely non-economic?

58. The criminal nature of hate speech is noneconomic, Similarly, inciteful crimes of speech are not, in any sense, economic activity. United States v. Morrison, 529 U.S. 598 (2000)

59. Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds. United States v. Lopez, 514 U.S., at 568, 577—578 (Kennedy, J., concurring) Lopez emphasized, however, that even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds. Id., at 557. ""a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." Id., at 561. United States v. Morrison, 529 U.S. 598, 610 (2000), (Finding that gender-

based crime is not an economic activity "in any sense of the phrase.) United States v. McFarland, 311 F.3d 376, 396-97 (5th Cir. 2002) (en banc) (concluding that robbery is not a commercial activity even though it has an "economic effect").

60. A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that there is no reasonable connection between the regulatory means selected and the asserted ends." Hodel v. Indiana, 452 U.S. 314, 323-24 (1981). Moreover, "[t]he pertinent inquiry therefore is not how much commerce is involved but whether Congress could rationally conclude that the regulated activity affects interstate commerce." 452 U.S. at 324. §230 is the equivalent of a Federal law that stipulates what a newspaper could print and not print. A congressional enactment can be invalidated upon a plain showing that Congress has exceeded its constitutional bounds. United States v. Lopez, 514 U.S. 549, 568, 577-578.

61. Various exercises of federal power have been held to be beyond the scope of the power granted to the federal government by the Constitution. U.S. v. Morrison, 529 U.S. 598 (2000)(striking down parts of the Violence Against Women Act of 1994 as exceeding Congress' authority under the Commerce Clause); National Federation of Independent Businesses v. Sebelius, 132 S.Ct. 2566 (2012)(striking down a portion of the Affordable Care Act that

would have significantly expanded Medicaid as being an impermissibly coercive and therefore invalid exercise of Congress' spending power); U.S. v. Lopez, 514 U.S. 549 (1995)(striking down the Gun Free School Zones Act of 1990 as exceeding Congress' authority under the Commerce Clause). Similar to *Morrison,* the Court should invalidate §230 because it creates a federal cause of action for speech that is inciteful or harassing. Inciteful speech is not, in any sense of the phrase, economic activity and contains no jurisdictional element tying the inciteful speech to interstate commerce. Accepting the reasoning that Congress can regulate speech, would eliminate the distinction between what is truly national and what is truly local, and would allow Congress to regulate virtually any activity, and basically any crime.

62. In *National Federation of Independent Business (NFIB) v. Sebelius,* Chief Justice Roberts, in a controlling opinion, suggested that Congress's authority to regulate interstate commerce presupposes the existence of a commercial activity to regulate. 567 U.S. ___, No. 11-393, slip op. (2012). Suppression or oppression of an individuals speech in public places and individual mandate upon citizens to speak as you are instructed, or you won't be allowed to speak in public. Further there are zero facts to support Congress's conclusion that speech in public has ties to any interstate commerce, economic or otherwise. U.S. at 252-53; Katzenbach v. McClung, 379 U.S. 294, 299-301

770 (1964). Accordingly, the Court "reject[ed] the argument that
771 Congress may regulate noneconomic, violent criminal conduct based
772 solely on that conduct's aggregate effect on interstate commerce."
773 Resurrecting the dual federalism dichotomy, the Court could find
774 "no better example of the police power, which the Founders denied
775 the National Government and reposed in the States, than the
776 suppression of violent crime and vindication of its victims.

777     63.   Congress, under any Commerce act or regulation, lacks
778 the authority to regulate and/or suppress noneconomic speech,
779 criminal speech or criminal conduct through §230 based solely on
780 that conduct's aggregate effect on interstate commerce as police
781 powers lie within the States and not with the Federal Government.
782 When applied, §230 creates a substantial expansion of federal
783 authority to regulate persons not otherwise subject to such
784 regulation.

785     G.   Does §230 impermissibly violate the nondelegation
786 doctrine and the separation of powers by placing exercise powers
787 traditionally reserved to the State to a private entity?

788     64.   §230(e) 3 violates the anti-commandeering principle in
789 that Congress cannot simply commandeer and dictate state laws in
790 pursuit of federal legislative goals pertaining to or regarding
791 any computer network's liability while removing indecent materials
792 from their network. In both *Reno v. Condon*, 528 U.S. 141, 120 S.
793 Ct. 666, 145 L. Ed. 2d 587, (2000) Reno v. Condon and *Coyle v.*

794 | *Smith*, 221 U.S. 559 (1911) held that the anti-commandeering
795 | analysis turned not on whether the federal law required an
796 | affirmative act, but instead on whether the federal law controlled
797 | or influenced how states govern. New Hampshire or any other State
798 | do not have any realistic options to enact statutes which would
799 | hold accountable any computer network for violations to its
800 | Citizens. §230(e) 3 is also a compulsion that it bans States from
801 | imposing liability upon computer networks who remove materials
802 | from their networks inconsistent with §230 and thus violative of
803 | the principles of federalism. §230 unconstitutionally abridges
804 | free speech rights and exercises "powers traditionally exclusively
805 | reserved to the State." Jackson v. Metropolitan Edison Co., 419 U.
806 | S. 345, 352.(1974)

807 | 65. "State sovereignty is not just an end in itself: Rather,
808 | federalism secures to citizens the liberties that derive from the
809 | diffusion of sovereign power." New York v. United States, 505 U.
810 | S. 144, 181 (1992) (internal quotation marks omitted). Because the
811 | police power is controlled by 50 different States instead of one
812 | national sovereign, the facets of governing that touch on citizens'
813 | daily lives are normally administered by smaller governments
814 | closer to the governed. The Framers thus ensured that powers which
815 | "in the ordinary course of affairs, concern the lives, liberties,
816 | and properties of the people" were held by governments more local
817 | and more accountable than a distant federal bureaucracy.

66. In passing §230, Congress voided any State Legislative duties to protect its citizens' free speech from computer networks who remove materials from their computer network. The legislative duties are therefore usurped by §230(e) 3 and with it the Judicial remedies and due processes available to Citizens for violations of State Constitutions or other State or common law claims against computer networks. What if the State Legislators determined that computer networks are Public Forums and therefore must obey free speech and freedom assembly rights, and then decided to hold accountable any computer network responsible for such actions either criminally or civil? It couldn't with §230 standing in the way. §230 in fact influences how Sates govern and protect their Citizens freedom of speech.

H. Does §230 encroach on States' policing powers to regulate free speech.

67. Non-enumerated powers, known generally as "police power," remain with the states. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2587-91, 2644 (2012) (finding the individual mandate beyond the Commerce Clause authority on that ground).

68. The imposition of penalties are quintessential government functions. Congress reserved for itself the decision as to whether what was fair speech Congress removed that decision from the sphere of private choice. This encouragement, endorsement

and participation in the private activity created state action exercising a delegated public function subject to constitutional limitations. In democratic societies, police are accountable to the courts, and to elected legislatures and executives. See Jerome H. Skolnick, Policing, in INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL & BEHAVIORAL SCIENCES 11535 (2001).

69. In passing §230, the legislature overrode the entrenchment clause under Part I, Article 22 of the New Hampshire Constitution and the due process rights that accompany it without any type of strict scrutiny which would have examined restrictions or regulations with regard to content of speech prior to it passing into law. (Congressional Records) Part I, Article 22 of the New Hampshire Constitution protects Plaintiff's free and political speech, which was reasonably exercised, in public forums even when the forums are privately owned.

70. The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. *Weeks v. United States*, 232 U.S. 383, 386, 34 S.Ct. 341, 342, 58 L.Ed. 652 (1914); *Amos v. United States*, supra. In such cases as this, there is no safety for Citizens when Twitter acts as judge, jury and executioner when it deletes free political speech and restricts entry into its Public Forum, except in the

protection of the judicial tribunals, for rights which have been invaded by actors claiming authority and professing they are acting in the name of the government. [But] one who demands admission under a claim of federal authority stands in a far different position. *Cf. Amos v. United States*, 255 U.S. 313, 317, 41 S.Ct. 266, 267–268, 65 L.Ed. 654 (1921)

71. Congress has exceeded its constitutional bounds in passing §230 as in our federal system, the National Government possesses only limited powers where the States and the people retain the remainder. Police power, such as punishing street crime, regulating speech or behavior is possessed by the States and not by the Federal Government.

72. Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" were held by governments more local and more accountable than a distant federal bureaucracy. "Whether termed 'traditional,' 'exclusive,' or 'significant,. . . . the State's delegation of that power to a private party is, accordingly, subject to due process scrutiny." Flagg Bros. v. Brooks, 436 U.S. 149, 176 (1978) (Stevens, J., dissenting). Delegation or allocation. The state action doctrine

should therefore focus not on the actor's status (official or private) but on the actor's function. Because the state cannot **abdicate its responsibility for the allocation of legitimate force,**50Joh, supra note 2, at 359-60 ("Whether it encourages by **inaction, or discourages through legislation and public critique, the state is always implicated in the development of private policing.").**

73. By definition, the state monopolizes "legitimate coercion" in a civilization. LES JOHNSTON, THE REBIRTH OF PRIVATE POLICING 218 (1992) (emphasis added); **see also PASTOR, supra note 4, at 40 ("The legitimacy of government, particularly regarding the use of force and of powers of arrest, had a deep-seated historical premise.")**

74. **Private police can perform some of the "dirty work" that the public police cannot-either because private police are less likely to be caught in illegal behavior, or because public police are legally prohibited from acting in ways that private police are not.--- See Gary Marx, The Interweaving of Public and Private Police in Undercover Work, in PRIVATE POLICING, supra note 104, at 172, 183.**140140 **Id.; see also Joh, supra note 14, at 115-17 ( describing consequences of "dirty work" model). Private police systems, on the other hand, are created to meet the economic needs and desires of private interests. They are paid from private funds and act as the agents and servitors of their employers, who occupy**

their positions by virtue of their ownership of property or as appointed agents of stockholders or owners .... Private police systems, therefore, cannot be viewed as agencies of law and order. S. REP. No. 76-6, pt. 2, at 2 (1939)

75. Public police rely on the criminal law with its neutral, universal, and uniform criteria-as a source of legitimacy. See Albert Reiss, Jr. The Legitimacy of Intrusion into Private Space, in PRIVATE POLICING 19, 26 (Clifford D. Shearing & Philip C. Stenning eds., 1982) A management model stresses efficiency and goal-achievement, whereas a governance model takes into account broader goals of integrity, the accommodation of interests, and morality.

76. When prevention fails, however, private police often can turn to a third means: private justice systems. See Stuart Henry, Private Justice and the Policing of Labor: The Dialectics of Industrial Discipline, in PRIVATE POLICING, supra note 69, at 45-46 (defining private justice as "localized nonstate systems of administering and sanctioning individuals accused of rule breaking or disputing within groups or organizations"). (Banishment, according to the authors, isn't dead. In fact, it's reemerging as a significant form of official punishment. The reason it hasn't been recognized widely is that it doesn't come packaged as "punishment," or even "banishment," for that matter.

38

77. This reemergence of banishment should matter to criminal law scholars for a number of reasons. First, it turns out that these civil alternatives are too often a backdoor to the criminal justice system. While each of the forms of banishment studied in Seattle is classified as civil, violations of park exclusion orders, trespass admonishments, and off-limits orders are criminal offenses. Note too that because the initial orders are civil, an individual subject to, say, a parks exclusion order receives nothing like the procedural protections that a conventional criminal defendant does. (In Seattle, the police may exclude a person from a public park without providing any evidence of wrongdoing.) The effects of the orders can be considerable; large swaths of the city can be designated as forbidden to the banished person. Banishment tools may seem to city officials and the police like a clear cut method to rid a city of unwanted behaviors, but from the viewpoint of those on the receiving end of these orders, banishment can be a separation from things, places, and persons that individuals hold most dear.

78. As noted above, in passing §230, Congress voided any States' discussion of whether computer networks may be liable for their actions and thus §230 escaped any type of strict scrutiny in which the States could examine restrictions or regulations with regard to content of speech, and the possibility of criminal or civil penalties for computer networks that violate such enacted

laws for those who violate it. If State Legislators believed that speech in New Hampshire should be "inviolably preserved" and wanted to pass criminal laws for computer networks who impeded or who penalizes its citizens for their free speech in public places or forums, or if State legislators didn't like the fact that their Citizens' inviolable free speech rights in public places or forums were being decided by biased, anti-white private police located in foreign countries, or if they oppose computer networks who hire private police who use artificial intelligence practices which include "surveillance discretion", [1], automated decision making and targeting by racial or other discriminatory reasons. If State Legislators wanted to hold computer networks to a higher standard [2], §230 would impede such legislation and its power to police these activities within any particular State. Lastly, you wouldn't hear about most abuses, unless you are well known, because all these policing actions taken by private police, would be private and not in public view.

[1] See Elizabeth E. Joh, The New Surveillance Discretion: Automated Suspicion, Big Data, and Policing, 10 Harvard L. & Pol'y Review 15 (2016).

[2] The Association for Computing Machinery defines algorithmic accountability with this principle: "Institutions should be held responsible for decisions made by the algorithms that they use, even if it is not feasible to explain in detail how the algorithms produce their results." ACM U.S. PUBLIC POLICY COUNCIL, STATEMENT ON ALGORITHMIC TRANSPARENCY AND ACCOUNTABILITY 2 (Jan. 12, 2017)

I.  Is §230 unconstitutional because it is too narrowly drawn, vague or too broad as (1) it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; (2) it authorizes or even encourages arbitrary and discriminatory enforcement.

79.  "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 4151 433 (1963). It is fundamental that statutes regulating First Amendment activities must be narrowly drawn to address only the specific evil at hand. *Broadrick v. Oklahoma,* 413 U.S. 601, 611, 93 S. Ct. 2908, 2915, 37 L. Ed. 2d 830 (1973). A law regulating speech will be deemed overbroad if it sweeps within its ambit a substantial amount of protected speech along with that which it may legitimately regulate. *Id.* 413 U.S. at 612, 93 S. Ct. at 2915; *Houston v. Hill,* 482 U.S. 451, 458-60, 107 S. Ct. 2502, 2507-08, 96 L. Ed. 2d 398 (1985); *Kolender v. Lawson,* 461 U.S. 352, 359 n. 8, 103 S. Ct. 1855, 1859 n. 8, 75 L. Ed. 2d 903 (1983); *Gooding v. Wilson,* 405 U.S. 518, 521-22, 92 S. Ct. 1103, 1105-06, 31 L. Ed. 2d 408 (1972).

80.  A statute is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning." Broadrick v. Oklahoma, 413 U.S. 603, 607 (1973). A statute must give adequate warning of the conduct which is to be prohibited and must set out explicit standards for those who apply

it.  Id.  These concerns apply with particular force where the challenged statute affects First Amendment rights.  *Village of Hoffmann Estates v. The Flipside*, Hoffmann Estates, Inc., 455 U.S. 489, 499 (1982).

81.    The vagueness doctrine, "originally a due process doctrine, applies when the statutory language is  unclear, and is concerned with notice to the potential wrongdoer and prevention of arbitrary or discriminatory enforcement."   Lambert, 446 F. Supp. at 897 ; see also State v. MacElman,  154 N.H. 304, 307 (2006) (explaining that vagueness may invalidate a statute for either of two independent reasons: (1) it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2) it authorizes or even encourages arbitrary and  discriminatory  enforcement).  "A  vague  law  impermissibly delegates basic policy matters to policemen, judges, and juries for  resolution  on  an  ad  hoc  and  subjective  basis,  with  the attendant dangers of arbitrary and discriminatory application." Grayned v. City of Rockford,  408 U.S. 104 , 108-09 (1972).  "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." United Food v.  Southwest Ohio Regional Transit,  163 F.3d 341 , 359 (6th Cir. 1998).  Thus, the vagueness  doctrine  serves  to  "[rein]  in  the  discretion  of

enforcement officers." *Act Now to Stop  War*, 905 F. Supp. 2d at 330. When First Amendment interests are at stake, "[c]ourts apply the vagueness doctrine with special exactitude." Id. 351. "Without such standards, every application of the regulation creates an impermissible risk of suppression of ideas." Id. (quotation omitted). "[T]his principle applies with as much force to civil statutes as it does to criminal  laws." Id. *In Dambrot v. Central Michigan University,* the first speech code case decided by a federal appellate court.  The challenged speech code was a discriminatory harassment policy which defined racial and ethnic harassment as "any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by . . . demeaning or slurring individuals . . . or . . . using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation." As with the first two speech code cases, the Sixth Circuit found the policy to be both unconstitutionally vague and overbroad. The Court stated, "It is clear from the text of the policy that language or writing, intentional or unintentional, regardless of political value, can be prohibited upon the initiative of the university." Additionally, responding to the university's argument that the policy only prohibited <u>fighting words</u>, the Sixth Circuit held  that, even assuming this argument to be true, "the CMU policy

constitutes content discrimination because it necessarily requires the university to assess the racial or ethnic content of the speech." As such, the policy was unconstitutional on its face, 55 F.3d 1177 (6th Cir. 1995).

82. The Supreme Court has consistently held that statutes punishing speech or conduct solely on the grounds that they are unseemly, or offensive are unconstitutionally overbroad. In *Houston v. Hill, supra*, the Supreme Court struck down a City of Houston ordinance which provided that "[i]t shall be unlawful for any person to assault or strike or in any manner oppose, molest, and abuse or interrupt any policeman in the execution of his duty." The Supreme Court also found that the ordinance was overbroad because it forbade citizens from criticizing and insulting police officers, although such conduct was constitutionally protected. *Id.* 482 U.S. at 460-65, 107 S. Ct. at 2508-10. The fact that the statute also had a legitimate scope of application in prohibiting conduct which was clearly unprotected by the First Amendment was not enough to save it. In *Gooding v. Wilson, supra*, the Supreme Court struck down a Georgia statute which made it a misdemeanor for "[a]ny person [to], without provocation, use to or of another, and in his presence ... opprobrious words or abusive language, tending to cause a breach of the peace." The Supreme Court found that this statute was overbroad as well, because it punished speech which did not rise to the level of "fighting words," as defined in

Chaplinsky v. New Hampshire, supra. The Supreme Court struck down a similar ordinance in *Lewis v. New Orleans,* 415 U.S. 130, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974), on the same grounds. In *Papish v. University of Missouri*, 410 U.S. 667, 93 S. Ct. 1197, 35 L. Ed. 2d 618 (1973), the Supreme Court ordered the reinstatement of a university student expelled for distributing an underground newspaper sporting the headline "Motherfucker acquitted" on the grounds that "the mere dissemination of ideas no matter how offensive to good taste on a state university campus may not be shut off in the name alone of conventions of decency." Id. at 670, 93 S. Ct. at 1199. Nonetheless, the chilling effect caused by an overly broad statute must be real and substantial and a narrowing construction must be unavailable before a court will set it aside. Young v. American Mini Theaters, 427 U.S. 50, 60 (1976). In our case, plaintiffs argue that the UW Rule is unconstitutionally vague for two reasons: (1) the phrase "discriminatory comments, epithets or other expressive behavior" and the term "demean" are unduly vague and (2) the rule does not make clear whether the prohibited speech must actually create a hostile educational environment or whether speaker must merely intend to create such an environment. Upon review, it appears that the phrase and term referred to by plaintiff are not unduly vague. However, the rule is ambiguous since it fails to make clear whether the speaker must actually create a hostile educational environment or if he must merely

intend to do so. Thus, the phrase "discriminatory comments, epithets and expressive behavior" and the term "demean" do not appear to have vagueness difficulties. Nonetheless, as stated above, these terms fail to solve the UW Rule's overbreadth difficulties. The rule clearly reaches beyond the narrow confines of the fighting words doctrine. Although the above terms give students adequate notice of the speech which the rule prohibits and provides explicit standards for those who apply the rule, the terms nevertheless allow the rule to prohibit protected speech.

83. A federal district court found the speech provisions of the University of Michigan's harassment code to be unconstitutionally overbroad. The code forbade "[a]ny behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis of race, ethnicity, religion, sex, sexual orientation, creed… and that… creates an intimidating, hostile, or demeaning environment for educational pursuits, employment or participation in University[-]sponsored extra-curricular activities." In invalidating the speech code, the court observed that "[t]he Supreme Court has consistently held that statutes punishing speech or conduct solely on the grounds that they are unseemly, or offensive are unconstitutionally overbroad." *Doe v. University of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989). In *Corry v. Leland Stanford Junior University*,, a California state court decided the first speech code case involving a private university. At issue

was Stanford University's policy on "harassment by personal vilification," which prohibited speech "intended to insult or stigmatize an individual . . . on the basis of their sex, race, color, handicap, religion, sexual orientation, or national and ethnic origin." Again, the university argued that its policy targeted only fighting words. The court responded that the policy, even if limited to fighting words, did not prohibit all fighting words, but only those words based on the enumerated categories, violating the First Amendment's requirement of content neutrality. Secondly, the court held that the policy in fact prohibited more than just fighting words, rendering it unconstitutionally overbroad. No. 740309 (Cal. Super. Ct. Feb. 27, 1995) (slip op.). In *Booher v. Board of Regents*, a federal district court declared a sexual harassment policy to be both overbroad and vague for prohibiting, in pertinent part, expression which "unreasonably affects your status and well-being by creating an intimidating, hostile, or offensive work or academic environment." In particular, the policy "fail[ed] to draw the necessary boundary between the subjectively measured offensive conduct and objectively measured harassing conduct," giving one "the impression that speech of a sexual nature that is merely offensive would constitute sexual harassment because it makes the individual hearer uncomfortable to the point of affecting her status and well-being." This made the policy clearly capable of reaching protected

speech and therefore overbroad. The court also found that the policy "fail[ed] to give adequate notice regarding precisely what conduct is prohibited" and "delegate[d] enforcement responsibility with inadequate guidance," rendering it unconstitutionally vague. 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. Jul. 21, 1998). At issue in *DeJohn v. Temple University*, was a policy defining sexual harassment to include "expressive, visual, or physical conduct of a sexual or gender-motivated nature, when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or . . . has the purpose or effect of creating an intimidating, hostile, or offensive environment." 537 F.3d 301, 319 (3d Cir. 2008). The Third Circuit found the policy to be untenable for several reasons. First, it observed that under the policy's "purpose or effect" prong, "a student who sets out to interfere with another student's work, educational performance, or status, or to create a hostile environment would be subject to sanctions regardless of whether these motives and actions had their intended effect." As a result, the policy violated the requirement that a school "must show that speech will cause actual, material disruption before prohibiting it." Additionally, the policy's use of terms which were not clearly self-limiting, such as "hostile," "offensive," and "gender-motivated," rendered it "sufficiently broad and subjective" that it "could conceivably be applied to cover any

speech of a gender-motivated nature the content of which offends someone." Critically, "[t]his could include 'core' political and religious speech, such as gender politics and sexual morality." Thus, the Third Circuit concluded that "the policy provides no shelter for core protected speech." The court ultimately held the policy to be facially overbroad and permanently enjoined the university from re-implementing or enforcing the policy. As a strongly-worded federal circuit court opinion, *DeJohn* carries much significance and should clearly and powerfully convey the message to university administrators that speech codes are unconstitutional. In, *Roberts v. Haragan*, another case coordinated by FIRE, a federal district court considered a speech code banning the use of "physical, verbal, written or electronically transmitted threats, insults, epithets, ridicule or personal attacks" that are "personally directed at one or more specific individuals based on the individual's appearance, personal characteristics or group membership, including, but not limited to, race, color, religion, national origin, gender, age, disability, citizenship, veteran status, sexual orientation, ideology, political view or political affiliation." The court held the speech code to be facially overbroad in covering "much speech that, no matter how offensive, is not proscribed by the First Amendment." 346 F. Supp. 2d 853 (N.D. Tex. 2004). ("[A] party [may] challenge an ordinance under the overbreadth doctrine in cases

where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." (citations omitted)); **Cox v. Louisiana, 379 U.S. 536, 551 (1965). The overbreadth doctrine provides that "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" United States v. Stevens, 559 U. S. 460, 473 (2010) (quoting Washington State Grange v. Washington State Republican Party, 552 U. S. 442, 449, n. 6 (2008).**

84. In any forum, §230 is unconstitutionally vague, overbroad and viewpoint discriminatory on its face under Part I, Article 22 of the New Hampshire Constitution and the First Amendment of the United States Constitution as it authorizes and encourages arbitrary and discriminatory enforcement, enabling State Actors to administer a policy on the basis of impermissible factors. As a prior restraint that regulates speech based on its content, §230 is presumptively unconstitutional. §230 is also unconstitutionally vague and overbroad because no one can decipher its meaning, it permits and encourages arbitrary and discriminatory enforcement, and it lacks any plainly legitimate sweep. Moreover, §230 is unconstitutionally overbroad because a

50

substantial number of its applications are unconstitutional when judged in relation to a purported legitimate sweep that reaches accusations of moral turpitude and laws must provide explicit standards for those who apply them. §230 does not.

85.   §230, because it is so loosely constrained, vague or broad, it authorizes or even encourages arbitrary and discriminatory enforcement," State v. MacElman, 154 N.H. 304 (N.H. 2006), and is, therefore, unconstitutionally vague. Accordingly, the Court should hold that, on its face, §230 violates the right to free speech guaranteed by Part I, Article 22 of the State Constitution. David Montenegro v. New Hampshire Division of Motor Vehicles, 2012-624 (N.H. 2014).

J.   Does §230 provide explicit standards to prevent arbitrary or discriminatory enforcement for those who apply it?

86.   A statute must give adequate warning of the conduct which is to be prohibited and must set out explicit standards for those who apply it. "No one may be required at the peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S. Ct. 618, 619, 83 L. Ed. 888 (1939). These considerations apply with particular force where the challenged statute acts to inhibit freedoms affirmatively protected by the constitution. *Smith v. Goguen,* 415 U.S. 566, 573, 94 S. Ct. 1242, 1247, 39 L. Ed. 2d 605

1252    (1974). A regulation may be invalidated as unconstitutionally

1253    vague when "it authorizes or even encourages arbitrary and

1254    discriminatory enforcement." MacElman, 154 N.H. at 307. However,

1255    the chilling effect caused by an overly vague statute must be both

1256    real and substantial, *Young v. American Mini-Theatres,* 427 U.S.

1257    50, 96 S. Ct. 2440, 49 L. Ed. 2d 310 (1976).

1258        87. As the Supreme Court has stated, "if arbitrary and

1259    discriminatory enforcement is to be prevented, laws must provide

1260    explicit standards for those who apply them." Grayned, 408 U.S. at

1261    108. In particular, "where a vague statute abuts upon sensitive

1262    areas of basic First Amendment freedoms, it operates to inhibit

1263    the exercise of those freedoms." Id. at 109 (quotations and

1264    brackets omitted). "Uncertain meanings inevitably lead citizens to

1265    steer far wider of the unlawful.

1266        88. Because §230's "indecent materials" standard regulates

1267    Citizens speech and Commercial entities and is not susceptible of

1268    an objective definition because the words or materials they

1269    suppress could be endless and mean many things to many persons,

1270    the restriction grants computer networks the power to deny ANY

1271    material because it offends particular Congressional officials'

1272    subjective idea of what is "good taste", and should be invalidated

1273    as unconstitutionally vague as "it authorizes or even encourages

1274    arbitrary and discriminatory enforcement." *Supreme Court of New*

1275    *Hampshire* Grafton Nov 1, 2006154 N.H. 307 (N.H. 2006).

K. Are there less restrictive means available, therefore making §230 unconstitutional?

89. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. *Reno*, 521 U.S., at 874 ("[The CDA's Internet indecency provisions'] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve"); Sable Communications, supra, at 126 ("The Government may … regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest"). To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit.

90. New Hampshire's less restrictive laws already prohibit and provide for punishment with regards to speech in public places, such as: N. H. RSA 644:2. Disorderly Conduct which restricts "Words which are likely to provoke a violent reaction", in "Public places"; N. H. RSA 644:4, which restricts harassment by any method of communication; N. H. RSA 644:9, which restricts violations of other persons privacy; N. H. RSA 644:11, restricts criminal defamation. All which taken alone or collectively, these laws would be less restrictive than §230.

53

1299    91. Similarly, there are already less restrictive Federal
1300  laws that prohibits and provides for punishment and accomplish
1301  exactly what §230 looks to accomplish, such as: 47 U.S. Code §223
1302  prohibits and provides for punishment for using telecommunication
1303  devices for communications that are obscene, abusive, harassing or
1304  threatening; 47 U.S. Code §231, which prohibits commercial
1305  communication or material on the world wide web that would be
1306  harmful to minors; 18 U.S. Code §1465; for whoever knowingly
1307  produces with the intent to….distribute, or transmit…. or uses …
1308  an interactive computer service… for the purpose of sale or
1309  distribution of any obscene, lewd, lascivious, or filthy book,
1310  pamphlet, picture, film, paper, letter, writing, print,
1311  silhouette, drawing, figure, image, cast, phonograph recording,
1312  electrical transcription or other article capable of producing
1313  sound or any other matter of indecent or immoral character; and 18
1314  U.S. Code §1470 restricts and provides for punishment for  the
1315  Transfer of obscene material to minors.

1316    92. There are already plausible, less restrictive
1317  alternatives to §230 in both State and Federal laws and for this
1318  reason, §230 should be unconstitutional. If the FCC is barred by
1319  law from censoring freedom of speech that its broadcast. It doesn't
1320  make sense that the FCC is barred, but that it's ok that §230
1321  censors speech on computer networks?

93. Anarchy was inevitable where " the State is incapable of protecting its citizens in their rights of person and property. S. Rep. No 52-1280 (1892).

WHEREFORE, Plaintiff invites this Court and the United States Attorney General to stop the oppression of American's free speech in public forums and find Title 47 U.S. Code § 230 unconstitutional under both the U.S. Constitution and the New Hampshire Constitution.

Respectfully,

/s/ Plaintiff, Anonymously as Sensa Verogna
SensaVerogna@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August 2020, the foregoing document was made upon the Defendant, through its attorneys of record to Jonathan M. Eck  jeck@orr-reno.com and Julie E. Schwartz, Esq., JSchwartz@perkinscoie.com, and to the United States Attorney General as noted above.